**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN DOE,<br><br>               Plaintiff,<br><br>vs.<br><br>BGC PARTNERS, INC., TOWER BRIDGE INTERNATIONAL SERVICES, L.P., BGC HOLDINGS, L.P., and SHAUN D. LYNN,<br><br>               Defendants. | Civil Action No. 1:19-cv-06076<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

Plaintiff John Doe (a fictitious name), by his undersigned attorneys, alleges upon personal knowledge as to his own acts and experiences, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's counsel, which included, among other things, a review of public documents issued by the U.S. Securities Exchange Commission ("SEC") and other regulators, and materials published by the International Consortium of Investigative Journalists ("ICIJ") and other related public documents, as well as non-public information provided to the SEC and other regulators in connection with said investigation, as follows:

## NATURE OF THE ACTION

1.     This action arises out of Defendants' harassment, suspension and wrongful termination of John Doe (hereinafter "DOE" or "Plaintiff"), a listed products trading manager, because of his opposition to supervisory failings and securities regulatory violations and to a scheme hatched by BGC Partners, Inc. ("BGC Partners" or "BGCP") executives to misstate the performance of subsidiary BGC Financial, L.P. ("BGC Financial" or "the Firm")'s New York

listed products trading desk ("New York Desk") in the fourth quarter of 2015. Specifically, the executives stated that the Desk had lost $500,000 when in fact it had profited, thus denying DOE and the traders working for him compensation owed to them. BGCP further retaliated against DOE by offsetting the falsified losses against the Firm's London trading desk ("London Desk"), which DOE also managed.

2.     The executives' scheme was hatched to cover up losses of more than $800,000 caused by a rogue trader who was illegally trading from his apartment on a laptop computer in New York City. The scheme was also hatched to compensate the Firm for the rogue trader's losses by externalizing the costs onto DOE and his trading teams.

3.     DOE subsequently discovered additional accounting fraud, including the illegal transfer of some $2.5 million in revenue away from the New York and London Desks over about a three-year period by BGCP executives in order to make another office of the Firm appear profitable.

4.     BGCP is a publicly traded company. As a result of the misstatements and omissions described, the accuracy of financial statements regarding BGCP was compromised. Further, the activities of BGCP and related companies were concealed from securities regulators, including but not limited to the SEC, the U.S. Commodity Futures Trading Commission ("CFTC"), the National Futures Association ("NFA"), and others in the United States and the United Kingdom. The misstatements and omissions were also ultimately concealed from tax authorities, including but not limited to the Internal Revenue Service ("IRS") in the U.S. and Her Majesty's Revenue and Customs ("HMRC") in the UK. Accordingly, upon information and belief, monies otherwise subject to taxation were laundered by BGCP and/or its affiliates, including but not limited to Defendant and BGCP subsidiary Tower Bridge International Services, L.P. ("Tower Bridge").

5.      When DOE became aware of this illegal activity and other violations of securities and tax laws and regulations, he reported his concerns to his direct supervisor, Jean-Pierre Aubin ("Aubin"), Executive Managing Director of BGCP, and other corporate officials including but not limited to Defendant BGCP President Shaun D. Lynn ("Lynn"), who directly controlled Aubin, and Paul M. Pion ("Pion"), the CEO of Defendant Tower Bridge, resulting in DOE's harassment, suspension, demotion, and eventual termination.

6.      DOE also began reporting this illegal conduct to the SEC's Office of the Whistleblower before his termination in January 2017.

7.      DOE suffered harassment and retaliation in 2016 and well after his termination in January 2017, continuing to the present, for exercising his legally protected rights to inform his supervisors about, and to refuse to participate in, conduct that he reasonably believed violated laws and rules designed to protect investors from violations of the federal securities laws. Such harassment was also carried out on Defendants' behalf by Ronin Capital, LLC ("Ronin"), that company's CEO John Springs Stafford III ("Stafford"), and a Ronin market maker based in the Bahamas named Tim O'Leary ("O'Leary"), who have defamed DOE to his present employer.

8.      In December 2017, another BGCP subsidiary, Defendant BGC Holdings, L.P. ("BGC Holdings"), wrongfully denied Plaintiff deferred compensation owing to him in further retaliation for his ongoing reporting to regulators nearly a year after his termination.

9.      Because DOE was harassed, suspended and terminated for his whistle-blowing activities, which are otherwise protected under Section 806 of the Sarbanes Oxley Act of 2002 ("Sarbanes Oxley Act") (18 U.S.C. § 1514A), Defendants have violated the Dodd-Frank Act of 2010 ("Dodd-Frank Act") (15 U.S.C. § 78u-6(h)).

## JURISDICTION AND VENUE

10.     Jurisdiction in this Court over Plaintiff's claim is invoked pursuant to the Dodd-Frank Act, 15. U.S.C. § 78u-6 ("Dodd-Frank Act").

11.     This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

12.     Venue is proper within this District, pursuant to 28 U.S.C. 1391(b)(2), in that "a substantial part of the events or omissions giving rise to the claim occurred" in this District.

13.     This Court has supplemental jurisdiction over DOE's state law claims pursuant to 28 U.S.C. § 1367.

## PARTIES

14.     DOE was hired by BGCP subsidiary BGC Brokers, L.P. ("BGC Brokers") in 2012 as Head of its Futures and Options Desk in London. In November 2014, BGCP promoted him to Managing Director of the equivalent operation in New York for BGC Financial, L.P., a U.S. subsidiary of BGCP. DOE signed a new employment contract with that entity in January 2015 that superseded his British contract with BGC Brokers.[1] In Spring of 2015, DOE learned that the Firm was allowing some of its traders operate unsupervised. He also learned that the Firm had issues with licensing in other offices. In Summer 2015, Defendant Lynn asked DOE to recruit a new trader for BGCP's Singapore office. The recruit observed that the Singapore office was sparsely staffed, and BGCP had not renewed its futures license with the Monetary Authority of Singapore ("MAS"). BGCP executive Mark Webster attacked DOE in emails over this incident, and Aubin threatened DOE's job. As DOE tried to clear up the problem,[2] Defendant Lynn offered him an exit from the Firm. In Fall of 2015, Defendant Lynn and Aubin misstated the profitability of the New

---

[1] DOE was first a partner of BGC Brokers in the UK and then an employee of BGC Financial in the U.S.

[2] In trying to make amends with Defendant Lynn, DOE had also mentioned meeting a former board member of another BGCP subsidiary who recently joined a Russian-owned hedge fund. This person had told DOE that he knew Defendant Lynn.

York trading Desk. DOE investigated, and was harassed by Aubin and others controlled by Defendant Lynn and BGCP Chairman and CEO Howard Lutnick ("Lutnick") as he reported his findings internally and to the SEC.[3] DOE was terminated in January 2017 after he refused to see doctors the Firm hired to discredit him. DOE then learned that BGCP subsidiaries and affiliated companies, as well as executives including Lutnick, are on the ICIJ "Panama Papers" database and may have connections to Russian organized crime via companies based in Cyprus, Malta, and elsewhere.[4] A copy of DOE's report to regulators about the foregoing is attached as an addendum hereto as **Exhibit A** and incorporated by reference as though fully set forth herein. As DOE continued to convey his findings to the SEC and other regulators, providing material assistance to their investigations into these and other related matters, Defendants and others whose help they enlisted defamed him to potential employers and worked to blacklist him from the securities industry.

15.     Defendant BGCP is a Delaware corporation with its principal place of business in New York, New York. It is a publicly held company listed on the NASDAQ. As described herein, BGCP controls a company share scheme known as the "Newton Plan" and other compensation for those working for the Firm as well as the Global Charity Day that raises money from employees for the Cantor Fitzgerald Relief Fund. Also, as described herein, several other BGCP personnel have personal knowledge of, and were involved in, the events forming the basis for this action.

16.     Defendant Tower Bridge is a UK-based partnership that administers payroll and registration for BGCP and its subsidiaries, including the Firm's employees in New York. As such,

---

[3] Lutnick is also the Chairman and CEO of Cantor Fitzgerald; that company's personnel were also involved in retaliation toward DOE during the relevant period, as described herein.
[4] *See, e.g.*, https://offshoreleaks.icij.org/nodes/55035700 and https://offshoreleaks.icij.org/nodes/81027346.

it also administers company share plans and deferred compensation.[5] A BGCP Accounting Department employee in London who helped DOE investigate the false $500,000 loss described herein described Tower Bridge as "tax haven." Tower Bridge also assists BGCP in registering and paying brokers in one country while they work in another, evading tax and regulatory reporting obligations. Pion has been Tower Bridge's CEO since 2012, taking over from former BGCP Chairman and CEO Lee M. Amaitis ("Amaitis").[6] DOE's investigation of BGCP's and affiliate Cantor Fitzgerald's corporate structures after his termination lead him to the ICIJ's Panama Papers database, which includes  a listing for Pion and what appear to be entities affiliated with Tower Bridge.

17.     Defendant BGC Holdings is a Delaware limited partnership. In December 2017, on the pretext that DOE had violated non-compete terms of his UK employment contract, BGC Holdings wrongly denied DOE deferred compensation he had earned while at BGC Brokers in the UK because he had taken a position the previous month with Square Global Ltd. ("Square Global"). This was improper because DOE's UK contract had been superseded by his U.S. employment agreement, which he had executed with BGC Financial in January 2015. Furthermore, BGC Financial had released DOE from his non-compete obligations in May 2017. BGC Holdings also wrongfully refused to pay DOE other deferred compensation owed to him during the relevant period in further retaliation by BGCP and Tower Bridge against DOE for his reporting to the SEC and other regulators.

18.     BGCP, Tower Bridge, and BGC Holdings (collectively, the "Corporate Defendants") each had and exercised supervisory powers over DOE, including the power to

---

[5] During the relevant period, DOE participated in what was called the "Newton Plan," in which he was required to invest 10% of his gross income each year.

[6] As described below, upon information and belief, Amaitis also played a role in Defendants' retaliation against DOE.

suspend and terminate his employment and to grant or deny him compensation. As such, BGCP, Tower Bridge, and BGC Holdings are considered "employers" pursuant to the applicable provisions of the Dodd-Frank Act.

19.      Defendant Lynn was at all relevant times an Executive Officer of BGCP, serving as its President. Defendant Lynn was Lutnick's second-in-command at what is known as the Cantor Fitzgerald family of companies, which included BGCP, and Aubin's direct supervisor during the relevant period. He was the individual directly responsible for the actions of BGCP described herein and was the individual who initiated the process of BGCP's making misstatements and omissions regarding the New York trading desk's production recalculations in Q4 2015, and ultimately retaliated against DOE for reporting his concerns.

20.      Defendant Lynn had and exercised supervisory powers over DOE, including the power to suspend and terminate his employment. As such Defendant Lynn is considered an "employer" under the applicable provisions of the Dodd-Frank Act.

### NON-PARTIES

21.      BGC Financial is a Delaware limited partnership with its principal place of business in New York, New York. BGC Financial is a FINRA member firm and has been registered with the SEC since 2008, when it was spun off from Cantor Fitzgerald. It is an inter-dealer broker that facilitates transactions in securities and other financial instruments between broker-dealers, dealer banks, and other financial institutions. BGC Financial employed DOE from November 2014 to the end of January 2017. BGC Financial is a subsidiary of BGC Partners, Inc. and an affiliate of Cantor Fitzgerald & Co.[7]

---

[7] See https://www.sec.gov/Archives/edgar/data/1094831/000119312512115541/d293185dex211.htm.

22.     Cantor Fitzgerald & Co. ("Cantor Fitzgerald" or "Cantor"), also a FINRA member, was originally founded in 1945 by Bernard G. Cantor. Cantor has historically specialized in institutional equity and fixed income sales and trading. More recently, Cantor has moved into new business lines like wagering and gaming and commercial real estate.

23.     BGC Financial and Cantor Fitzgerald are both affiliates of BGCP. These companies have principal places of business in New York, New York. They largely share executive management teams, as well as Human Resources ("HR"), Legal, Compliance, and other related departments. They also share broker registration and payroll systems that are run through Tower Bridge. Both companies are controlled and managed by Lutnick and are his alter egos. The executive structure is a close-knit and tightly controlled group, with most of the same executives also managing these companies' affiliates and reporting directly to Lutnick.

24.     Lutnick is the Chairman and CEO of BGCP and Cantor Fitzgerald. Lutnick first joined Cantor Fitzgerald as a trainee in 1983. In 1996, he wrested control of the company through a "palace coup" in which he forced a takeover via a vaguely worded succession plan, maintaining that his mentor and the company's founder, Bernard G. Cantor, was "incapacitated." Lutnick emerged from such acrimonious dispute as the self-described "apex executive" of what he calls the Cantor Fitzgerald family of companies. He has personal knowledge of, and was involved in, the events forming the basis for this action.

25.     Aubin was DOE's direct supervisor during the relevant period and has personal knowledge of, and was involved in, the events forming the basis of this action. Aubin joined BGC Financial in 2005 as Global Head of Listed Products and was Executive Managing Director at BGCP during the relevant period. He worked closely with Amaitis, particularly in Europe and Asia, to expand Cantor Fitzgerald's business after 9/11. He continues to do so. Like Amaitis, Aubin

has a history of litigation brought against him by former employees, including a sexual harassment court case in New York, New York, and FINRA arbitrations.[8] During the relevant period, Aubin was under the direct official control of Defendant Lynn at BGCP.

26.     Amaitis joined Cantor Fitzgerald in 1995 and had been Lutnick's second-in-command for most of his career until Defendant Lynn assumed that role more recently. Amaitis helped create and run Tower Bridge. He helped Lutnick wrest control of Cantor Fitzgerald from its founder in 1996. He also helped Lutnick create and run eSpeed, an electronic platform for trading U.S. Treasuries. When BGCP spun off from Cantor in 2004, Amaitis was its Chairman and CEO. Since then, he shifted his focus to Cantor's gaming business. Amaitis recently faced a federal probe into money laundering at CG Technology in Las Vegas. In September 2016, Amaitis returned to New York after the federal probe ended, and gave up his FINRA broker licenses. Amaitis has personal knowledge of, and was involved in, the events forming the basis for this action.

