# EMPLOYMENT AGREEMENT

AGREEMENT, dated as of January 21, 2015, by and between BGC FINANCIAL, L.P., a Delaware limited partnership, with offices at One Seaport Plaza, New York, New York 10038, together with its successors and assigns (collectively, "**BGC**"), and                         , residing at                New York City,        ("**Employee**").

BGC and Employee desire to enter into an employment agreement ("**Agreement**"), on the terms and conditions set forth below, to provide for the employment of Employee for the term herein specified. In consideration of the mutual agreements set forth below, BGC and Employee therefore agree:

Section 1. Employment and Term.

(a) BGC hereby agrees to employ Employee, and Employee hereby agrees to serve, on the terms and conditions set forth in this Agreement, as Managing Director with the duties set forth in Section 2, for a term beginning on             2015 (the "**Start Date**") and ending on the fourth (4th) anniversary of the Start Date (the "**Initial Term**") (such period, together with any subsequent employment period, referred to herein as the "**Term of Employment**"), unless earlier terminated as specified in Section 4 below. Should Employee not provide continuous service to BGC as a result of reasons other than customary vacations or similar absences, then the Initial Term shall be extended by the period of such interruption in continuous service.

(b) The Term of Employment shall, unless terminated earlier, be automatically extended for successive periods of one year, on the same terms and conditions as contained in this Agreement, unless (i) either party notifies the other party at least twelve (12) months prior to the expiration of the Term of Employment of its intention not to renew this Agreement or (ii) this Agreement is otherwise terminated in accordance with its terms, including without limitation termination for Cause under Section 4.

Section 2. Duties.

Employee agrees that during the Term of Employment, Employee will perform such duties and assignments relating to the business of a Managing Director of BGC and any entity whether now existing or hereafter arising that directly or indirectly, through one or more intermediaries, controls or is controlled by or under common control with BGC (each such entity, an "**Affiliate**"), as the management of BGC and/or their designees shall direct. It is currently anticipated that, depending on the then current business needs of BGC, Employee will work in BGC's New York office for three (3) weeks per month and in the London office of BGC Brokers, L.P. for one (1) week per month. During the Term of Employment, Employee shall, except during customary vacation periods and periods of illness, devote all of Employee's business time, attention and energies to the performance of Employee's duties and to the business and affairs of BGC and to promoting the best interests of BGC, and Employee shall not, either during or outside of such normal business hours, directly or indirectly, engage in any activity inimical to such best interests. BGC retains the right, in its sole discretion, to place Employee on paid administrative leave (such payment to include all compensation provided for in this Agreement as and when payable hereunder) if it determines that the circumstances so warrant

and to provide Employee with alternative work of a broadly similar nature to the work Employee may be asked to normally perform under this Agreement.

Section 3. Compensation During the Term of Employment.

(a) BGC shall pay to Employee a variable draw at the annualized rate of three hundred sixty-four thousand dollars ($364,000) (the "**Draw**"), less all applicable withholdings and payable in accordance with BGC's payroll practices in effect at the time. In addition, Employee will also be paid a fixed monthly salary of three thousand dollars ($3,000) gross (or thirty-six thousand dollars ($36,000) gross annualized) (the "**Salary**"), which except as permitted by law is not subject to reduction due to variations in the hours worked or the quality or quantity of Employee's performance.