27.     Pion is Amaitis' successor as CEO of Tower Bridge. Pion has personal knowledge of, and was involved in, the events forming the basis for this action. Pion is an American citizen and runs Tower Bridge from New York City. On the ICIJ Panama Papers database, he is at https://offshoreleaks.icij.org/nodes/80112898.

28.     Ronin is a FINRA-member firm that provides proprietary trading services. It operates on listed exchanges in various product classes, including equities, fixed income, commodities, currencies, options, forwards, and futures. It was founded in 2001 and is based in Chicago, with additional offices in New York, London, and Singapore. Ronin encouraged and

---

[8] BGC broker Kelly Dunloy named Aubin in a 2012 case filed in the United States District Court for the Southern District of New York; BGC managers Ray Walton and Michael Riffice filed FINRA arbitrations against BGC in 2013 and 2015, respectively, based in large part upon Aubin's misconduct.

supported the participation of its employee, market maker Tim O'Leary, in the events forming the basis for this action.

29.     Stafford is the CEO of Ronin, which is his alter ego. Stafford has personal knowledge of, and was involved in, the events forming the basis for this action, including the activities and misconduct of O'Leary.

30.     O'Leary is a market maker with Ronin and a close associate of Aubin. He is not licensed with FINRA, the NFA, or with the Financial Conduct Authority ("FCA") in his native England and operates unsupervised out of his home in the Bahamas.[9] O'Leary has personal knowledge of, and was involved in, the events forming the basis for this action.

## STATEMENT OF FACTS

### I.     DOE Accepts Employment with BGC Brokers in London.

31.     DOE joined BGC Brokers in 2012. Before joining BGC Brokers, he had been successfully managing a team of traders at Nomura, producing $10 to $12 million a year in revenue. DOE was assigned the position of Head of the Futures and Options Desk at BGC Brokers' London Desk, and brought most of his team at Nomura with him.

32.     As part of his compensation package, DOE was granted partnership in BGC Brokers (the "Partnership") and was awarded 2,000,000 Partnership Units, a portion of which he shared with his incoming team.

33.     As Head of the London Desk, DOE reported directly to Aubin, Executive Managing Director at BGCP. Aubin also supervised the New York Desk. Aubin reported directly to Defendant Lynn.

---

[9] A business O'Leary apparently controls in the Bahamas is also on the ICIJ Panama Papers database. *See* https://offshoreleaks.icij.org/nodes/20175098 and http://panama.data2www.com/e/20175098.

34.     Although responsible for ultimate supervision of the London Desk, Aubin had little understanding of or knowledge about its daily activities or that of its sister operation at the New York Desk. During DOE's onboarding, Aubin provided a list of brokers he said DOE would be "inheriting" as supervisees in London. As DOE and his team settled in, however, he learned that several of the brokers on Aubin's list were no longer employed by BGC Brokers.

35.     Aubin also had little regard for the traders who worked the desks under his supervision, improperly denying them compensation so BGC Brokers—and, later, BGC Financial—could appear more profitable than it was. The first instance of Aubin denying DOE and his team compensation occurred within a year of their arrival at BGC Brokers.

36.     Following guidance published by the British Financial Services Authority ("FSA") in May 2012 regarding payment for order flow ("PFOF"), which suggested that inter-dealer brokers like BGC Brokers would no longer be able to charge market makers for trades because such payments could be seen as improper inducements, several market makers refused to pay BGC Brokers approximately $600,000 USD owed and in arrears.

37.     Rather than properly account for these outstanding payments, which would have required BGC Brokers to disclose them as "aging debt" on its financial statements, in 2013, Aubin confiscated $600,000 from the London Desk's revenue pool to satisfy the outstanding debt.

38.     Under DOE's contract, the $600,000 should have been allocated as revenue brought in by the London Desk and thus included in the firm's calculation of DOE's compensation and the compensation of his team of traders. The denial of bonuses came at the worst time—Christmas—sowing significant discontent among DOE's team.

39.     Defendant Lynn and Sean Windeatt ("Windeatt"), BGCP's COO in the U.K., directed Aubin to reimburse the firm for the unpaid PFOF amounts rather than compensate DOE's team.

40.     The FSA had also recently put the brakes on BGC Brokers' expansion in the UK in 2011 because its anti-money laundering ("AML") controls were inadequate.[10] It explicitly required BGC Brokers to tighten these controls. BGC Brokers provided some on-line training to its employees but otherwise did not substantively change its policies and procedures.

41.     "We [BGC Brokers] are at war with the FSA," Aubin declared, and tried to transfer DOE and his team to France, though none were licensed there. His rationale: BGC was willing to "work around" registration rules to escape the FSA's jurisdiction. DOE and his team refused, considering the regulatory implications of what Aubin proposed.

42.     In 2013, BGCP sold off eSpeed to Nasdaq OMX Group, Inc. As compensation to partners for the sale, the Firm issued its own shares at a buy level well below market, but also took back some of these "to pay for tax liability." The Firm provided no accounting for this transaction, which amounted to nothing more than BGC Partners improperly externalizing its own tax and related liabilities onto its partners, increasing their individual tax liability in order to lower the Firm's. Put bluntly, BGC Partners got a "tax break" that was unwittingly and unwillingly subsidized by its own partners.

43.     There was no training for partners to explain how the "take-back" would "pay for tax liability," and when they would be allowed to redeem the shares they still held after the "take-back." Instead, BGCP executives spoke "informally" about what would happen with their money. Shortly after the eSpeed sale closed, Mark Webster, then head of trading in BGCP's London office,

---

[10]  *See* https://www.telegraph.co.uk/finance/newsbysector/banksandfinance/8587646/FSA-hits-BGC-with-controls-after-finding-weaknesses-in-governance-procedures.html.

informed DOE and the other partners that the sale had created a large tax liability for BGCP and that "BGC don't like paying tax."[11] This would not be the first, or the last, time DOE would wonder, "Where did the money go?"

## II.     BGC Partners Requires DOE to Move to New York.

44.     In or around October 2014, because BGCP's North American business was losing money and the Firm was about to fire DOE's predecessor at BGC Financial, Mike Riffice, BGCP asked DOE to add management of the New York Desk and the Chicago Futures Execution Desk to his responsibilities. BGCP also promoted DOE to Managing Director—a position he had been promised two years before, when he joined BGC Brokers.

45.     BGC Financial fired Riffice after he internally reported his concerns about the Firm's regulatory compliance—just as BGCP would later orchestrate DOE's termination due to his reports.[12]

46.     DOE moved to New York, New York in or around late 2014. He signed a one-year lease, which required him to pay a broker fee (typically 12.5% of a year's rent), a deposit of one month's rent, and rent for the first month—a total of about $15,000.

47.     In reliance on BGCP's promise to employ him in New York, DOE withdrew from the BGC Brokers partnership and sought to cash in some of his Newton Plan shares. Rather than allowing him to cash in shares, BGCP executives pressed DOE to take a loan in exchange for the

---

[11] DOE notes here that Amaitis had a significant role in eSpeed's administration since its creation and likely through its final sale to NASDAQ OMX Group, Inc. in 2013. As described in more detail in the addendum attached hereto as **Exhibit A**, eSpeed may also be implicated in relation to the Panama Papers, and money laundering more generally.

[12] In this period, BGC Financial was being pressured by its guarantor Barclays to update its supervisory controls in the U.S. as it strained against limits imposed on its use of margin. In the end, BGC Financial was forced to find a new guarantor. The Firm gave Riffice this task, a job well outside of his contract. After forcing Riffice to fix this problem instead of producing, Aubin used the resulting decline in earnings as a pretext to fire him. Though Riffice secured a new guarantor for BGC Financial, replacing Barclays with ABN AMRO, few of the supervisory problems necessitating that change were resolved. When Riffice spoke up about these persistent problems, he was fired for being "insubordinate."

shares. DOE later learned that BGCP had done the same thing to Riffice, forcing Riffice to pay back the loan—without having received any of his shares—when it terminated him from BGC Financial.

48.     Because he would be managing a team of brokers trading listed products in the United States, DOE needed to obtain a Series 30 license. This required him to pass the "Series 30 – NFA Branch Manager Exam" (formerly entitled, "Branch Managers Exam – Futures"). The purpose of the Series 30 is to provide assurances to FINRA that teams of futures traders are being properly supervised, including that firms employing such traders are ensuring compliance with applicable regulations. Series 30 managers are required to sign off on the trading activity of the traders under their supervision, which functions to inform the NFA and the CFTC that the trading activity complies with applicable regulations. Studying for and passing a Series 30 exam can take several weeks. During that time, DOE would not be legally permitted to supervise the New York Desk.

49.     The Firm had terminated Riffice before promoting DOE to manage the New York Desk, leaving the desk without a manager. To fill this gap while DOE prepared for and took the Series 30 exam in London, Senior Vice President of New Business at BGCP, Kristi Haas, was installed as the temporary Series 30 to supervise the New York Desk. Although she had a current Series 30 license, Haas had little experience managing listed products trading. Indeed, she had not actively traded or supervised traders since at least 2006, her last year as an Operations Manager at BGCP.

50.     Nonetheless, because supervising the New York Desk would add to Haas' duties, the Firm required that she be paid an additional $10,000 in compensation for supervising the New York Desk until DOE received his Series 30.

51.     Rather than pay Haas out of Aubin's "pool," or allocate other Firm funds to compensate her, Aubin demanded that DOE pay Haas an "offline" bonus out of his personal funds. Aubin told DOE that, if he failed or refused to pay Haas, Lou Scotto ("Scotto") would be "livid." Scotto was then co-CEO of BGC Financial—one of the few at the Firm who had direct authority over DOE.

52.     Jon McLachlan, Aubin's Business Manager at BGCP, informed DOE that he would be reimbursed once he passed his Series 30.

53.     Despite passing his Series 30, however, DOE encountered significant resistance to his request for reimbursement for paying Haas. Finally, DOE went to Scotto directly. Scotto told DOE that he had never directed Aubin to require DOE to pay Haas. Instead, Scotto had directed Aubin himself to pay Haas.

54.     Moreover, DOE was never fully reimbursed for the payment to Haas because the reimbursement was made from bonus pool funds, requiring him to pay taxes and allocate ten percent of it to the Newton Plan (which is more fully described below).

55.     The Firm also failed and refused to pay DOE for the first four months after he took over the New York Desk. BGCP executives excused this failure and refusal by saying they were unable to pay DOE until he had a U.S. Social Security number. Because Aubin required DOE to return to London at least once a month, his stays in the U.S. were too short to qualify for a Social Security number; he was submitting new applications every few weeks.

56.     Eventually, rather than paying him as an employee, the Firm paid DOE's monthly rent in New York until he was able to obtain a Social Security number.

A.     **The Newton Plan.**

57.     BGCP requires its brokers to contribute 10% of their gross earning into a share scheme it calls the "Newton Plan." When BGCP informed DOE of this requirement, it told him

only that his ability to sell shares during his employment with BGC Financial was subject to management approval but that such approval was not difficult to obtain.

58.     Otherwise, BGCP provided little information about the Plan. Specifically, BGCP provided no information about the Plan's vesting schedule or procedures for cashing in shares that had vested.

59.     As it turned out, BGCP would not allow the Firm's employees to cash in shares—unless they committed to another several-year contract term, guaranteeing that additional compensation would be withheld and used by the Firm as additional leverage in the future. DOE would later hear from other BGC Financial employees about their difficulties with the Firm in this regard, causing him to wonder if the Newton Plan was a Ponzi scheme.

60.     DOE's suspicions grew in mid-2015 after BGCP took over GFI Group ("GFI"). GFI CEO Mickey Gooch had stated in a December 2014 deposition, which was broadcast on Bloomberg Television in May 2015, that "[BGCP] have committed to committing crimes [including] money laundering." Gooch also said that "[BGCP's] relationship with their employees is outrageous. They're in constant litigation with their own employees. All of the highest producing brokers in [GFI] would never work for [BGCP] under any circumstances." Gooch added, "…I consider the structure of [BGCP] and their stock to be an extremely risky dividend Ponzi scheme that could collapse at any time."[13]

61.     GFI employees who shared Gooch's beliefs were concerned that they would lose much of the value of their Restricted Stock Units ("RSUs") in GFI in the takeover, and that the RSUs would be exchanged for what they called "Howie Dollars" (named for Lutnick) or

---

[13]   *See*   http://www.msn.com/en-us/money/watch/inside-mickey-goochs-bgc-buyout-trash-talk/vi-BBk4hIr.   Gooch abruptly ended his criticism of BGCP after receiving some $285 million when the merger was completed. *See also* http://www.independent.co.uk/news/business/news/gfi-chief-loses-control-of-his-destiny-but-ends-up-285m-richer-10061102.html.

partnership shares of [BGCP] that they considered of questionable value. In their words, "There is absolutely no vesting schedule. There are several different types, which give you some sort of participation, but at the sole discretion of the managing member. You're at their mercy. [BGCP's] game is that they'll let you cash in a million [dollars' worth of shares] but you have to put 15% of your future income into more of their [BGCP] partnership interests. So, you get some out, but you have to put a lot more in. Other times they're granted in the form of loans. You do get a dividend but that's in lieu of your bonus compensation."[14]

      **B.**    **DOE's U.S. Employment Agreement with the Firm.**

62.    DOE signed his U.S. employment agreement with BGC Financial on or about January 21, 2015, during a period in which BGCP was not paying DOE on time for his work in New York, and he was under severe financial pressure, as described above. A copy of DOE's employment agreement is attached hereto as **Exhibit B** and incorporated by reference as though fully set forth herein. Aubin told DOE to either sign the employment agreement and related documents as written or lose his job.