(b) Employee shall be entitled to participate in an incentive pool compensation arrangement (the "**Pool**") related to the performance of BGC's North American Futures and Options Desk (excluding the Chicago Futures Execution Desk) and the London Financial Futures and Options Desk (the "**Desks**"). The Pool shall be an amount equal to: (x) 50% of the Net Revenues of the Desk (as determined on a calendar quarterly (February 1-April 30, May 1-July 31, August 1-October 31 and November 1-January 31) basis in accordance with BGC's then current accounting policies and practices (the "**Calculation Period**")); minus (y) Desk Compensation (as defined herein) for the same calendar quarterly period, BGC's employment-related expenses and any similar employment-related tax expenses for the Desk, all travel and entertainment expenses (including but not limited to promotion accruals) incurred by employees on the Desk during the Calculation Period to the extent that they exceed 3% of Net Revenues, market data expenses (i.e. Bloombergs and Reuters) for the Desk, Desk, any other direct or indirect expenses attributable to the Desk, a one hundred fifty dollar ($150) per calendar month per Desk employee for front office support costs, client services charges for the Desk and a share of Desk support ("**Deductions**"). "**Net Revenues**" means revenues generated by the Desk with respect to voice brokering transactions, floor expenses and other direct and indirect expenses including a per contract futures charge (presently 1.5 cents per contract), discounts, brokerage sharing, rebates, charges, losses, trading losses, overdue brokerage receivables, damages, and/or other expenses not contemplated or generally incurred as of the time of execution of this Agreement, all as determined in accordance with BGC's policies and practices currently in effect at the time such Net Revenues are determined with respect to each Calculation Period. Employee agrees and acknowledges that Employee will use Employee's best efforts to collect on all outstanding brokerage receivables. "**Desk Compensation**" shall mean the aggregate of all compensation paid or payable to employees assigned to the Desk (including Employee), including but not limited to base salaries, draws, commission payments, advances and bonuses. If, in any Calculation Period, the Pool is a negative amount or insufficient to pay all guaranteed bonuses/compensation, then the shortfall (i.e., the amount needed to make the Pool break-even and to pay such guarantees) shall be carried over to the next Calculation Period as a dollar-for-dollar reduction of the Pool for that quarterly period. BGC shall have the right to assign or reassign all employees of the Desk after consultation with Employee. The allocation of amounts in the Pool for distribution on a calendar quarterly basis to Desk employees, including Employee, shall be recommended by Employee, subject to the final approval of the President of BGC Partners, Inc. or his designee. Employee's allocation is payable within 45 days after the last day of the Calculation Period. It is a condition precedent to receiving and earning payment of the

Commission Payment that Employee remains employed by BGC (or any Affiliate) at the time payment is made; however, should Employee work for the entire Term of Employment and is not otherwise in breach of this Agreement, Employee's allocation of the final Pool will be made to Employee at such time as other similar payments are made.

(c) Employee agrees that if the Net Revenues (as defined above) generated by Employee during any consecutive three (3) month period as of the Start Date and thereafter do not exceed two (2) times the sum of the Salary, Draw, and Deductions (all as determined in accordance with BGC's policies and practices currently in effect at the time), BGC in its sole discretion, may immediately reduce the Draw paid to Employee by the amount that the Net Revenues fall short during such three-month period.

(d) Employee agrees that if the Net Revenues (as defined above) generated by Employee during any consecutive three (3) month period as of the Start Date and thereafter do not exceed two (2) times Salary (all as determined in accordance with BGC's policies and practices currently in effect at the time), BGC in its sole discretion, may terminate Employee's employment on three (3) months' written notice.

(e) Employee may also be eligible to receive discretionary bonuses during the Term of Employment. Any such discretionary bonus may be in the form of cash, a contingent non-cash grant or a combination thereof, subject to the terms of the grant document(s) under which such non-cash grant was awarded, including any vesting and cancellation provisions and restricted covenants contained therein. Employee understands that such non-cash grant may consist of REUs, RPUs, PSIs or PSUs as those terms are defined in the BGC Holdings, L.P. Agreement of Limited Partnership, as Amended and Restated, or may consist of any other form of non-cash grant. With respect to each such bonus, Employee must still be employed by and performing substantial services for BGC, not given notice of resignation, and not breached this Agreement in order to receive any bonus.

(f) Employee understands and agrees that a percentage of the aggregate compensation-related amount attributed to Employee by BGC (including but not limited to cash, loans, non-cash grants, and any form of equity) (the "**Total Allocation**") may, as determined in the sole discretion of BGC, consist of (rather than cash) a contingent non-cash grant, subject to the terms of the grant documents under which such non-cash grant was awarded, including any vesting, cancellation, and restrictive covenants provisions contained therein (the "**Grant Portion**"). The form, manner, and valuation of such Grant Portion shall be determined in the sole discretion of BGC. Employee understands that such non-cash grant may consist of REUs, RPUs, PSIs, PSEs or PSUs as those terms are defined in the BGC Holdings, L.P. Agreement of Limited Partnership, as Amended and Restated, or may consist of any other form of non-cash grant. Should Employee receive PSIs, PSEs or PSUs pursuant to this Section 3(e), the amount of the grant award for purposes of this subsection shall be deemed to be the result of the number of units granted multiplied by the market price of BGC, Partners, Inc. Class A common stock on the date of final determination of such award. Nothing herein shall be construed as requiring BGC to procure the grant of any particular type of contingent non-cash grant award or prevents BGC from procuring the grant of any other type of contingent non-cash grant award from time to time. For the avoidance of doubt, where BGC procures that any payment, award, benefit, or loan of