63.    Pursuant to the agreement, DOE was to be paid a base salary of $36,000 per year. This salary was "not subject to reduction due to variations in the hours worked or the quality of quantity of" his performance. Section 3(a).

64.    DOE was also entitled to compensation pursuant to "an incentive pool compensation arrangement (the 'Pool')[.]" Section 3(b).

65.    DOE Pool was calculated based on the performance of "BGC's North American Futures and Options Desk (excluding the Chicago Futures Execution Desk) and the London Financial Futures and Options Desk (the 'Desks')"—the desks DOE managed.

---

[14] *See* the December 30, 2014 article in *The Observer*, at https://observer.com/2014/12/exclusive-gfi-top-performers-threaten-to-quit-en-masse-if-bgc-wins-tender-offer/.

66.     The Pool was "an amount equal to" 50% of each desk's net revenues minus salaries, taxes, and certain administrative expenses.

67.     Accordingly, by definition, each desk's net revenues were to be calculated separately, as were each desk's "Desk Compensation."

68.     The amount of the Pool was calculated on a quarterly basis and bonuses paid from the Pool were "payable within 45 days after the last day of the" quarter.

69.     DOE was also to be paid a "variable draw at the annualized rate of three hundred sixty-four thousand dollars ($364,000)," plus bonuses. Bonuses were to be awarded following DOE's recommendation regarding how to allocate the Pool, after required deductions. The Firm agreed that it would not make bonus decisions without receiving DOE's recommendations and consulting with him.

70.     The Firm retained the right to reduce DOE's draw and/or salary if the Net Revenues for his Pool fell below certain levels—setting the stage for Aubin to manipulate accounting to deny DOE and his team their well-earned compensation.

71.     The employment agreement also provided that 10% of DOE's compensation was to be paid as a non-cash grant that was to be put into the Newton Plan.

72.     Although the employment agreement states that the non-cash grant was "subject to the terms of the grant documents under which such non-cash grant was awarded," few substantive documents for the Newton Plan were ever provided to DOE—despite multiple requests.

73.     Because the majority of DOE's and his team's compensation depended upon their ability to generate revenue, the Firm also agreed to exclude the performance of certain traders from the calculation of DOE's Pool. The excluded traders were not members of DOE's original team, and they had been underperforming for some time. Thus, to protect DOE's team's revenues from

dilution, the Firm agreed to compensate these traders based solely on their individual performance and not from the total available Pool.

74.     As it turned out, in late 2015, BGCP and the Firm refused to honor this agreement, retroactively reducing the Pool by, among other things, including revenue from underperforming traders in order to avoid paying earned compensation, including bonuses, to DOE and his team.

75.     BGCP only went back on its word after DOE began identifying and objecting to the Firm's regulatory violations regarding trader supervision in New York.

## III.    Defendants Retaliate Against DOE Because He Reported His Reasonable Belief That the Firm was Engaged in Regulatory Violations.

### A.    DOE Objects to Rogue Traders in New York.

76.     In late April 2015, DOE learned that BGC not only tolerated, but supported, rogue traders, even when their trading activity hurt clients. Worse, when rogue traders' activities hurt BGCP and related companies, BGCP directed subsidiaries like BGC Financial to pilfer from its other employees' pools—like DOE's—to avoid having to declare a loss.

77.     On or about April 28, 2015, BGC Financial compliance officer Steve Duchene ("Duchene") informed DOE that Aubin had authorized a trader in New York named Richard Anthony ("Anthony") to trade e-Mini S&P, also known as "Mini S&P." Mini S&P refers to futures contracts that are one-fifth the size of standard S&P futures and are electronically traded on the Chicago Mercantile Exchange. Trades in Mini S&P should be supervised by a firm's Series 30. Further, Mini S&P involves a high use of margin. It is one of the fastest-moving futures products, traded in one of the largest and most volatile markets.

78.     Anthony's primary experience was in trading equities. He was not a member of DOE's team and did not sit on DOE's floor. Anthony did not have access to the futures trading platform used by DOE's team, so Aubin had also provided Anthony with his own trading platform,

giving him essentially free rein to trade without supervision in a market new to him in which the risks were far higher than many other markets.

79.     Aubin did not ask for or receive input from anyone else, including DOE, before approving Anthony to trade a product with which he had no experience in a market with which he had very little experience. Aubin's unilateral sign-off was also unusual because Aubin operated primarily in Paris, France and Nyon, Switzerland. He only rarely visited New York and, thus, had no real ability to supervise Anthony.

80.     Typically, futures trading in an inter-dealer broker setting is segregated from other types of trading and is heavily supervised, in part due to the high level of regulatory oversight of exchange-based products. As the Series 30 for the New York Desk, supervision of futures traders in New York was DOE's responsibility.

81.     DOE objected to the arrangement for Anthony. Anthony had held a Series 3 license—which allowed him to sell commodities futures contracts and options on commodities futures contracts—for fewer than six years. He had limited experience trading futures.[15]

82.     DOE viewed the arrangement—allowing a relatively inexperienced broker to trade unsupervised—as "a disaster waiting to happen." He was not willing to expose the Firm to such risk and refused to sign off on Anthony's trading activities. Instead, DOE suggested that Anthony "place orders through the desk"—i.e., DOE's desk—"and we will rebate him," an arrangement that was already in place with Scotto. The suggestion was ignored.

83.     DOE was also concerned that Anthony would front-run against other BGC Financial clients. Aubin had left the Firm's trade booking system open to the whole Firm—to other trading teams in New York as well as in other offices—so all trading teams had access to all other

---

[15] Earlier in Anthony's career, possessing only a Series 7, his flawed options trading strategies caused losses over $15 million to three separate clients at Alex Brown & Sons, Inc.

trading teams' accounts and trades. Anthony's own book of clients had been dwindling, as had the books of the team of traders Anthony was managing on the Firm's equities desk in New York, giving Anthony incentive to "poach" from other trading teams' books.

84.   DOE's concerns were not misplaced. On or about September 30, 2015, Anthony put up a trade of 120,000 VIX futures contracts for BlackRock, Inc. ("BlackRock") with only two market makers instead of the customary four to six. Anthony also failed to check the market for interest by other participants, including other BGC Financial clients, busting through resting and potential bids that other BGC Financial traders had set for their institutional clients.

85.   The procedure Anthony should have followed was to 1) call around to the other desks and banks (including the Firm's clients) with proposed bids for transparency so that they could put in bids of their own, 2) call the market makers (4 to 6, at least), 3) call the floor and check price, and then 4) find best price and put up the trade. Anthony did only one of these—he had the floor broker put up the trade—skipping the other steps altogether.

86.   Because Anthony did not allow the floor brokers to first gauge their own interest and possibly contribute bids, Anthony caused the transaction to go through at a unit price of about a dollar lower than what other participants would have paid. This constitutes a market conduct rules violation.

87.   It also set off an uproar among the other BGC Financial traders. As the Series 30, DOE was the first manager to hear about the incident. The Firm's other clients—who had not been given the opportunity to participate in the trade—also voiced their shock at Anthony denying them bids on a trade that size.

88.   Moreover, because Anthony did not trade with the pit or "on the screen," as he was required to do under applicable regulations and the Firm's own policies and procedures, he

received commissions and rebates not only from BlackRock but from the two market makers and the floor broker. Had Anthony traded in compliance with regulations and internal policy and procedure, he would have received a commission only from BlackRock.

89.     Aubin reacted not by admonishing Anthony but by bullying Compliance. In an email to Duchene and BGC Financial Chief Compliance Officer Michael Sulfaro ("Sulfaro") on or about October 2, 2015, Aubin demanded to know, "Did you talk to my guys before talking to me?" Aubin indicated that Compliance should always speak to him before anyone else. Duchene quickly placated Aubin to avoid further browbeating.

90.     In an email sent on or about October 5, 2015, DOE further explained his concerns to Aubin about an inexperienced broker working in futures, crossing unsupervised, and the risks that posed to BGC. DOE reminded Aubin that crossing at the wrong market level could open the Firm to complaints from other market participants as well as regulatory investigation.

91.     "Crossing" at the wrong market level refers to cross trades that were not executed at a price that corresponds to the prevailing market price when the trades were executed.[16]

92.     Aubin replied that Compliance "was fine with the trade" and "had no issue with it."

93.     DOE told Aubin that it was his duty to point out "potential risks to the business" but did not continue the argument. Plainly, Aubin—who had supervisory authority over DOE— had made up his mind.

---

[16] A "cross" trade occurs when a broker executes matched buy and sell orders for the same security across different client accounts and reports them on an exchange. For example, if Client A wants to sell and Client B wants to buy, a broker is permitted to match the two orders without sending them to an exchange to be filled. This type of trade is only permitted if the broker reports the reports the transactions in a timely manner after they occur. The transactions also must be time-stamped with the time and price of the cross, and the trades must be executed at a price that corresponds to the prevailing market price at the time.

94.     When BGC Financial traders and managers told Aubin how displeased their clients were with what had happened, he responded, "Tell them it will happen again." Scotto and then co-CEO of BGC Financial Shawn McLoughlin ("McLoughlin") sided with Aubin.

95.     Upon information and belief, Anthony and Aubin received additional improper inducements from the two market makers Anthony contacted and other market participants in the form of entertainment and/or other non-cash compensation that was not recorded on the Firm's travel and entertainment ("T&E") books.[17]

96.     Aubin administered T&E for BGC employees in New York, including Anthony. In his role as manager of the BGC Financial equities desk in New York, Anthony had signed off on T&E for all brokers on that desk, relaying his reports to Aubin for approval.

97.     DOE later learned that Anthony was not the only rogue trader in New York.

98.     In or around late April 2015, a trader named Mourad Jridi ("Jridi") lost more than $800,000 trading on his laptop from his living room in an unauthorized institutional-sized cash trade in a risk arbitrage transaction. Because the trade was unauthorized, the loss was borne by BGC Financial and ultimately BGCP, not the client.

99.     Jridi was employed in the New York office of BGC Financial. He was assigned to be monitored by Eugene Croddick ("Croddick"), a Series 24 licensee managed by Bob Velez ("Velez"), an equities trading manager. Croddick and Velez had significant concerns about Jridi's trading activities, including his penchant for working from home and the abnormally high frequency of his trades, which often generated $500,000 to $800,000 per month in commissions.

---

[17] Anthony was a subject of the SEC's Order in Administrative Proceeding File No. 3-18598, released in July 2018. The Order outlined the issues relating to T&E record-keeping at BGC Financial—and the Firm's improper destruction of relevant recorded communications—but did not address the other supervisory issues DOE describes above.

Croddick and Velez informed Duchene and Scotto of their concerns. Duchene and Scotto were also concerned.

100.    After engaging in detailed email and oral discussions about Jridi's trading with the Firm's Compliance Department, Velez told McLachlan at BGCP that he no longer wanted to supervise Jridi, given the risks Jridi posed to the Firm. McLachlan advised Velez to speak to Aubin about it.

101.    Aubin was unconcerned. He was equally unresponsive to the statements of the Firm's management in New York, including the Compliance and HR Departments, warning him that Jridi's trading posed an unacceptable risk.

102.    Nonetheless, Velez convinced Scotto to take on supervision of Jridi. Aubin agreed to share this duty with Scotto, although Aubin, who was rarely present in the New York office, had little ability to supervise anyone in New York.

103.    Just days after Velez was able to remove Jridi from his supervision, Jridi wrongly anticipated a client's position and traded ahead of the client's instructions. When Jridi received the client's instructions and saw that the trade had gone against the client, he doubled down, increasing the loss.[18]

104.    The loss would not appear on a profit and loss statement until the next month, but Lutnick directed Aubin to find an immediate solution. Rather than reporting it to the Firm's insurer—probably because a loss due to unauthorized trading would not be covered—Lutnick told Aubin in a face-to-face meeting to find an internal source of funds to cover the loss.[19]

---

[18] After Velez communicated his concerns regarding this and similar issues to Defendant Lynn and other executives at BGCP and BGC Financial, including but not limited to Aubin and Scotto, BGC Financial terminated him at BGCP's direction in August 2016.

[19] After learning of the Jridi incident, Lutnick summoned Aubin to get on the next plane to New York from London to explain what had happened. Before this meeting, Aubin expressed fears of losing his job to Velez.

105.    Aubin chose DOE's New York and London pools as the source of those funds.

106.    Aubin's approval of Jridi's conduct was particularly troubling because the Firm was aware that brokers were not generally permitted to trade at home on their laptops, without supervision. On or about January 12, 2016, Dyanne Rosado, Deputy Director of Human Resources for Cantor Fitzgerald ("Rosado"), sent an email that reminded employees about the Firm's work-from-home policy. The email emphasized that such arrangements were "rare," citing "security and compliance issues."[20]

### B.    DOE Witnesses a Hiring Debacle in Singapore.

107.    In Summer 2015, Defendant Lynn and Aubin asked DOE to help BGC Partners (Singapore) Limited recruit Elise Choukroun, a futures trader from Israel, to the Singapore office. Being a team player, DOE agreed, although the task was well outside his contractual duties.

108.    During the recruiting period, Choukroun visited the Singapore office. She told DOE that "something was off" there—the office was sparsely furnished and appeared to have few staff. Choukroun said, "It was like something out of that scene in *The Boiler Room*."

109.    When Mark Webster, BGCP's Executive Managing Director for East Asia based in Hong Kong, learned of Choukroun's visit to Singapore, he personally attacked DOE, sending him obscenity-laced emails. It turned out that the Singapore office did not have a license for futures trading, and Webster had no intention of getting one—and Choukroun's visit brought this circumstance to light. Though Choukroun could have worked in Singapore conducting other types of trades, Webster refused. He said he "didn't want MAS involved."