77654 v3

money or property (including without limitation distributions in respect of such award and the application of any distributions) (each an "**Award**") pursuant to this Agreement or otherwise, is provided to Employee by BGC or an Affiliate, Employee agrees that BGC shall be entitled to treat such Award as being in satisfaction of any of its own obligations to Employee which respect to the Award, including but not limited to under Section 3(e) herein. The Grant Portion shall be ten percent (10%) of the Total Allocation.

(g) BGC shall reimburse Employee for the cost of one (1) round-trip business-class airfare tickets from London, England to New York, new York per month, *provided that* the cost of the ticket is pre-approved by Jean-Pierre Aubin, or his successor or designee.

(h) Employee shall be entitled each year to participate in such employee benefit plans and programs as BGC may from time to time generally offer to employees of BGC. Employee will also be entitled to a vacation or vacations in accordance with the policies of BGC as determined by the management of BGC from time to time. BGC shall not pay Employee any additional compensation for any vacation time not used by Employee, other than as required by law.

(i) All compensation shall be subject to withholding and other applicable taxes. Employee further agrees that (i) any sums owed (or owing in the future) to BGC (or any Affiliate) by Employee may be deducted from Employee's paychecks (or any bonus checks) in amounts that are in accordance with applicable law; (ii) to the extent that BGC guarantees Employee's American Express Corporate Charge Card, any sums owed to American Express and Employee's American Express Corporate Charge Card that are 90 days past due for payment may be deducted by BGC from Employee's paycheck (or any bonus checks) in amounts that are in accordance with applicable law and make payments to American Express on Employee's behalf; (iii) to the extent that BGC guarantees Employee's American Express Corporate Charge Card, any sums owed to American Express and Employee's American Express Corporate Charge Card upon the termination of Employee's employment (for whatever reason) may be deducted by BGC from any outstanding paycheck in amounts that are in accordance with applicable law and make payments to American Express on Employee's behalf. Moreover, Employee understands and agrees that excess travel and entertainment expenses, as determined in BGC's sole discretion, shall be allocated and treated in accordance with BGC's then current practices.

(j) All compensation shall be earned and payable only if Employee is employed by BGC or an Affiliate at the time payment is made. Employee agrees that any compensation paid to Employee subsequent to the termination of Employee's employment with BGC shall only be paid upon execution by Employee of a general unconditional release in favor of BGC in a form satisfactory to BGC.

Section 4. Termination.

(a)   During the Term of Employment, BGC may terminate this Agreement with Employee for Cause and notice of such termination shall be sent to Employee. For the purposes hereof, "**Cause**" means Employee's (i) dishonesty, disloyalty, insubordination, unsatisfactory performance or attendance, or failure to follow BGC's policies, rules, codes of conduct, or procedures, (ii) nonperformance or breach by Employee of any of the provisions of this Agreement (including inaccuracy of representations), (iii) conviction of a crime under U.S.

Federal, state or local laws or any applicable foreign laws (including any pleas of *nolo contendere*), (iv) serious misconduct in connection with or affecting the business of BGC or any Affiliate, (v) serious neglect or gross negligence in performing Employee's duties hereunder, (vi) failure to perform Employee's duties hereunder (other than as a result of being disabled) after delivery to Employee by BGC or an entity owned or controlled by BGC of written notice identifying the duties not being performed by Employee, which failure may include the failure to maintain any regulatory approvals or licenses necessary to perform Employee's duties, (vii) violation by Employee or Employee aiding and abetting any violation by another, as reasonably determined by BGC, of any law, order, rule or regulation pertaining to Employee, BGC or its affiliates including, among others, the rules, regulations and by laws of the Financial Industry Regulatory Authority, (viii) illegal drug use by Employee, or (ix) request for reimbursement of expenses not actually incurred by Employee and/or not in accordance with BGC's travel and entertainment policy, or assisting others in such efforts.