110.    Instead of protecting DOE, Aubin took Webster's side, accusing DOE of "putting the BGC Franchise at risk."

---

[20] DOE and others at the Firm considered it odd that an HR official at Cantor Fitzgerald would be sending a memo around that would normally be the province of the Compliance Department at BGC Financial.

111.    DOE turned to Eva Chan, HR Manager, VP – Asia Pacific for BGCP/Cantor Fitzgerald in Hong Kong, reaching out to her multiple times about Webster's abuse. Chan never responded. Defendant Lynn was also unresponsive to DOE's inquiries. The stress and confusion of this experience, which overlapped the work required to run the New York and London Desks, caused DOE to have a heart attack.

112.    DOE's heart attack kept him in the hospital for a week and out of the office for two more weeks. After DOE returned to work, he made efforts to clear up the Singapore issue with Defendant Lynn and to repair the damage to his relationship with BGCP that Aubin and Webster had caused, and with Aubin, who took Webster's side in the foregoing exchange.

113.    Attempting to move forward, in September 2015, DOE emailed Defendant Lynn, describing his recent work seeking more business for the Firm. DOE specifically referenced institutions he had spoken to. Among these was LetterOne, a hedge fund that Russian oligarch Mikhail Fridman had set up in 2013. DOE told Defendant Lynn that the fund's Chief Information Officer ("CIO") Yves Leysen was at a meeting he'd set up and that Leysen mentioned that he knew Defendant Lynn. Leysen also mentioned having been on the board of BGC European GP Limited.[21] DOE also described the problems he faced in dealing with Webster and Aubin over Singapore and other issues, indicating that the situation was bad enough to cause him to consider resigning.

114.    Less than nine hours later, Defendant Lynn responded by email, offering to "work out an exit" from the Firm for DOE. But DOE did not want to leave the Firm. Rather, he wanted

---

[21] That company is a BGCP subsidiary. Leysen also appears to have briefly parked his British securities licenses at BGC International and BGC Brokers L.P., where he was also a director, from 2009 to 2011 and from 2009 to 2014, respectively. *See* https://register.fca.org.uk/ShPo_IndividualDetailsPage?id=003b000000LUnzRAAT.

to correct the problem and continue building his business at BGC Financial. He later learned that Defendant Lynn had passed his complaint on to Aubin.

115.    BGCP responded to DOE's efforts by escalating its campaign of retaliation. Aubin called DOE to Amaitis' office in London (which Aubin routinely used) to reprimand him. Threatening to fire DOE, he said, "You'll go the way of Mike Riffice if you don't shut up!"

**C.    Aubin Claims a False Loss of $500,000.**

116.    In Q4 2015, after DOE and his team had been compensated as agreed for nearly a year, Aubin directed an associate in Paris, Aldric Marinos, Business Officer in Charge of Front Office Operations for BGCP, to recalculate the New York Desk's 2015 production.

117.    Marinos had no experience in listed products, exchanges, rebates, and the other specifics of DOE's teams' trading activities and, therefore, was not adequately equipped to understand how DOE's teams' trades should be accounted for. Nonetheless, Aubin directed Marinos to revise the accounting for DOE's Desks.

118.    Marinos' recalculation resulted in an on-paper loss of $500,000 for the New York Desk—meaning no bonuses for DOE and his team.

119.    DOE knew that the New York Desk had not lost money in 2015, but rather had profited, and that his team should receive bonuses. When he challenged the alleged loss, Aubin told him to "keep his mouth shut" and "stay focused on doing the job." Aubin implied that, if DOE cooperated, his and his teams' situation would improve in 2016.

120.    Not satisfied, DOE asked Marinos to explain his accounting. Marinos refused and further blocked DOE's access to the electronic and other files related to his teams' production in New York and London.

121.    DOE then enlisted the help of Tommy Attrill, a business analyst in BGCP's Accounting Department in London. Attrill had significant experience reconciling disputed figures

throughout the Firm and had specifically calculated the profitability of the New York and London Desks in previous quarters and, therefore, was familiar with the desks' performance histories.

122.    DOE asked Attrill to review Marinos' accounting. When Attrill began looking into the issue, Aubin and Marinos also worked to block *his* access to information. In response, Attrill submitted his resignation from BGCP. DOE convinced Attrill to delay his departure by a month in order to try to sort out the accounting that generated the false $500,000 loss.

123.    Despite BGCP's efforts to block his access, Attrill identified the accounting gymnastics that had produced the false loss. Attrill also discovered that, for several years, Aubin had been siphoning revenue from the New York and London Desks and assigning the revenue to other desks and offices, including the BGC Financial Chicago office, a non-client facing office (meaning its revenue was not generated by direct client trades and, accordingly, BGC Financial did not have to pay bonuses and other compensation out of the revenue booked in Chicago). Aubin refused to provide any information about monies "reassigned" to other offices from New York and London.

124.    Attrill explained that, to create the false $500,000 loss, Marinos first had improperly applied losses incurred by traders who, according to the agreement DOE made when he took over the New York Desk, were not supposed to be counted for purposes of the New York and London Desks' revenue pools.

125.    Second, Marinos retroactively characterized a $26,000 "override" DOE had already received from New York's Q4 2015 performance figures as an error and debited it to the New York Desk's revenue pool. However, this "override" had originally been paid to DOE by the Firm's management out of its general funds, not the New York Desk's pool. Accordingly, even if

the "override" had been made in error, it should not have been debited from the New York Desk's pool but from the Firm's general fund—where it came from in the first place.

126.    Third, Marinos excluded from the accounting revenues directly resulting from DOE's New York and London teams' trades, including but not limited to rebates paid by pit brokers to BGC Financial for trading activity executed directly with them on the CME. Specifically, Marinos excluded revenue from pit brokers rebating BGC Financial 7.5 cents per contract executed on the CME.[22] Marinos also excluded revenue generated from matched trades made with market makers. And, he excluded rebates from the CME that were customarily paid to BGC Financial when the Firm exceeded a certain threshold trading volume. DOE's trading teams enabled BGC Financial as a firm to meet this threshold, but by Marinos' new accounting they were not credited for having done so.

127.    Excluding revenue from pit broker and CME rebates, and matched trading involving market makers, had a severe impact on the New York trading desk's performance calculation for Q4 2015. For such trading, market makers in the U.S. paid BGC Financial commissions. In his recalculation, Marinos discounted these commissions altogether. Leaving out revenue generated from both matched trading and rebates enabled Aubin to deny DOE and his team in New York compensation due to them. It also enabled Aubin to offset "losses" against the London office, denying bonuses and other earned compensation to those traders as well.

---

[22] Note that BGC Financial was a non-clearing member of the Exchange and therefore ABN AMRO assumed those duties on behalf of the Firm. Aubin falsely claimed that ABN AMRO was charging BGC 7.5 cents per contract to pay for that service. He said that he had discounted that rate down to 1.5 cents for DOE's teams. The actual cost for ABN AMRO's services was, in truth, capped at about $125,000 per month for *all* trading teams at BGC Financial collectively, equaling a fee of roughly 1 cent per contract. Upon information and belief, this discrepancy enabled Aubin and/or BGC Financial, and ultimately BGCP, to skim revenue from DOE's teams in New York and London as a result. Aubin justified the theft of the rebate revenue that DOE's teams would otherwise have received, and which would have factored into their true production figures, by saying that the rebates were going towards paying for the discount of the clearing fees ABN AMRO allegedly charged.

128.   In Attrill's experience, Marinos' offset of false losses at the New York Desk against the London Desk was unprecedented.

129.   DOE also reviewed the offset with Annette Fong, BGCP's Head of Compliance for Europe. Fong holds CF11 licenses in the UK for Money Laundering Reporting and was likely the person at BGCP who would have had the most relevant experience and knowledge to understand the problems with Aubin's false accounting. Fong told DOE that Aubin's offsetting the "losses" in New York against the revenue of the London Desk was illegal.

130.   Fourth, Marinos excluded another $1 million in commission revenue earned by the New York Desk in Q4 2015, though BGC Financial had already claimed 50% of those funds as its share.

131.   Finally, Attrill also discovered that Marinos assisted Aubin in concealing the illegal transfer of about $2.5 million in market maker matched revenue away from the New York and London Desks over a period of about three years.

132.   Because Attrill continued to examine Marinos' recalculation, BGCP sent him home, refusing to allow him access to any Firm information for the remainder of his notice period.

133.   DOE so spoke with John Skitt, an attorney serving as Group Head of Human Resources for BGCP and Cantor Fitzgerald EMEA and APAC, about the foregoing accounting issues and the retaliation he and Attrill were facing from Aubin. Skitt refused to engage DOE and dismissed his concerns out of hand.

134.   Because he could not get answers from Aubin, in early 2016, DOE went further up the BGCP chain of command to address the accounting issue created by Marinos. DOE believed he had a duty to report his concerns, pursuant to BGCP's Policy on Reporting Possible Ethics Violations and Disciplinary Action (the "Policy") in effect at the time, which required employees

to report violations to Compliance. Compliance, in turn, was required "to maintain the confidentiality of the individual reporting the possible violation." Finally, the Policy "strictly prohibit[s]" retaliation for reporting violations. A copy of the Policy is attached hereto as **Exhibit C** and incorporated by reference as though fully set forth herein.

135.    On or about January 28, 2016, DOE emailed Scotto and McLoughlin, referencing "serious issues with regard to the accounting procedures that are in place at BGC." He asked Scotto and McLoughlin to engage in a discussion with him to "ensure that the correct revenue is being allocated" to the correct office. Neither Scotto nor McLoughlin responded.

136.    Within a week of the email to Scotto and McLoughlin, DOE learned that his communications had been forwarded to Aubin—in direct violation of the Policy.

137.    In early February 2016, DOE complained again to McLoughlin that accounting for the New York and London Desks was being improperly manipulated to deny bonuses. DOE also provided this information to Rosado in HR; Sulfaro; and Haas. The stress associated with this process and Aubin's backlash caused DOE chest pains and other health problems.

138.    On or about February 4, 2016, DOE followed up with an email to Rosado, informing her that he reported the accounting irregularities to Sulfaro because the NFA was scheduled to conduct an audit at BGC Financial on February 19, 2016. He cited his concerns about false accounting at the Firm and stated that he would not lie about what was happening, despite pressures from Aubin.

**D.    The Firm Issues DOE an Unwarranted and Unsupported "Conduct Warning."**

139.    On February 8, 2016, Cantor Fitzgerald Director of Human Resources for the Americas Patricia Dreste ("Dreste") gave DOE a conduct warning and placed him on administrative leave for two weeks—through February 19, 2016. The purported reason for the

conduct warning was that DOE's conduct had been "inappropriate, unprofessional and insubordinate" and had "caused the Company to have serious concerns about your present ability to appropriately execute your duties and responsibilities." The letter also stated that DOE should have no communication with Cantor Fitzgerald's commercial real estate arm, Newmark Grubb Knight Frank ("NGKF") while he was on leave. This made no sense to DOE, as he had never had any contact with that entity.[23]

140.    Before the February 8 conduct warning, the Firm had not given DOE any indication that it believed his conduct fell outside ordinary business standards. Nor did the Firm cite any internal document, such as the Employee Handbook, to support the conduct warning. Plainly, the warning was pretextual: to exclude DOE from the NFA audit, despite his status as the New York Desk's Series 30.

141.    The Firm also stated that it would "continue" an investigation into the allegations DOE had raised the week before. There is no record of any such investigation. To the extent there was an investigation, it was a sham.

142.    While on administrative leave, and believing that the Firm intended to fire him, DOE began looking for another job. During interviews with other firms, DOE spoke with Matt Kent, a Director at Sigma Broking Ltd. ("Sigma") in London. During that interview, DOE expressed concerns about non-solicit/non-compete issues. Kent told him that another former BGC employee named Rob Palmer "got around" such problems because he knew of the firm's "shady" accounting, including "illegal offshore payments" to executives through one subsidiary called "Tower Bridge," and another called "Seminole," "Seminole Financial," "Seminole Group," or "Seminole Holdings."

---

[23] As described in the addendum attached as **Exhibit A**, DOE would later learn that entities tied to Cantor Fitzgerald's real estate businesses can be found on the ICIJ's Panama Papers database.

143.    Kent said Palmer also knew of BGCP and Cantor brokers registered and paid in one country while operating from another, a "tax dodge." He said that a trader named Alex Mouradian, a friend of Aubin, had such an arrangement while he was employed by BGC Brokers in London from 2009 to 2012. Specifically, Mouradian worked in BGC Brokers' office in Nyon, Switzerland but was registered in and paid from the company's Hong Kong office, allowing BGC Brokers to evade Swiss taxes and tighter regulation.[24]

144.    Attrill confirmed the foregoing, particularly about Tower Bridge's role. Attrill had previously worked for Amaitis at Tower Bridge in its Accounts Department in London. He told DOE that he had routinely reviewed documents published internally by Tower Bridge called "BR Reports," and that such reports revealed the "tax dodge" of registering and paying brokers out of one office while they worked out of another that would receive less favorable tax treatment. When Attrill questioned this practice, BGCP executives told him that this was "nothing to worry about and not your concern."

145.    Attrill believed that entities like Tower Bridge and Seminole were part of a wider tax evasion scheme at BGCP. According to the BR Reports and other documents he had reviewed, Attrill discovered that BGCP plays this "shell game" with its traders in Hong Kong, Switzerland, France, and Dubai, and possibly also with its traders in Florida.