(b)   Subsequent to the expiration of a notice of election to terminate the Term of Employment pursuant to Section 1, if BGC elects, at its sole discretion, to continue to employ the Employee, the Employee will be an employee at will and BGC may terminate employment of Employee without Cause. This Agreement shall no longer govern the terms of the Employee's compensation when Employee is an employee at will. While Employee is an employee at will, the terms of the Employee's employment, including, but not limited to Employee's compensation, shall be governed by BGC's policies then in effect; provided, however, that Employee shall remain subject to the restrictions set forth in Section 5 here of.

(c)   If in BGC's judgment during the Term of Employment, by reason of physical or mental disability, Employee is incapable of performing the essential functions of his position, with or without reasonable accommodation for a period of 60 out of 180 consecutive days, BGC at its option may thereafter terminate this Agreement with Employee and notice of such termination may be sent to Employee. Salary of Employee during any period of disability shall be in accordance with the then-current policy of BGC. If Employee shall die during the Term of Employment, the Term of Employment shall automatically terminate; in the event of such death, or if BGC terminates the Term of Employment pursuant to this Section, BGC shall pay to Employee or to Employee's legal representatives, or in accordance with a direction given by Employee to BGC in writing, Employee's compensation to the date on which such death or termination for disability occurs.

(d)   In the event BGC notifies Employee of BGC's election to terminate this Agreement with Employee, such termination shall become effective (i) if mailed, three (3) days after mailing of notice thereof to Employee or (ii) if delivered by hand, upon delivery.

(e)   In the event Employee is terminated for Cause or because of disability, he will promptly resign from any officer and/or director positions he may hold.

Section 5.   Non-Competition; Non-Disclosure;
             Non-Solicitation; Non-Disparagement.

(a)   During the Term of Employment and until six (6) months after termination of Employee's employment (the "**Non-Compete Period**"), for Cause or upon Employee's

77654 v3

voluntary resignation, Employee shall not, alone or with others, directly or indirectly, participate, engage, render services to or become interested in (as owner, stockholder, partner, lender or other investor, director, officer, employee, consultant or otherwise) any business activity that is in competition with, or otherwise related to or arises from, the then current business of BGC or any Affiliate. Notwithstanding any other provisions herein, nothing in this Agreement shall prohibit Employee from acquiring or owning in accordance with BGC's policies and procedures regarding personal securities transactions, less than five percent (5%) of the outstanding securities of any class of any corporation that are listed on a national securities exchange or traded in the over-the-counter market.

(b) As additional consideration for Employee's performance of the covenants contained in Section 5(a) above, BGC shall pay Employee for each month during the Non-Compete Period (the "**Non-Compete Payments**") an amount equal to an amount equal to one-twelfth (1/12th) of Employee's Salary and Draw in effect of the time of Employee's termination of Employment or resignation of employment. Notwithstanding the foregoing, BGC, written notice at any time to Employee, may terminate early the Non-Compete Period and, in connection therewith, stop any further Non-Compete Payments and the obligation of Employee under this Section 5(a). In addition, if BGC determines that Employee has breached any of Employee's covenants contained herein, BGC may suspend the making of any Non-Compete Payments (or, if during the Term of Employment, any payments under Section 3 above), or offset from such payments (or any other amounts then due or that will become due to Employee from BGC) BGC's reasonable estimate of the damages it has suffered as the result of such breach (or any other amounts owed by Employee to BGC), in each case without prejudice to any of its rights or remedies under this Agreement.

(c) Employee acknowledges that during Employee's employment with BGC, Employee will have access to and become acquainted with the Company's confidential records and information and Employee shall keep all such records and information in compliance with BGC's Confidentiality and Intellectual Property Agreement, which Employee agrees to execute into in connection with the commencement of Employee's employment with BGC.

(d) During the Term of Employment and for a period of twelve (12) months after the termination of Employee's employment, for any reason whatsoever, Employee shall not, alone, or with others, directly or indirectly, solicit, hire or retain for Employee's benefit or the benefit of any person or organization other than BGC and its Affiliates, the employment or other services of any individual employed by BGC or any Affiliate or serving as a consultant or independent contractor at the time of such termination or within six months prior thereto ("**Non-Solicitation Period**").