146.    Considering that Aubin had tried to move DOE's London trading team to France in 2012, and that Aubin and Mouradian had also worked at Paris-based commodities firm Compagnie

---

[24] DOE subsequently learned that a BGC Brokers executive named Laurent Imbert, also Senior Managing Director of Seminole Financial Limited, had threatened to go to a BGCP shareholders meeting and expose the company regarding financial misconduct. Upon information and belief, BGCP paid Imbert a large settlement for his silence.

Financière Tradition ("Tradition"), together, it was not far-fetched for DOE to conclude that Aubin played a central role in BGCP's "shell game" and "tax dodge."[25]

147.    Kent later revealed that DOE interviewed at Sigma to Ronin market maker Tim O'Leary, also a friend of Mouradian. O'Leary told Aubin about DOE's interview at Sigma, causing further retaliation.

**E.    The Firm Issues DOE a Second Unwarranted and Unsupported "Conduct Warning."**

148.    On or about February 22, 2016, DOE's first day back in the office after his forced leave, Rosado and Dreste called him into a meeting with Aubin to interrogate him about his internal reporting. After DOE defended his statements, Dreste issued DOE another "conduct warning," based on alleged "off-contract" payments to, among others, a trader named Andrew Chiles in London.

149.    In fact, the payments DOE had made were standard bonus payments, as authorized by his employment agreement with BGC Financial.

150.    Furthermore, "off-contract" payments clearly were not prohibited by BGCP's "management policies"—as evidenced by Scotto's demand that Aubin, and Aubin's displacement of that demand onto DOE, pay Haas $10,000 to act as the New York Desk's Series 30 until DOE received his Series 30 license.

151.    After the February 22 meeting, DOE informed Rosado and Dreste that they had to stop trying to falsely pin things on him or he would be forced to report their conduct to the SEC.

---

[25] Aubin had also recently been named director of a new UK-based company called Lake Securities Limited, housed at BGCP's offices in London. This company was incorporated in the UK in July 2015 but kept its brokers in Geneva, Switzerland. Two of DOE's team members in London, Nigel Roberts and Lester Saunders, put market crosses through the exchanges for these brokers when they were apparently unable to do so themselves. Roberts and Saunders noted that many of these crosses were facilitated in the single stock equity space with a high turnover of trades. They also questioned where the Geneva brokers were registered, finding it odd that they were placed in Geneva, Switzerland rather than BGC Brokers' facilities in Nyon, only a half hour away, and while their firm was based in the UK.

152.    On or about February 23, 2016, DOE again contacted Rosado and Dreste, demanding that they withdraw the conduct warnings. DOE also informed them that he was aware of Jridi's $800,000 loss, and he questioned the Firm's decision to have him sign off on listed products trading activities without any knowledge of these activities just before a scheduled NFA audit. The Firm's conduct was not only improper, but exposed DOE individually to possible regulatory backlash.

153.    Aubin then offered to retract the conduct warning if DOE would sign a non-disclosure agreement. DOE also lost the London Desk. Aubin promised to give it back, but only if DOE was a "good employee"—meaning, DOE would no longer speak with Compliance or any other internal authority without first speaking to Aubin about his concerns. Aubin also required DOE to retract his complaints of retaliation.

154.    Sulfaro told DOE that any more internal reporting would "just get you thrown back to the business," meaning it would be reported to Aubin. Aubin told DOE, "You talk to anybody at BGC, you're talking to me. There's no use talking to anyone else. We all talk to each other and we all know everything."

### F.    The Firm Demands that DOE Rubber-Stamp Trading Activity, Despite His Reasonable Concerns About Compliance.

155.    On or about March 14, 2016, DOE received an email from Compliance with the subject "Weekly Transaction Review." The email asked him to "vote approve on the review forms."

156.    DOE refused to do so, on the ground that he did not have complete information about the trading activities he was being asked to approve. DOE had only recently learned that the Firm was allowing traders to trade unsupervised from laptops at home, in addition to allowing Anthony to trade unsupervised from another area in the building.

157.   Sulfaro told DOE that he could not reject the supervisory signoff process, as signing off on the New York Desk's activities would provide evidence that he was reviewing trading activity in accordance with the Firm's policies and procedures and CFTC and NFA regulations.

158.   DOE responded that he would sign off when the Firm would report accurately to regulators, rather than what the Firm was telling him to do. DOE further informed Sulfaro that he would not sign off until the Firm followed procedure correctly. What Sulfaro was suggesting appeared to DOE as "doublethink," a directive to sign off on activities he knew were noncompliant as a means of demonstrating the Firm's compliance with applicable regulations.

159.   Given that the Firm was demanding that DOE approve trading activities as compliant with CFTC and NFA procedures and regulations whether he had supervised them or not—in violation of his core duties as the Series 30 for the New York Desk—DOE's objections were reasonable.

160.   McLoughlin then got involved, recommending that DOE recuse himself because the Firm needed a "proper supervisor" for the New York Desk.

161.   Shortly thereafter, McLoughlin forwarded the email correspondence to Aubin, who demanded that DOE contact him.

162.   This email correspondence establishes that the Firm treated the Series 30 for the New York Desk as a "rubber stamp," expecting the supervisor to sign off regardless of his concerns about whether trading activities complied with CFTC and NFA regulations. It also reveals that the Firm failed to take DOE's concerns about its lack of compliance seriously, reinforcing the conclusion that the conduct warnings the Firm issued to DOE, and its later termination of DOE's employment, ordered by BGCP executives, were retaliatory.[26]

---

[26] The Firm ultimately withdrew all the conduct warnings it had issued to DOE, despite ongoing resistance by BGCP HR Head John Skitt, who said, "This guy's never going to give up."

163.    On or about March 15, 2016, Aubin admitted in an email to DOE that, in fact, there had been no $500,000 loss on the New York Desk. However, Aubin refused to have the false accounting corrected or restore any of the $2.5 million he had diverted away from the New York and London Desks.

164.    In May 2016, aware that DOE was still interviewing at other firms, O'Leary emailed him, copying others at BGC Financial, saying that he had "let Deutsche Bank know what a terrible broker you are" and said, "hopefully they won't be hiring you now."[27]  O'Leary said he "hoped BGC's Compliance Department was reading this email."

165.    DOE emailed Aubin to complain about O'Leary's conduct. Aubin answered that he had "known O'Leary for years" and would "take care of it."

**G.    DOE Reports His Concerns About Accounting Issues to Cantor Fitzgerald's Deputy General Counsel.**

166.    Because the issue of the false $500,000 loss remained unresolved, on or about May 5, 2016, in his capacity as a whistleblower, DOE emailed Cantor Fitzgerald's Deputy General Counsel Michael Popok, providing details about the New York Desk's accounts and explaining his and Attrill's concerns with Marinos' accounting. DOE specifically noted that the Chicago desk showed a large profit for Q4 2015, evidence at least of "improper accounting practice." At most, and of significant concern, the Chicago desk's profit showed accounting fraud.

---

[27] DOE had not interviewed with Deutsche Bank during this period. He found such statement very odd until he learned of Deutsche Bank's connections to BGCP and Cantor Fitzgerald and Ronin Capital on the Panama Papers, as described in the addendum attached as **Exhibit A**. Considering Defendants' connections to Deutsche Bank, and the recent hiring of former Deutsche Bank co-CEO Anshu Jain as President of Cantor Fitzgerald, O'Leary's statements take on new significance. Jain left Deutsche Bank in 2015 amid scandals in which the firm was forced to pay massive fines to authorities on both sides of the Atlantic over manipulation of interest rates and money laundering, as well as pleading guilty to criminal charges in the U.S. On June 7, 2019, Jain was added to the list of suspects in an ongoing German criminal probe of the Cum-Ex tax deals. The deals being reviewed by Cologne prosecutors took place roughly between 2007 and 2012, overlapping the period when Jain was responsible for the London-based investment-banking arm of Deutsche Bank.

167.    Popok failed to substantively respond. Accordingly, on May 9, 2016, DOE, through counsel, made a formal Whistleblower Complaint (the "Complaint") to Cantor Fitzgerald, detailing the regulatory violations he had discovered and the Firm's campaign of retaliation against him as a result of his reports of such violations. The Complaint is attached hereto as **Exhibit D** and incorporated by reference as though fully set forth herein.[28]  When he received the Complaint, Popok quipped, "You can't shit a shitter."

168.    In or around June 2016—six months after DOE reported the accounting manipulation and fraud—Annette Fong, BGCP's Head of Compliance for Europe, left the Firm. Dyanne Rosado, Deputy Director of Human Resources for Cantor Fitzgerald, also left.

169.    On or about July 11, 2016, Popok told DOE that a formal investigation of his allegations had been completed and that there were no findings of accounting fraud. Popok provided no substantive details to support this conclusion and did not address the fact that Aubin had even admitted in March 2016 that there was no $500,000 loss in New York. Popok also stated that there had been "no retaliatory acts" and that BGCP's internal policies had been followed. Regarding other issues like rebates and market maker matches and other payments due to the New York and London Desks, and expenses those desks carried as an ongoing burden, Popok deferred to executives Defendant Lynn and Windeatt at BGCP. These other executives also refused to address the issues DOE had raised.

**H.    Under Mounting Pressure, BGCP Escalates Its Retaliation Against DOE, Pulling Out All Stops.**

170.    Over Summer and Fall 2016, along with the unresolved issues described above, retaliation against DOE continued, with Tim O'Leary bullying DOE's teams to secure preferential

---

[28] The Complaint also references the fact that DOE had reported his concerns regarding accounting, internal controls, auditing, and other matters, including the conduct of BGCP to its outside whistleblower counsel Christopher T. Jensen, Esq. of Morgan, Lewis, & Bockius, LLP.

treatment as a market maker. O'Leary's attacks on DOE and his trading teams also increased in frequency and intensity. In one email to DOE, O'Leary wrote, "As long as I do business with BGC no one can do anything." O'Leary's attacks prompted other BGC Financial traders as well as DOE to again complain to the Firm's Compliance and Legal Departments.

171.    Popok, Sulfaro, and William Shields ("Shields"), Chief Compliance Officer and Assistant General Counsel at Cantor Fitzgerald, considered responses to O'Leary's harassment, including contacting Ronin's compliance department. Aubin told them he alone would deal with O'Leary and said, "Everyone has to respect what I say about Ronin." Popok, Sulfaro, and Shields stood down.

172.    DOE reached out again to the Firm's internal counsel as well as Morgan Lewis & Bockius regarding the compliance and compensation issues he and his trading teams continued to face. DOE informed Emily Milligan, Assistant General Counsel for Cantor/BGC/GFI, that he had not received a management override since Q2 2015, despite his teams' ongoing gains in trading volumes and revenue over the previous year; that Aubin continued to deny him access to the accounting for the New York Desk; and that O'Leary's abuse had never been addressed.[29] DOE also voiced his frustration that, though rebates from the CME and pit brokers were generated by his teams' production from client orders, the rebates were not being accounted for.[30] DOE's traders in New York and London were also subsidizing the costs associated with the Firm's clearing of trades, apparently for *all* trading centers at BGC. And, DOE again asked that something be done to stop Aubin's continuing retaliation. He reminded BGC's counsel that he had a heart attack and

---

[29] Popok did not show up for the meeting. Shields attended part of the meeting via speakerphone.

[30] In the Riffice and Walton FINRA arbitrations referenced above, upon information and belief, Aubin has given conflicting testimony regarding rebates, market maker matches, and other related issues. The issue of rebates has been a lingering problem at BGC Financial and other BGCP subsidiaries, affecting the compensation of other managers besides DOE.

had been hospitalized several times as a result. Milligan told DOE that BGC was "investigating" the foregoing issues but did not follow through as there was, in truth, no investigation. Popok offered DOE no solutions. Instead, the retaliation against DOE got much worse.[31]

173.    In Fall of 2016, after meeting with intense resistance from BGCP's normal reporting channels, DOE opened an investigation with the SEC.

174.    Around the same time, CG Technology, the company Amaitis had founded to enable Cantor Fitzgerald to make its foray into the gambling business in Las Vegas, ended a federal money laundering probe by paying $22.5 million in fines. During the probe, Amaitis had been forced to resign as CEO of the company. By the end of September 2016, Amaitis was back in New York and had surrendered his FINRA licenses.[32]

175.    According to U.S. Attorney Robert L. Capers of the Eastern District of New York, who headed up a team of investigators including agents of the U.S. Postal Inspection Service, IRS, New York City Police Department, and local Nevada law enforcement, "Cantor Gaming quickly grew into one of the largest race and sports book operators in the United States. Unacceptably, this growth came at the expense of compliance with the law, and as a result Cantor Gaming became a place where at least two large-scale illegal bookmakers could launder their ill-gotten proceeds."[33]

176.    Cantor Gaming had engaged in "messenger betting," or having an agent or "runner" place a bet on behalf of a third party in exchange for compensation, an illegal practice in Nevada;

---

[31] Popok separated from Cantor Fitzgerald in March 2019 after losing FINRA Arbitration Case No. 15-00142 in New York City, a case the Firm dragged out for several years. Plaintiffs, former BGC Financial employees, sought damages for breach of contract, violation of New York's labor laws, defamation, slander, hostile work environment, discrimination, and retaliation. The award included a significant sum for retaliation by the Firm in particular.

[32] In 2013 CG Technology had been fined $3.5 million for violating Nevada Gaming Board regulations. Vice President Michael Colbert was charged with enterprise corruption, first, third, and fourth-degree money laundering, and fifth degree conspiracy.

[33] *See* https://www.bloomberg.com/news/articles/2016-10-03/cantor-funded-business-said-to-pay-22-5-million-to-end-probe.

proceeds from this activity were laundered. IRS Criminal Investigation Chief Richard Weber told Bloomberg News, "Cantor Gaming bet on never getting caught but this wager didn't pay off. Financial transactions always leave a money trail and IRS-CI Special Agents relentlessly follow that trail."[34] An offshore sportsbook in Costa Rica was involved in addition to those Amaitis ran for CG Technology in Las Vegas.