(e) Employee recognizes that Employee is being placed in a position of trust and confidence and as such will not during the Term of Employment or thereafter defame, disparage, libel or slander BGC or its Affiliates in any way and will not during the Term of Employment or thereafter contact, respond to any request from or in any way criticize, defame, disparage, libel or slander BGC or its Affiliates, employees, agent to the media (print, television, or otherwise, whether on or off the record).

77654 v3

Section 6. <u>Warranty</u>.

Employee warrants that Employee shall use his best efforts to generate revenue on behalf of BGC during the Term of Employment and to advance the interests of BGC. Employee also represents, warrants and covenants that Employee possesses and will maintain all licenses, permits and qualifications necessary to perform Employee's duties hereunder.

Section 7. <u>Other Employee Obligations.</u>

(a) In order to retain and enhance BGC's standing and integrity at the forefront of the business community, the business conduct of Employee must be totally professional and Employee must at all times observe appropriate standards of politeness and courtesy in Employee's behavior both with the public and with colleagues. Employee is required to well and faithfully serve BGC and to the best of Employee's ability use Employee's best endeavors at all times to promote the development of BGC's business and reputation.

(b) Employee must maintain the highest standards of honesty and fair dealing in Employee's work for BGC and any Affiliate. Great importance is attached to the observance of BGC's policies and procedures as expressed in any personnel or compliance manual, all Federal and State laws and regulations (or if applicable, those of a foreign jurisdiction) and the rules of the Financial Industry Regulatory Authority or any other applicable self-regulatory organization. Material breach of any of these obligations may be regarded as misconduct and may result in summary dismissal for Cause.

(c) Within thirty (30) days of the Start Date, Employee shall be required to obtain a Series 30 license.

(d) During the Term of Employment and any extensions thereof, Employee shall not, without the written consent of BGC, enter into an agreement, whether oral, written or otherwise, with any person, firm or corporation providing for Employee's future employment by such or any other person, firm or corporation.

Section 8. <u>Injunctive Relief</u>.

The parties acknowledge that in the event of a breach or a threatened breach by Employee of any of Employee's obligations under this Agreement, BGC and its Affiliates will not have an adequate remedy at law. Accordingly, and notwithstanding Section 8 hereof, in the event of any such breach or threatened breach by Employee, BGC and its Affiliates shall be entitled to specific performance of this Agreement or such equitable and injunctive relief, without proof of special damages or the posting of any bond or other security, as may be available to restrain Employee and any business, firm, partnership, individual, corporation or entity participating in such breach or threatened breach from the violation of the provisions hereof. BGC and its Affiliates will be entitled to seek such relief, without the posting of any bond or other security, in court pursuant to Section 7502(c) of the New York Civil Practice Law and Rules, or any successor provision thereto. Nothing herein shall be construed as prohibiting BGC or any Affiliate from pursuing any other remedies available at law or in equity for such breach or threatened breach in any dispute submitted to arbitration under Section 8 hereof.

77654 v3

Section 9. <u>Dispute Resolution</u>.

Subject to the provisions of Section 8 above, any disputes, differences or controversies arising at any time under this Agreement or Employee's employment shall, to the maximum extent permitted by applicable law, be governed by the Dispute Resolution Policy and Agreement that Employee agrees to execute in connection with the commencement of Employee's employment with BGC.

Section 10. <u>Entire Agreement; Enforceability; Partial Invalidity, Attorneys' Fees</u>.

(a)   This Agreement, together with the Dispute Resolution Policy and Agreement and the Confidentiality and Intellectual Property Agreement entered into in connection with the commencement of Employee's employment with the Company, contains the entire agreement of the parties or its Affiliates with respect to the subject matter hereof and supersedes any and all prior agreements and understandings between the parties or any of BGC's Affiliates, including Employee's Broker's Contract with BGC Brokers L.P., dated             2012. Neither party is relying upon any promises, representations or inducements, written, oral or otherwise, which are not set forth in this Agreement, and no modification or waiver of any provision hereof will be binding upon any party unless in writing and signed by the parties hereto.