177.    Michael Colbert, the VP charged with multiple counts of money laundering in 2013, was a focus of the new investigation beginning that year. Throughout the relevant period, Colbert was in email communication with a person the taskforce called "Cantor Executive No. 1," later identified as Amaitis. In 2010, Amaitis emailed Colbert that CG Technology faced a loss of $300,000 on one of its bets, saying, "I will be crucified in New York."

178.    During this period, Amaitis only answered to Lutnick. Amaitis' fear of discipline by Lutnick over such a relatively small sum of money reveals the control Lutnick maintained over CG Technology, and over Amaitis.[35] Considering also Lutnick's reaction to the $800,000 loss caused by rogue trader Jridi, and how he handled it with Aubin, it was reasonable for DOE to believe that Lutnick and Amaitis had involved themselves in BGCP's retaliation against him.

179.    Another issue contributing to BGCP's overreaction to DOE's internal reports was a November 2016 federal lawsuit filed by investors against GAW Mining, LLC ("GAW"), et al. The suit named Cantor Fitzgerald Vice Chairman Stuart Fraser as a "controlling person," due to his involvement in cryptocurrency mining. The suit also implicated Lutnick and other Cantor executives, as well as Cantor's Legal, Compliance, and Accounting Departments. Indeed, the complaint states: **"**On information and belief, Fraser approached [Lutnick] about investing in

---

[34] *Id.*

[35] Lutnick was also CG Technology's founder and was majority owner throughout the relevant period.

GAW Miners. But, according to an October 31, 2014 message written by Fraser, 'Howard is supportive. Only wants us to make a shitload. But not be involved.'" Lutnick plainly was aware of GAW's operations, including the "9/11 fund," and gave his blessing by supporting Cantor's Compliance, Legal, Accounting and other Departments, all of which ultimately report to him.

180.    The SEC had filed a similar case against GAW the year before, in which it said that GAW bore "the hallmarks of a Ponzi scheme." Both suits alleged that, from August through December 2014, defendants sold—to over 10,000 investors—investment contracts representing shares in the profits they claimed would be generated from using their purported computing power to "mine" for virtual currency.[36]

181.    Fraser was a mentor to GAW's founder Homero Garza ("Garza") and had an 80% stake in the enterprise. Plaintiffs called him a "culpable participant" in the fraud, involving investment units called "hashlets."[37] Investors' returns on them were, according to the SEC, "mostly paid by using the money invested by others"—by definition, a Ponzi scheme.

182.    According to the investors' complaint, Fraser used his position at Cantor to introduce investors to Garza and GAW. He also not only involved Cantor's legal, compliance, and accounting resources, but also what he referred to as a "9/11 fund." The "hashlets" involved a graphic depicting the outline of the Pentagon housing an image of the World Trade Center's twin towers. *See* **Exhibit E**, attached. Upon information and belief, none of the proceeds from the sale of these hashlets ever went to any charity.[38]

---

[36] According to the SEC complaint, "'Mining' for virtual currency means applying computer power to try to solve complex equations that verify a group of transactions in that virtual currency. The first computer (or collection of computers) to solve such an equation is awarded new units of that virtual currency. This process is known as 'mining,' and the computer equipment used in this process, and the humans who own it, are known as 'miners.'"

[37] For a description of how these "hashlets" work, *see* http://cryptominingasic.com/gaw-miners-hashlet-explained/.

[38] DOE has also examined the accounting of the Cantor Relief Fund's 9/11 Global Charity Day event, in which traders employed by BGCP subsidiary and affiliated firms worldwide are required to give up all gross revenue for that trading day as celebrities do trades with institutional clients in their stead. In 2015, DOE arranged to have actor Samuel L.

183.    Garza has been criminally prosecuted and pled guilty to wire fraud in the related criminal case, and has paid out disgorgement and other penalties, fees, and restitution of more than $20 million to date. Fraser and Lutnick may have been under even greater legal and regulatory pressures than Amaitis in this period, as the fraud case was just beginning.

184.    BGCP's campaign of harassment and retaliation, both direct and through O'Leary, continued to take a toll on DOE's physical and mental health. Upon information and belief, in or around fall 2016, because DOE continued to raise the issue of possible money laundering at BGC Financial and further up BGCP's chain of command, Amaitis, Lutnick, and other top executives, including but not limited to Fraser, also became involved.

185.    Nonetheless, DOE soldiered on for fear of losing his job. He consulted several doctors in this effort to take care of himself and maintain his high level of performance for the Firm. BGCP showed DOE no sympathy as he endured a worsening situation. In fact, it tried to impede his ability to do his job and create a pretext for firing him.

186.    During Election Week 2016 in the U.S., a time of very heavy trading—especially in futures—Aubin tried to block DOE's access to the London office, purportedly because he had not provided a note from his doctor stating that he was cleared to return to work. No such note was required, however.

187.    Despite Aubin's efforts to prevent him from producing, DOE and his teams in New York and London posted one of their best quarters yet, producing a 250% gain in revenue over 2015. Though Aubin and others at BGCP applauded this achievement, the harassment and

---

Jackson attend the Charity Day with him. The way BGCP handled Mr. Jackson's contributions led DOE to take a closer look at the company's IRS Forms 990 for the past several years. The accounting is incomplete and misleading. BGCP and Cantor Fitzgerald do not generate or maintain complete records of the actual revenue generated by the celebrities and do not fully report other related sources of revenue or costs involved in generating such revenue to the IRS and tax authorities in other countries. This is an international tax issue, much like Aubin's improper transfer of $2.5MM away from the New York and London Desks.

retaliation continued. In mid-November 2016, DOE experienced chest pains and dizziness. He feared another heart attack.

188.    Although he did not suffer another heart attack, DOE was hospitalized for five days. During that time, Aubin constantly texted, emailed, and called him, demanding immediate responses. DOE refused to engage, knowing such back-and-forth would further compromise his health.

189.    Because he knew that returning to work would increase the stress that contributed to his latest hospitalization, DOE asked BGC Financial to limit his work schedule, which the Firm agreed to do on or about November 21, 2016. DOE also pleaded with the Firm to assign him to a different supervisor, relieving him from the daily stress of Aubin's retaliation. BGC Financial refused this request and Aubin's retaliation continued.

190.    Anthony Warner, a general manager with BGCP in London who had previously worked for the company in Singapore, offered DOE a job with Mint Partners ("Mint"), a division of BGC Financial, L.P. DOE refused. Had he accepted such offer, DOE would have lost the New York and London Desks, and considerable compensation. His trading teams would have competed against him in that role. Warner's offer is yet more evidence of BGCP's retaliation against DOE, as Warner essentially offered DOE a demotion.

191.    In attempting to address the regulatory issues he saw, and the retaliation he was being subjected to, DOE had asked HR several times for the name of the person responsible for BGCP's Code of Conduct and internal whistleblower procedures. After repeatedly rebuffing DOE, HR finally told him to contact Pion.

192.    On or about November 30, 2016 DOE informed Pion and Shields about the regulatory compliance violations and accounting irregularities he had observed as well as the

retaliation he had suffered. He followed up with an email to Pion so that his report would be complete. At the time, DOE did not know that Pion was the executive in charge of Tower Bridge, the company DOE had previously learned may be involved in tax evasion and money laundering for BGCP, Cantor Fitzgerald, and their subsidiaries and affiliates. Similarly, Shields was about to become the CCO of Sunrise Brokers, LLC, a FINRA member firm owned by BGCP subsidiary BGC Partners, L.P., with connections to Cyprus, as described in the attached Addendum regarding Defendants' presence on the Panama Papers.

193.    On December 1, 2016, the Firm ordered DOE to attend a Tandberg videoconference with Aubin. In place of the HR personnel in New York with whom DOE had dealt before, Eva Chan, who DOE had tried to contact in Hong Kong in summer 2015, was present, sitting behind him.[39] Chan would not answer DOE's questions about why she was now involved or why she had refused to return his calls when Webster had been attacking him by email the year before. Chan seemed surprised to learn that DOE had suffered a heart attack in summer 2015.

194.    During the Tandberg, Aubin was visibly shaken as he questioned DOE about his recent statements to HR and others at BGCP and Cantor Fitzgerald. Aubin studiously avoided mentioning Pion. Aubin asked DOE why he had not responded to his emails, text messages, and phone calls while in hospital. Aubin then revealed that he had been planning to replace DOE as manager of the New York and London Desks for nearly a year.[40] When DOE asked for clarification about the Q4 2015 "loss" and other accounting irregularities, Aubin's admission that there was no loss, and possible money laundering in general at BGCP and Cantor Fitzgerald, Aubin abruptly

---

[39] In September 2016, Eva Chan had transferred to New York and became Sr. HR Generalist, VP for Cantor Fitzgerald.
[40] DOE had questioned Aubin about this issue before, and Aubin had said it was "just market rumors"—meaning Aubin had spent nearly a year lying to DOE about his ongoing efforts to replace him.

went off the Tandberg. It appeared to DOE that someone off camera was guiding Aubin in this interrogation.

195.   Aubin returned a few minutes later, picking up his previous line of questioning. DOE informed Aubin that he was seeing physicians for stress and anxiety as well as for the heart condition he developed due to Aubin's conduct. DOE again raised the issue of money laundering. Aubin, again appearing prompted to do so, brought the Tandberg to an immediate close.[41] Visibly disturbed, Chan abruptly got up and left the conference room.

196.   The day after the Tandberg conference, the Firm reneged upon the bargain it had made with DOE on November 21, 2016. Further, Chan refused to give DOE a copy of her minutes from the meeting.

197.   Despite the December 1 Tandberg, BGC Financial alleged in written correspondence that DOE had "failed to comply" with Aubin's requests to communicate and again put DOE on administrative leave.

198.   The Firm also stated that it was "exercising its right to submit you to separate examinations by a qualified mental health professional and a licensed physician, to be scheduled by the Company, with doctors selected by the Company[.]"

199.   DOE was also instructed not to enter any premises of BGCP or its affiliates or perform any work for said entities.

200.   The allegedly qualified mental health professional was a doctor located in Port Jefferson, New York, approximately two hours outside Manhattan. He had been sued previously for his role in helping the New York School System fire a teacher by falsely diagnosing him with

---

[41] Upon information and belief, Lutnick and/or Amaitis accompanied Aubin on the Tandberg.

mental illness. Upon information and belief, Amaitis has family in Port Jefferson, including a relative who works for the New York School System.

201.    The allegedly qualified physical health professional, a doctor who was an infectious diseases specialist, had been sued previously for misdiagnosing a patient with HIV.

202.    The Firm wrote several more letters to DOE in the following weeks, attempting to reschedule the appointments, and threatening termination, either for "insubordination" or lack of fitness for the job, if DOE failed to comply. Such terms are found in DOE's employment agreement with BGC Financial; the Firm deliberately posed the dilemma to DOE of complying, and being fired on the pretext of incapacity, or refusing to help the Firm discredit him and being "insubordinate."

203.    DOE again refused to attend the medical appointments, though Popok now joined in the Firm's efforts in pressuring him to do so. Shields and Pion were part of the email traffic that evidenced such efforts. Popok avoided speaking with DOE's counsel but tried to make it appear as if DOE and his counsel were at fault for the breakdown in communications.

204.    January 31, 2017, the Firm terminated DOE's employment in a letter sent by Dreste. It waited until the last day of the trading quarter to fire DOE, denying him a $250,000 bonus and other monies he earned during Election Week, in further retaliation for his internal whistleblowing.[42]  BGC Financial did so at the direction of Defendant Lynn and BGCP.

205.    A few days after DOE's termination, he received cryptic communications via LinkedIn from Kamal Haider, a friend of Aubin's and CEO of BGCP-affiliated company Kyte Broking Limited. Haider feigned curiosity about DOE's situation and where he would be seeking future employment. Haider was obviously fishing for negative comments.

---

[42] Failing to follow BGCP's own internal procedures, Dreste in HR did not call DOE in for an exit interview.

206.    In spring 2017 as DOE submitted whistleblower reports to other regulators, BGCP continued to encourage O'Leary to defame him, including by telling potential employers that DOE was "a drug addict and alcoholic." O'Leary's false and defamatory statements obstructed DOE's efforts to find an equivalent position at commodities trading firms ICAP and R.J. O'Brien.

207.    Around this time, as DOE began researching BGCP's, Cantor Fitzgerald's and Ronin's corporate structures, he learned that these entities, as well as companies owned by O'Leary himself, have a connection to the Panama Papers, suggesting that O'Leary's attempts to destroy DOE's career were motivated by more than a personal grudge.[43]

208.    Undersigned counsel Christopher H. Tovar contacted Ronin's general counsel James Griffin and demanded that O'Leary cease and desist from all harassment of DOE. Griffin refused, and said that, should a suit be brought for defamation, Ronin CEO Stafford would "fight to the death" allegations about O'Leary and that Stafford "had all the time and money in the world." For about a year after this exchange, however, O'Leary fell silent.

209.    In mid-2017, BGCP demanded repayment of just over £257,000 for payments it claimed to have made on DOE's behalf to British tax authorities for tax year 2014/15 on capital gains associated with his partnership shares. BGCP would not produce an accounting and refused to provide other information DOE needed to resolve the alleged outstanding tax issues regarding the valuation of his shares.

210.    The timing of this demand is noteworthy, as BGCP made no attempt to recoup these purported tax payments until well after they were allegedly made, and the Firm had fired DOE. Upon information and belief, BGCP harassed DOE in this manner because he had submitted whistleblower reports to SEC and other regulators, including regulators in the UK.

---

[43] As described in the addendum attached hereto as **Exhibit A**, Aubin also appears to have at least one company listed on the ICIJ database.