(b)   The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted. In the event that a court of competent jurisdiction shall determine that any covenant set forth in this Agreement is impermissibly broad in scope, duration or geographical area, or is in the nature of a penalty, then the parties intend that such court should limit the scope, duration or geographical area of such covenant or reduce the amount of Liquidated Damages to the extent, and only to the extent, necessary to render such covenant reasonable and enforceable, and enforce the covenant as so limited.

Section 11. <u>Miscellaneous</u>.

This Agreement:

(a)   shall be binding upon and inure to the benefit of the parties hereto and their respective successors, permitted assigns, heirs, executors and administrators. No waiver or modification shall be deemed to be a subsequent waiver or modification of the same or any other term, covenant or condition in this Agreement;

(b)   may not be assigned, in whole or in part, by either party hereto without the prior written consent of the other party (any purported assignment hereof in violation of this provision being null and void); however, it may be assigned without recourse, in whole or in part by BGC to any Affiliate or to any successor in interest of BGC or any Affiliate by merger, consolidation, reorganization or otherwise, and may be executed in various counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to the principles of conflicts of laws thereof. Employee hereby waives personal service of process, and irrevocably submits to service of process by mail; and

(c)     shall be effective only when executed both by BGC and Employee and upon such shall be binding and enforceable; the Agreement in unsigned form does not become an offer of any kind and does not become capable of acceptance until executed by Employee, and at such time, the Agreement is capable of acceptance by signature by an official at BGC; and

(d)     may be executed in one or more counterparts, all of which together shall constitute but one Agreement.

Section 12.    Notices.

All notices pursuant to this Agreement shall be in writing, shall either be delivered by hand or mailed by certified or registered mail, return receipt requested, postage prepaid to the address set forth above or to such other address as may be designated for such purpose in written notice and shall be effective upon receipt when delivered by hand or on the third business day after the day on which mailed. Any notice to BGC hereunder will similarly be sent to:

> Stephen M. Merkel, Esq.
> Executive Managing Director
> and Chief Legal Officer
> BGC FINANCIAL, L.P.
> 110 East 59th Street
> New York, New York 10022
> Tel: (212) 829-4829
> Fax: (212) 829-4708

Section 13.    No Conflicts.

Employee represents and warrants that Employee is not in default under, or in breach of, any agreement requiring Employee to preserve the confidentiality of any information, client lists, trade secrets or other confidential information or agreements not to compete or interfere with any prior employer including, but not limited to, any employment agreement; and neither the execution and delivery of this agreement nor the performance by Employee of Employee's obligations hereunder will conflict with, result in a breach of, or constitute a default under, any confidentiality or non-competition agreement or any employment agreement to which Employee is a party or to which Employee may be subject.

Section 14.    Code Section 409A.

This Agreement is intended to comply with Code Section 409A and the interpretative guidance thereunder, including the exceptions for short-term deferrals, separation pay arrangements, reimbursements, and in-kind distributions, and will be administered, construed, and interpreted in accordance with such intent. If any provision of this Agreement needs to be revised to satisfy the requirements of Code Section 409A, then such provision shall be modified or restricted to the extent and in the manner necessary to be in compliance with such requirements of the Code and any such modification will attempt to maintain the same economic results as were intended under this Agreement. Each payment under this Agreement is intended to be treated as one of a series of separate payment for purposes of Code Section 409A and

77654 v3

Treas. Reg. §1.409A-2(b)(2)(iii) (or any similar or successor provisions). Notwithstanding anything in this Agreement to the contrary, to the extent Employee is considered a "specified employee" (as defined in Code Section 409A and Treas. Reg. §1.409A-1(c)(i) or any similar or successor provision) and would be entitled to a payment during the six (6)-month period beginning on Employee's date of termination that is not otherwise excluded under Code Section 409A under the exception for short-term deferrals, separation pay arrangements, reimbursements, in-kind distributions, or any otherwise applicable exception, the payment will not be made to Employee until the earlier of the six (6)-month anniversary of Employee's date of termination or Employee's death and will be accumulated and paid on the first day of the seventh month following the date of termination. BGC does not guarantee that any payments made in connection with the Agreement will satisfy all applicable provisions of Code Section 409A.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

BGC FINANCIAL, L.P.

By: _____
Name: Louis T. Scotto
Title: General Manager North Am.

*[Signature page to Agreement, dated as of _____ 2015, between BGC FINANCIAL, L.P. and _____ ]*

77654 v3