211.    Mark Snelling, Director of Legal for BGCP and Cantor Fitzgerald, operating in the capacity of Data Protection Officer for Tower Bridge International Services, L.P., and acting by its General Partner, Tower Bridge GP Limited, refused to provide information requested by DOE's counsel about Tower Bridge and other entities likely involved in handling transactions related to DOE's partnership shares. As DOE describes in the attached addendum regarding the Panama Papers, Snelling is a corporate officer of many companies comprising a latticework of entities BGCP and Cantor Fitzgerald and their subsidiaries and affiliates may use to launder money around the world.[44]

212.    When DOE's counsel continued to seek information about Tower Bridge, BGCP abandoned its demand that DOE reimburse it for the alleged tax payments.

213.    On December 11, 2017, BGC Holdings alleged in a letter to DOE that, by taking a job with Square Global, a London-based brokerage, he had violated the terms of the "Partnership Agreement" he had signed in 2012, when he joined BGC Brokers in London.[45] BGC Holdings further stated that, as a result of the alleged violation, DOE had forfeited his partnership shares that were awarded to him in 2013 and other payments otherwise due to him. However, DOE's U.S. employment agreement with BGC Financial, L.P., signed in January 2015, expressly superseded the Partnership Agreement. DOE's counsel attempted to resolve this issue with BGC Holdings in written correspondence. Its counsel refused to respond. BGC Holdings' baseless penalty constitutes yet more retaliation against DOE for reporting his findings to the SEC and other regulators and is unsound as a matter of contract law.[46]

---

[44] More information regarding Tower Bridge GP Limited is also included in the addendum attached as **Exhibit A**.

[45] DOE had joined Square Global in November 2017 and left the firm in August 2018. Eva Brunot, VP and Assistant General Counsel at Cantor Fitzgerald, authored the December 11, 2017 letter.

[46] Neither BGCP nor its subsidiary BGC Holdings had spoken with DOE about the implications of changing his employment from BGC Brokers to U.S.-based BGC Financial, L.P. in 2015, any effect the contractual changes would have on compensation, or any other such relevant issues prior to sending him the December 11, 2017 letter. It is

214.     In September 2018, when DOE was hired by BGCP-rival Tradition—where Aubin had previously worked—BGCP, Ronin, and O'Leary renewed their campaign to put DOE out of work. An associate of O'Leary, a trader named David Blewett, began spreading rumors at Tradition that DOE "has a drinking problem," and Ronin has taken the position that it will not work with Tradition if DOE remains with the firm. An email between Tradition employees Stuart Giles and Dan Marcus on or about September 4, 2018 reads: "Did you hire a futures guy named [DOE]? Reason I ask is I am trying to onboard Ronin to NY futures and they said if he works at Tradition NYC they will NOT deal with us."[47]

215.     BGCP also worked to impede DOE's onboarding at Tradition by refusing to provide full and accurate information regarding the circumstances of his termination in January 2017. For several weeks, this hindered Tradition's ability to register DOE and delayed his process of joining Tradition as a manager in London. The issue had to be resolved with FCA involvement.[48]

216.     More recently, DOE learned Aubin has threatened to terminate and sue anyone at BGCP or any affiliated company who speaks to him.

217.     The retaliation Defendants have inflicted upon DOE has resulted in permanent physical and psychological injury, as well as financial losses in the millions of dollars. The damage to DOE's health and reputation from Defendants' campaign to blacklist him have caused a permanent loss of status and longevity in the securities industry and a significant net loss of future

---

especially noteworthy that on May 24, 2017, after DOE's counsel confronted Ronin about O'Leary's ongoing defamation, Christina George, then Asst. VP, BGCP – Americas, sent DOE a letter telling him that BGC Financial, L.P. was releasing him from his gardening leave two months early and from his non-compete obligations as of June 1, 2017. That letter cc'd Aubin. BGC Holdings' error in telling DOE he had forfeited his partnership shares was therefore obviously willful and retaliatory.

[47] Note his use of the word "they." This was not O'Leary acting alone, but likely Ronin CEO John Stafford and others he directed to send such message to Tradition.

[48] Previously, when DOE was onboarding at Square Global, he learned that BGCP and its affiliates had not updated his records with the FCA regarding his termination date, causing delay there as well. BGCP has apparently done this with several other brokers; FCA rules require that a firm report a broker's separation within seven (7) days.

earnings. At the age of 50, especially considering the damage done to his health, DOE is forced to start his career over with very long odds of achieving the kind of success he had before. In fact, though DOE has worked diligently to mitigate his losses, Defendants persist in their efforts to put him out of a job for good.

218.    Financially, the wrongful actions of Defendants have cost DOE more than two years of compensation that would have otherwise amounted to more than two million dollars, and partnership share value and other compensation that would have amounted to several million dollars more.

219.    Defendants' actions have permanently damaged DOE's health. After his heart attack and related health issues that Defendants have worsened through their more recent actions against him, DOE has been diagnosed with Chronic Fatigue Syndrome ("CFS"), which significantly limits his longevity in this business and impairs his day-to-day living.[49] The possibility that he will not be able to continue as a trader and manager in listed products at all spells the loss of several millions more in lost future earnings. DOE has also spent several hundred thousand dollars on moving and other logistical expenses of relocating his family to London, medical bills in the U.S. and the UK for health problems Defendants caused and/or exacerbated, legal bills associated with bringing these claims and in dealing with UK tax authorities and regulators in multiple countries, and other costs that he would not have incurred had Defendants not engaged in their campaign of abject retaliation.

---

[49] CFS is the common name for Myalgic Encephalomyelitis (ME). ME/CFS is a long-term, chronic, and devastating multi-system disease that causes dysfunction of the neurological, immune, endocrine and energy metabolism systems. It is a fluctuating neurological condition that affects many body systems, most commonly the nervous and immune systems. ME/CFS affects an estimated 250,000 people in the UK, and around 17 million people worldwide. People with ME/CFS experience debilitating pain, fatigue, and a range of other symptoms associated with post-exertional malaise, or the body and brain's inability to recover after expending even small amounts of energy.

220.     Like other BGCP-employed managers who have come before him, DOE has had his career and life permanently damaged by companies that acted in a manner calculated to either silence him as he uncovered supervisory and accounting irregularities, or worse, to destroy him as a member of the securities industry and as a human being. The information contained in the addendum attached as **Exhibit A** will shed much light on their motivations for doing so.

221.     As demonstrated by the above, DOE's warnings to his employers regarding the activities of Aubin and other BGCP-employed and controlled personnel were clearly true and made in good faith, and his harassment, suspension, and termination were unlawful retaliation for his attempt to stop illegal activity at BGCP and its subsidiaries and affiliated companies.

### FIRST CAUSE OF ACTION
**Violations of the Dodd-Frank Whistleblower Statute**
**(Against all Defendants)**

222.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 221 as if fully set forth herein.

223.     BGCP is a publicly traded company having SEC reporting obligations. Tower Bridge and BGC Holdings are wholly owned subsidiaries of BGCP. Defendant Lynn was President of BGCP throughout the relevant period.

224.     As detailed above, DOE reported his concerns about trader supervision issues and accounting irregularities, including possible money laundering, and other violations of federal securities and tax laws to his employers with the expectation that his concerns would be addressed and that any misconduct would be reported to the SEC.

225.     Instead, DOE was unlawfully discharged in retaliation for his reporting of these securities and tax law violations. This took place after DOE initiated an investigation with the SEC Office of the Whistleblower regarding his concerns. After DOE's discharge, BGCP continued to

defame DOE in the markets to prevent him from obtaining equivalent employment in the securities industry, and BGC Holdings denied him deferred compensation that was due to him in retaliation for his taking a new position with Square Global, and for his ongoing reports to regulators including but not limited to the SEC.

226.     Section 922 of the Dodd-Frank Act, 15 U.S.C. § 78u-6 states that no employer may discharge a whistleblower because of any lawful act done by the whistleblower in providing information to the SEC regarding potential violations of the federal securities laws *or* in making disclosures that are required or protected under the Sarbanes-Oxley Act, the Securities Exchange Act of 1934 (15 U.S.C. 78a *et seq.*), or any other law, rule or regulation subject to the jurisdiction of the Commission.

227.     DOE's internal reports regarding accounting fraud and money laundering, as well as violations of applicable regulations and federal securities laws at BGCP, BGC Financial, Tower Bridge, and other BGCP subsidiaries was protected by Section 806 of the Sarbanes-Oxley Act, 18 USC § 1514A and his termination based upon these internal reports violates the Dodd-Frank Whistleblower Statute, 15 U.S.C. § 78u-6.

228.     As a result of Defendants' violations of the Dodd-Frank whistleblower statute, DOE has been injured in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### Breach of Contract
### (Against Corporate Defendants)

229.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 228 as if fully set forth herein.

230.     As described above, DOE entered into a valid and binding employment contract with the Corporate Defendants, which included promises of deferred compensation tied directly to

performance, as well as promises that he would not suffer retaliation for the reporting of wrongdoing at BGCP or its subsidiaries or affiliates.

231.   As a result of the actions set forth herein, the Corporate Defendants have breached their employment contract with DOE by harassing, suspending, demoting, and terminating him for refusing to engage in and/or conceal illegal behavior by his supervisor and others at BGCP and its subsidiaries and affiliates.

232.   The Corporate Defendants have also breached their employment contract with DOE by refusing to pay monies due under their agreement related to deferred compensation in the form of performance bonuses, and by retaliating against him for the reporting of wrongdoing with regards to their illegal activities during the relevant period.

233.   As a direct result of Defendants' actions, DOE has suffered damages, including consequential damages, in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**Breach of Covenant of Good Faith and Fair Dealing**
**(Against Corporate Defendants)**

234.   Plaintiff repeats and realleges the allegations in paragraphs 1 through 233 as if fully set forth herein.

235.   It is presumed that parties to contracts undertake their respective obligations in good faith, with intent to deal fairly. In light of the Corporate Defendants' obvious and blatant bad faith and wrongdoing, the Corporate Defendants have breached their duties of good faith and fair dealing.

236.   Due to the bad faith conduct of the Corporate Defendants, punitive damages should be assessed so that they are deterred from attempting such harmful employment practices in the future.

237.    As a direct result of the Corporate Defendants' actions, DOE has suffered damages, including consequential damages, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### Tortious Interference with Contract
### (Against Individual Defendants)

238.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 237 as if fully set forth herein.

239.    The Individual Defendant Lynn knew that a valid and binding employment contract existed between DOE and the Corporate Defendants.

240.    The Individual Defendant Lynn intentionally and with malice toward DOE interfered with his contract utilizing wrongful means. Specifically, Defendant Lynn caused his direct supervise Aubin and others at BGCP, Tower Bridge, and BGC Holdings to harass, suspend, demote, and terminate DOE for refusing to engage in and/or conceal illegal behavior by Aubin and others at these companies and affiliates thereof.

241.    As a direct result of Defendant Lynn's actions, DOE has suffered damages, including punitive damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### Prima Facie Tort
### (Against All Defendants)

242.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 241 as if fully set forth herein. Plaintiff does not assert a claim of prima facie tort on the basis of his termination.

243.    Defendants have intentionally inflicted harm upon DOE without excuse or justification solely by reason of Defendants' malevolence toward him, insofar as Defendants have harassed, suspended, demoted, and terminated DOE without lawful basis and have caused DOE to be denied a bonus payment to which he was entitled by virtue of work already performed.

244.    As a direct result of the Defendants' actions, DOE has suffered damages, and is entitled to consequential and punitive damages, in an amount to be determined at trial. DOE has also suffered specialized and particularized damages in an amount to be determined through discovery.

### SIXTH CAUSE OF ACTION
**10b-5 Securities Fraud**
**(Against Corporate Defendants)**

245.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 244 as if fully set forth herein.

246.    Corporate Defendants repeatedly made false and misleading statements to Plaintiff regarding the shares they required him to purchase in the Newton Plan 10% scheme and regarding the sale of eSpeed in 2013. Corporate Defendants failed and refused to provide any substantive accounting to Plaintiff regarding the valuation of the company shares he was required to purchase and/or that were granted to him and instead offered only a black box investment scheme and a demonstrated pattern of untimely, inaccurate, incomplete, and contradictory reporting that left Plaintiff uninformed regarding such valuation. Corporate Defendants made these material misrepresentations with the intended objective and effect of inducing Plaintiff to invest, or remain invested in BGCP, while Corporate Defendants intentionally prevented him from ascertaining the true value of the shares he was required to purchase in the scheme and/or was granted.

247.    In reliance on Corporate Defendants' foregoing misrepresentations, Plaintiff was induced to purchase the shares, and in fact, did purchase the shares in the Newton Plan, and to give up shares awarded to him in the eSpeed sale. Additionally, Corporate Defendants made false statements regarding the growth of the valuation of such shares, and the benefit of the "deferred compensation" component. Those representations were made by Corporate Defendants in order to

drive up share prices, and to camouflage their misleading accounting practices. Corporate Defendants repeatedly refused to provide Plaintiff with an accounting of the value of his shares during the relevant period. Despite Plaintiff's repeated requests for verifiable calculations and historical financial statements supporting BGCP's redemption valuations, none were provided.

248.   Not only was Plaintiff wrongfully denied redemption liquidity at various times relevant and critical to this action, but the manner in which Corporate Defendants expressly responded to Plaintiff's queries regarding redemption demonstrates the inherent conflict of interest that Corporate Defendants either caused or failed to reconcile as those Corporate Defendants continued to profit from Plaintiff's invested funds locked up in a black box with no reasonable options to liquidate as previously promised.

249.   Corporate Defendants' primary liability, and controlling person liability, arise from the following facts: (i) the subject Corporate Defendants' personnel, including but not limited to Defendant Lynn and Aubin, were senior officers, executives and/or directors during the relevant time period, and they were members of Corporate Defendants' management teams or had control thereof; (ii) each of these Corporate Defendants' personnel, by virtue of his responsibilities and activities as a high-level officer, executive and/or director of the Corporate Defendants, was privy to and participated in the creation and development of the Newton Plan and the false and misleading financial statements generated by Corporate Defendants; (iv) each of these above-named Corporate Defendants was aware that their statements to Plaintiff regarding the Newton Plan and the sale of eSpeed were materially false and misleading.

250.   Corporate Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

Corporate Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of inducing investment and thereby allowing their officers, executives, and directors to profit by collecting certain management/administrative fees from the investment and associated arrangement without providing Plaintiff, the investor, any real benefit.

251.    At the time of said misrepresentations, Plaintiff was unaware of the false and misleading nature of Corporate Defendants' representations and believed them to be true. Had Plaintiff known of the truth about his investments, Plaintiff would not have purchased or otherwise acquired the shares in the Newton Plan in particular. At the time Plaintiff joined he would not have gotten into this plan if he could have avoided it or would not have joined the Firm as an employee anyway.

252.    Corporate Defendants exhibited conduct that was highly unreasonable, grossly negligent, and intentionally deceiving, because Corporate Defendants failed to provide Plaintiff with truthful, timely and accurate prospectuses or other detailed information regarding the financial instruments Plaintiff purchased and/or was awarded.

253.    The conduct of these Corporate Defendants was an extreme departure from the standards of ordinary care provided to investors.

254.    By virtue of the foregoing, Corporate Defendants violated §10(b) of the '34 Act, and Rule 10b-5(a), (b) and (c) promulgated thereunder.

255.    As a direct and proximate result of Corporate Defendants' wrongful conduct, Plaintiff suffered damages in connection with his purchases of the Newton Plan shares and with shares awarded to him in the sale of eSpeed during the relevant period in an amount to be proven at trial.

256.     Plaintiff's above alleged damages include, but are not limited to, BGCP share valuations based on Plaintiff's gross earnings invested during the relevant period, plus increased tax liability, loss profits, and interest.

257.     By virtue of the foregoing, Corporate Defendants violated §10(b) of the '34 Act, and Rule 10b-5(a), (b) and (c) promulgated thereunder.

### SEVENTH CAUSE OF ACTION
**Common Law Fraud**
**(Against All Defendants)**

258.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 257 as if fully set forth herein.

259.     Throughout the relevant period, Defendants made false statements to Plaintiff regarding his employment status and their contractual obligations to him, including but not limited to those regarding his compensation and costs to his trading teams in London and New York, and to those related to rebates and other expenses of operation, as well as to those relating to the Newton Plan, the sale of eSpeed, T&E expensing and reimbursement, paying for Kristi Haas to operate in his stead as the Series 30 for the New York Desk until he could assume the role, and his participation in the Charity Day event, with the intent to deceive him. Plaintiff reasonably relied on such statements, described above, and suffered significant financial injury as a result of such reliance.

260.     As a direct and proximate result of Defendants' fraud, Plaintiff has suffered money damages in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
### Fraud in the Inducement
### (Against All Defendants)

261.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 260 as if fully set forth herein.

262.    In forming the employment agreements and other related employment contracts with Plaintiff, the Defendants made misrepresentations or omissions of material fact which they knew to be false. Defendants made such statements with the intention of inducing Plaintiff's reliance. Plaintiff reasonably relied on Defendants' statements, which caused him injury. Specifically, at the time Defendants induced Plaintiff to sign the employment agreement with BGC Financial, they made misstatements of present facts related to the soundness of the compliance culture at the Firm, Plaintiff's actual role or roles in the firm to be performed in New York, and how he would ultimately be compensated and/or expensed. Defendants also had a preconceived intention of not performing their obligations to Plaintiff under the employment agreement.

263.    As a direct and proximate result of Defendants' fraud, Plaintiff has suffered money damages in amounts to be proven at trial collectively, plus interest and attorneys' fees.

## NINTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (Against All Defendants)

264.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 263 as if fully set forth herein.

265.    Defendants owed fiduciary duties to Plaintiff during the relevant period when they solicited Plaintiff to invest in the Newton Plan and to carry out the Firm's business objectives. Defendants owed Plaintiff duties of care, loyalty and full disclosure. Defendants also owed a duty to act in Plaintiff's best interest.

266.    Defendants breached their duties in one or more of the following ways:

A.    Failing to accurately represent and report BGCP's valuations of Newton Plan shares;

B.    Failing to provide fair, accurate and timely accounting and financial records of Plaintiff's investments in BGCP;

C.    Failing to accurately represent how investment funds were collected, invested, allocated, and distributed in any given year to Plaintiff;

D.    Failing to provide a solid investment that offered growth;

E.    Failing to effectively facilitate deferment of taxes and other related benefits;

F.    Providing unreasonable, inconsistent, ever-changing and disparate redemption valuations without clear or reliable explanations or documentations;

G.    Co-mingling assets by and between the Defendants and putting their own interests in maximizing their own personal profits above the interests of Plaintiff;

H.    Providing no vesting schedule for Plaintiff's shares of BGCP;

I.    Refusing to allow Plaintiff to redeem his shares; and

J.    Misappropriating and converting revenues generated by Plaintiff that constituted his earnings.

K.    Plaintiff has been damaged in amounts to be proven at trial as a result of breaches of their respective fiduciary duties by the Defendants.

267.    As a direct and proximate result of Defendants' breach, Plaintiff has suffered money damages in amounts to be proven at trial collectively, plus interest and attorneys' fees.

## <u>TENTH CAUSE OF ACTION</u>
### Conversion
### (Against All Defendants)

268.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 267 as if fully set forth herein.

269.    With intent to deprive Plaintiff of monies he had earned while working at the Firm, the Defendants interfered with Plaintiff's possession of such monies to the exclusion of his owner's

rights in them, monies to which he was entitled and which he alone had the right to possess. The

Defendants did so through schemes including but not limited to the Newton Plan, the eSpeed sale,

T&E expensing and reimbursement, and the Charity Day events Plaintiff was made to participate

in during the relevant period.

270.    As a direct and proximate result of the Defendants' conversion, Plaintiff has

suffered money damages in an amount to be proven at trial, plus interest and attorneys' fees.

**ELEVENTH CAUSE OF ACTION**
**Unjust Enrichment**
**(Against All Defendants)**

271.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 270 as if fully

set forth herein.

272.    Plaintiff conferred a benefit on Defendants. Specifically, Defendants capitalized

and profited from the funds invested by Plaintiff in the Newton Plan, shares clawed back in the

sale of eSpeed, and monies not reimbursed to Plaintiff from BGCP's T&E scheme. Defendants

relied on Plaintiff's association with BGCP to solicit other financial service firms and clients to

conduct business with BGCP, generating revenue for the firm. Defendants were also unjustly

enriched by misappropriating and converting revenues generated by Plaintiff that constituted his

earnings. Defendants have also been unjustly enriched by Plaintiff's forced participation in

BGCP's annual Charity Day event, in which BGCP and its executives misappropriated funds

raised by Plaintiff.

273.    Defendants have been unjustly enriched in an amount to be proven at trial.

274.    Despite demand, Defendants have not paid Plaintiff for the benefits that Defendants

received.

## TWELFTH CAUSE OF ACTION
### Accounting
### (Against Corporate Defendants)

275.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 274 as if fully set forth herein.

276.    By their conduct alleged above, Corporate Defendants and entities and/or persons they control, committed fraud and conversion against Plaintiff and breached fiduciary duties owed to him. This fraud and conversion and breach of fiduciary duty led to dispersion of assets misappropriated from Plaintiff.

277.    In order to discover and trace the whereabouts of assets misappropriated from Plaintiff, an accounting is required from Corporate Defendants and entities and/or persons they control, as described herein, and in the addendum attached hereto as **Exhibit A**.

## THIRTEENTH CAUSE OF ACTION
### RICO 18 U.S.C. S 1962(c) & (d)
### (Against All Defendants)

278.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 277 as if fully set forth herein.

279.    Defendants' conduct alleged above, and in the addendum attached hereto as **Exhibit A**, constitutes the conduct of an enterprise through a pattern of racketeering activity under 18 U.S.C. § 1962. Defendants' conduct constitutes indictable acts under 18 U.S.C. § 1961(1)(B) and "fraud in the sale of securities" (see Second Claim for Relief, *supra*) under 18 U.S.C. § 1961(1)(D). Defendants' racketeering activity compromises a pattern because the acts, omissions, and conduct at issue: (1) occurred well over 2 times in the past 10 years; (2) had the same purpose, participants, victims, and methods of commission; and (3) occurred over a substantial period of time.

280.     As a direct and proximate result, Plaintiff has suffered damages in an amount to be proven at trial and Plaintiff is entitled to treble damages, attorneys' fees, and costs pursuant to 18 U.S.C. § 1964(c).

## FOURTEENTH CAUSE OF ACTION
### Defamation
### (Against All Defendants)

281.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 280 as if fully set forth herein.

282.     Throughout the relevant period, Defendants have made false and disparaging statements about Plaintiff and/or caused others to do so on their behalf, that he was somehow unfit for his role at the Firm, disparaging him to his co-workers and others in the securities industry. As described above, Tim O'Leary of Ronin admitted to disparaging Plaintiff to Deutsche Bank. In Fall of 2018 agents of Ronin falsely told Plaintiff's current employer, Tradition, that Plaintiff "has a drinking problem" and Ronin would not do business with them if Plaintiff remained there. Such publication to third parties orally and in written email communications, without privilege or authorization, and fault amounting to at least negligence have irreparably harmed Plaintiff's personal and business reputation, and constitute defamation per se.

283.     Defendants are jointly and severally liable by virtue of their involvement in defaming Plaintiff and are therefore liable to Plaintiff for money damages in amounts to be proven at trial.

## FIFTEENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (Against All Defendants)

284.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 283 as if fully set forth herein.

285.    Defendants have acted toward Plaintiff in a manner meant to cause intimidation, fear, and severe emotional distress. By defaming Plaintiff as "having a drinking problem" to his present employer, Tradition, and stating that they would not work with Tradition so long as Plaintiff was employed there, Ronin and its agents, acting at the direction of Defendants, have intentionally (or recklessly) caused severe emotional distress, mental trauma and bodily harm to Plaintiff. This, and such other extreme and outrageous behavior by Defendants against Plaintiff, as described herein, has led Plaintiff to seek medical attention. He presently fears another heart attack and/or other health problems as a result of the trauma of knowing that Defendants seek to put him out of another job and blacklist him from the securities industry altogether.

286.    Defendants are jointly and severally liable by virtue of their involvement in intentionally inflicting emotional distress upon Plaintiff and are therefore liable to Plaintiff for money damages in amounts to be proven at trial.

## SIXTEENTH CAUSE OF ACTION
### Civil Conspiracy
### (Against All Defendants)

287.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 286 as if fully set forth herein.

288.    Defendants conspired to retaliate against Plaintiff for internally reporting accounting fraud, theft, and supervisory failings at BGCP and its subsidiaries and affiliates, and for reporting same to regulatory agencies including but not limited to the SEC, both while he was employed by BGC Financial, L.P. and after his termination.

289.    As a direct and proximate result of the actions taken in furtherance of this conspiracy, Plaintiff was damaged in an amount to be determined at trial; Defendants are jointly and severally liable to Plaintiff.

## SEVENTEENTH CAUSE OF ACTION
### Violations of New York Labor Law ("NYLL")
### (Against All Defendants)

290.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 289 as if fully set forth herein.

291.    Defendants, through their retaliatory actions described herein, denied Plaintiff unpaid deferred compensation in an amount to be proved at trial.

292.    Plaintiff seeks attorneys' fees and costs as required by NYLL § 198(1-a).

293.    Plaintiff seeks liquidated damages in an amount equal to the unpaid deferred compensation as required by NYLL § 198(1-a).

294.    Plaintiff seeks prejudgment interest in an amount of 9 percent per annum as required by NYLL § 198(1-a).

295.    Plaintiff seeks interest to run as required by NYLL § 198(1-a).

## ATTORNEYS' FEES AND COSTS

296.    Plaintiff's attorneys' fees and costs, including expert witness costs, are compensable in this matter pursuant to the Dodd-Frank Act. In addition, an award of attorneys' fees and costs are particularly warranted in this matter as DOE has repeatedly and in good faith attempted to negotiate a reasonable resolution of this dispute without having to refer the matter to this forum for adjudication.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff seeks judgment in his favor and against Defendants, as follows:

A.      Reinstating Plaintiff to his position at BGC Financial with the same seniority status that he would have had but for the discrimination and retaliation or providing him with front pay in lieu thereof;

B.      Awarding Plaintiff two times the amount of back pay he is owed, with interest;

C.      Awarding Plaintiff the deferred compensation he was due pursuant to his employment contract with reasonable interest;

D.      Compensating Plaintiff for litigation costs; including expert witness fees and reasonable attorneys' fees;

E.      Finding that Defendants committed intentional torts against Plaintiff and granting Plaintiff a punitive damages award; and

F.      Granting such other and further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: June 27, 2019                    Respectfully submitted,

                                        PUGH HAGAN PRAHM PLC

                                        By: */s/Siobhan Briley*
                                            Siobhan Briley
                                            sbriley@pughhagan.com
                                            425 E. Oakdale Blvd., Suite 201
                                            Coralville, IA 52241
                                            Tel: (319) 351-2028
                                            Fax: (319) 351-1102
                                            *Attorney for Plaintiff John Doe*


                                        LAW OFFICES OF CHRISTOPHER H.
                                        TOVAR, PLLC

                                        By: */s/Christopher H. Tovar*
                                            Christopher H. Tovar
                                            christopher.h.tovar@gmail.com
                                            3990 Chilson Road
                                            Howell, MI 48843
                                            Tel: (832) 370-3908
                                            *Attorney for Plaintiff John Doe*