# GAGE SPENCER & FLEMING LLP

ATTORNEYS AT LAW

410 PARK AVENUE

NEW YORK, NEW YORK 10022

TELEPHONE: (212) 768-4900
FACSIMILE: (212) 768-3629
E-MAIL: info@gagespencer.com

May 9, 2016

By Email

Michael S. Popok
Deputy General Counsel
Cantor Fitzgerald
110 East 59th Street
New York, NY 10022

Re:  Whistleblower Complaint of

Dear Mr. Popok:

We write on behalf of                an employee of BGC Financial, L.P. who recently reported to Christopher T. Jensen, Esq. of Morgan, Lewis & Bockius LLP concerns regarding accounting, internal controls, auditing and other matters, including the conduct of BGC. I understand you have requested a written report about the sequence of conduct by BGC management which Mr.         reported involving management's intentional misstatement of earnings-based financial figures and BGC's possible exposure to false tax accounting as a consequence.

Mr.         serves as a Managing Director and head of BGC's North American Futures and Options Desk (the "North American Desk") and London Financial Futures and Options Desk (the "London Desk"). In that capacity, he manages a group of executing brokers on both Desks. In his position, he spends time each month in both the New York and London offices. He reports directly to J.P. Aubin, an Executive Managing Director of BGC Partners.

## Background

Beginning in 2015, the North American Desk became subject to efforts to restate financial performances which previously had been reviewed and approved by senior management, including Mr. Aubin and his business manager Jon McLachlan. Soon after Mr. McLachlan left the firm, Mr. Aubin assigned that task to his new business manager, Aldric Marinos. Mr. Marinos reported directly to and, on information and belief, acted at the behest of Mr. Aubin. On information and belief, Mr. Aubin directed Mr. Marinos to cut costs.

**EXHIBIT D TO COMPLAINT**

Michael S. Popok, Esq.
May 9, 2016
Page 2

In response, Mr. Marinos recalculated and restated 2015's quarterly performances to reverse profitable quarters into losses.

Mr. Marinos did this even though, previously, Mr. Aubin and Mr. McLachlan had signed off on the profitable performance. Based on it, they had approved the payment of bonuses for the North American Desk and in fact had paid Mr. $26,000 as an "override," or management incentive payment, for that profitable performance. Then, before the bonuses were paid (which depend on profitability), Mr. _____ was informed by Mr. Aubin that the North American Desk was not profitable, but was instead in deficit of $500,000. As a consequence, the previous decision approving the payment of bonuses was reversed. Furthermore, traders on the London Desk were notified that the losses of the North American Desk would be offset against their own profitability and negate bonuses to them.

When Mr. _____ disputed the matter, Mr. Aubin refused to investigate or to admonish Mr. Marinos or disavow the restatements of quarterly results Aubin himself had previously approved. Instead, he reprimanded Mr. _____ and told him to pursue his contentions with Mr. Marinos. In his ensuing follow-up, Mr. Marinos declined to answer his questions, show him his work, or provide him with the basis for his calculations.

Mr. _____ then notified his business manager in London, Tommy Attril, about Mr. Marinos' accounting conclusions and their effect on both the North American and London Desks. Mr. _____ asked him to conduct a review of that accounting. Mr. Attril worked in the Accounts Department where one of his principal functions was to speak with other departments with the object of reconciling disputed figures. Before Mr. Atril was able to discharge the task Mr. _____ had given him, Mr. Attril was blocked from his previous access to other departments in an effort to shut down the effort. Mr. Attril resigned from BGC in response.

At the instigation of Mr. _____ Mr. Attril agreed (with BGC's approval) to stay on for four weeks to help with a transition to a new business manager. Within days, he was able to obtain Mr. Marinos' accounting from the Accounts Department where he worked. Having previously reconciled the quarterly performances, he was easily able to spot the flaws in the Marinos accounting and reported his observations. Immediately, the Human Resources Department in London, with the approval of Mr. Aubin, sent him home, well prior to the expiration of the four-week period that the firm had agreed.

<u>Improper Accounting</u>

Mr. Marinos' conclusions were based on improper accounting to create "false losses." <u>First</u>, Mr. Marinos inappropriately applied losses incurred by traders excluded from the Desks' compensation pools. Traders on the Desks are either paid out

Michael S. Popok, Esq.
May 9, 2016
Page 3

of the performance of the particular Desk, or are excluded from that group calculation and paid based on their own performances. For these latter traders, who are compensated according to criteria set forth in their own contracts, trading losses incurred by them do not (and should not) affect the accounting of the Desks' respective performances. It is only those traders who do not have such individual contractual provisions who are included on the Desks' accountings. This logical reality has long been observed by BGC's managers, and was so in 2015 when Messrs. Aubin and McLachlan signed off on the original calculations of the North American Desk's performance.

Additionally, Mr.          particular circumstance made Mr. Marinos' treatment especially inappropriate. Mr.          had been brought over from London in late 2014 (where he ran the London Desk) to assume responsibilities for the North American Desk. When he arrived, he found that numerous traders, signed to contracts with a remaining term, were underperforming. In order to permit him to clean up the North American Desk without having his own compensation from the compensation pool adversely affected by poor performers for whom he had had no responsibility for hiring, Mr. McLachlan had agreed not to recognize the losses from these traders.

Second, the aforementioned "override" of $26,000 – the incentive payment paid to Mr.          by management as a reward for a profitable performance of the North American Desk – was characterized retroactively as an error and was debited to the North American Desk's compensation pool. However, the debit was plainly incorrect accounting as the "override" had been paid to him by management out of BGC's general funds. It had not been paid out of the compensation pool. Accordingly, even if an erroneous payment (which it wasn't), it could only properly be debited to the BGC general fund from which it originated. It was not appropriately debited to the compensation pool. As it stands, the debit acts as an offset to the Desk's profitability going forward which, in consideration of all that has happened here, appears to be the driving intent.

Third, Mr. Marinos' accounting denied the North American Desk revenues that were directly caused by the Desk's trading. The Desk's trading had caused BGC to receive large revenues from rebates paid by the CME or by pit brokers through whom trades were executed, as well as from matched trades made with market makers.

With respect to rebates, under the firm's arrangement with it, the CME paid a rebate to BGC based on BGC's surpassing a threshold trading volume (which was met). While applicable to the entirety of the firm's trading, and not just the North American Desk, the Desk should have been credited with its share of that rebate revenue as are other desks at the firm. Additionally, BGC received rebate revenue from pit brokers who rebated BGC 7 ½ cents per contract on the CME and 5 cents per contract on the CBOT. These sums were solely the result of trading by the North American Desk, which was entitled to credit for the full sum of that revenue.

EXHIBIT D TO COMPLAINT

Michael S. Popok, Esq.
May 9, 2016
Page 4

        The failure to recognize revenue from matched trading was even more egregious. Such trades (accomplished by the North American Desk) involve off-floor, block trades made directly with market makers. For such trades, the market makers paid BGC commissions, 80% of which were to be allocated to the North American Desk in New York and 20% to be allocated to the Chicago office. As such commissions indisputably derived from trading by the Desk's traders, the revenues received by BGC from that trading deserved to be credited to the Desk.

        Instead, Mr. Marinos excluded the revenues from both the matched trading and from rebates received as a result of the Desk's trades. As a consequence, he was able to establish (falsely) that the Desk was in deficit, not profit, and nullify bonuses to the traders. In so doing, he improperly and falsely helped accomplish his mandate to reduce costs.

        Fourth, Mr. Marinos did not recognize $1 million in commission revenue earned by the North American Desk and realized in the 4th Quarter 2015 even though the firm had already taken its 50% share of that revenue.

        Fifth, Mr. Marinos instituted an offset of revenue between the North American and London Desks. In this way, the fictitious losses from the North American Desk were offset against the profits of the London Desk to deprive the London traders of bonus compensation as well. Such an offset had no precedent at BGC, and had never been discussed with, or agreed to by, Mr. _____ (as the head of both Desks) with anyone.

        Sixth, and finally, notwithstanding the offset imposed by Mr. Marinos, it is our information and belief that BGC transferred more than $2.5 million in revenue earned in the United States to London without crediting the North American Desk in any way. While such a transfer raises a tax and transfer pricing issues, its failure to be included in the accounting for the North American Desk is another indication that Mr. Marinos' accounting work was faulty.

        Mr. _____ Responses and BGC's Retaliation

        In or about late January 2016, Mr. _____ reported the false accounting to BGC's Compliance Departments both in London and New York where he works. From the Company's internal policy, he read and understood that he had a specific duty to report them. BGC's policy on Reporting Possible Ethics Violations and Disciplinary Action states that "[e]mployees have an obligation to report potential ethics violations to Compliance." In return, Compliance is bound to "maintain the confidentiality of the individual reporting the possible violation[,]" and the policy specifically warns that "[r]etaliation against employees who report possible violations is strictly prohibited."

        On February 5, 2016, after learning that his confidential communications to Compliance had been shared with Mr. Aubin, Mr. _____ sent to Human Resources

**EXHIBIT D TO COMPLAINT**

("HR") a list of concerns which largely consisted of the points outlined above and asked it to investigate. Furthermore, to ensure the confidentiality of these assertions and to protect against any personal fallout resulting from my having brought them, he specified that the contents of the assertions should be treated as "strictly private and confidential" and, more importantly, should not be forwarded to his boss, Mr. Aubin. Despite this request, HR notified Mr. Aubin of his assertions within five hours of his having made them.

Incredibly, three days later, on February 8, 2016, HR notified Mr. that he was being placed on two weeks' paid administrative leave and then proceeded to escort him from the building. He was not allowed any access to his clients or his files. Though HR assured him it was taking "very seriously" and investigating the concerns he had reported, it concluded that his conduct – which it described as "inappropriate, unprofessional and insubordinate" – warranted the administrative leave. HR stated that this decision had been made "separately" from his coming forward with his report of potential violations, and was based on "repeated reminders" to him about his poor conduct. In truth, no person at BGC had ever raised an issue about his conduct prior to that moment, much less had reminded him about it.

Mr. returned to work on February 22, 2016, at the conclusion of his administrative leave. That day, his first day back, he was called into a meeting with Mr. Aubin and HR personnel Patricia Dreste and Dyanne Rosado at which Mr. Aubin subjected him to very aggressive and erroneous questioning. Earlier that day, HR had also issued to Mr. a written "Conduct Warning" which it copied to Mr. Aubin. As it expressed, the Conduct Warning was made at the request of Mr. Aubin to memorialize Mr. purported "poor judgment" in making several "off-contract" payment arrangements with traders under his leadership. The warning memo expressed concern that these "arrangements" "undermine[d] the Firm's discretionary payment process and created a potential liability for the Firm."

In reality, under his contract, Mr. had full discretion over whether or not to pay bonuses to traders on the North American Desk who did not have a contractual bonus formula, and any such bonus would have been paid out of his own contractually-earned share of the Desk's compensation pool. Furthermore, emails establish that each of the three proposed bonuses to traders had been approved by BGC management based on the broad acknowledgement that the Desk had been profitable in 2015. These approvals include the approval of Mr. Aubin himself to one of the three bonus requests. Thus, the Conduct Warning issued at Mr. Aubin's request was directly contrary to Mr. Aubin's own knowledge and, on that basis, manifestly issued for a retaliatory purpose.

Additionally, the bonus targets had been BGC's own idea. As part of the effort to provide helpful incentives to fix the North American Desk, Mr. adopted a framework setting forth bonus sums for certain performance targets which had been set up by Mr. Aubin's business manager, Mr. McLachlan. This framework was then

EXHIBIT D TO COMPLAINT

Michael S. Popok, Esq.
May 9, 2016
Page 6

provided to qualifying traders to give them some expectation of bonus compensation based on their individual performances. Importantly, there is no fair dispute that these traders knew the source of such bonuses was the compensation pool and thus was not available if the Desk was not profitable, a fact which they have since acknowledged. Thus, contrary to the expressions of the Conduct Warning, the bonus payment incentive framework was created by BGC management, not Mr.     did not alter the firm's discretionary payment process as any payments were in Mr.    discretion and out of his pocket, and no potential liability was created for the firm. Furthermore, the specific bonuses had all been approved by Mr. Aubin or others in management.

      Originally, the Desk's profitable results caused Mr.     to allocate portions of his share of the compensation pool, once paid, to three traders on the Desk. Thus, it bears emphasis that it was only Mr. Marinos' false accounting to turn those profits into deficits that caused BGC, erroneously, to conclude that Mr.     had created a liability for it.

      For these reasons, when presented with the Conduct Warning, Mr.     articulated to Mr. Aubin that the evidence showed that his assertions were incorrect. Accordingly, he told Mr. Aubin, Ms. Dreste, and Ms. Rosado that he considered the Conduct Warning to be another act of unlawful retaliation against him for his request that Mr. Marinos' accounting be investigated.

      Finally, for reasons discussed in greater length below, Mr.     also informed them that he had learned that BGC had withheld disclosure to him about the fact, known to BGC, that an employee had been able to access BGC's trading platform from home and caused the firm an $800,000 loss. Mr.     communicated that this non-disclosure was material because, holding a Series 30 license, he had sign-off authority for Listed Futures and thus needed to know about such material weaknesses in the firm's internal controls relating to its trading platform that could permit such an event to occur. The non-disclosure was especially wrongful because, as the firm knew, Mr.     had just recently signed off for Listed Futures due to the impending NFA examination. Accordingly, the firm's non-disclosure of this event to him placed him personally in jeopardy with the NFA regulators.

      The next day, February 23, Mr.     was called to another meeting with Mr. Aubin and HR. At the outset, he was told that he would not be permitted to take notes of the meeting and that he would be required to sign a non-disclosure agreement regarding the content of the meeting "or there will be no meeting." Subsequently, Mr. Aubin communicated that he would be stripped of my responsibility for the London Desk and that Mr. Aubin would run it instead. Mr.     protested that this was yet another act of unlawful retaliation. Mr. Aubin said it was his decision to do so and that it was not retaliation. The HR personnel, Ms. Dreste and Ms. Rosado, agreed in turn that it was not

**EXHIBIT D TO COMPLAINT**

Michael S. Popok, Esq.
May 9, 2016
Page 7

retaliation.[1] Mr. Aubin then told Mr.           that the London Desk would be returned to him if he proved to be a "good employee." Mr. Aubin then set forth two conditions to establishing that "good employee" threshold:  (1) he was prohibited from speaking with Compliance without first speaking with Mr. Aubin; and (2) he needed to retract all allegations of retaliation and harassment which, once accomplished, HR would withdraw the "Conduct Warning" it had issued.

At the meeting, Mr. Aubin further declared that he would be unable to pay the compensation pool amounts needed to fund one of the three bonuses Mr.           had requested (and, though not specifically expressed, the other two as well).  Then, he admitted that the revenue from the Desk's matching trades (discussed above) was incorrectly omitted from the Desk's performance and should have been credited to the Desk's compensation pool (out of which the bonus compensation would have been paid). Nevertheless, Mr. Aubin declined to fix that accounting. Rather, he only said that the firm would agree to account for it correctly going forward.

Finally, Mr. Aubin denied that the firm instituted an offset of the North American and the London Desks. In the face of that denial, there is an email from Mr. Marinos that explains that that is exactly what the firm is doing. Furthermore, Mr. Marinos explained to Jeremy Kostyniak in London that he would not receive a bonus because of the offsetting of London profits with North American losses. That news caused great turmoil to traders learning that the firm would not be rewarding their successful performances in 2015.

In the ensuing weeks, Mr.           continued to point out Mr. Aubin's misconceptions (and Mr. Marinos' errors). Ultimately, at a meeting with Mr.           Mr. Aubin and the Head of Human Resources in London, John Skitt, agreed that Mr.           should not have been placed on leave or issued a Conduct Warning and pledged that BGC would withdraw all such previously issued negative references, including the Conduct Warning. Mr.           subsequently communicated this agreement to Dyanne Rosado of HR in New York and asked her to confirm in writing that all such letters had been withdrawn. Ms. Rosado did not respond to that request, and has not responded to any of Mr.           follow-up requests.

<u>BGC's Effort to Get Sign Off on Incorrect Figures and Incomplete Disclosures</u>

Based on Mr. Marinos' false accounting, Mr.           has declined to provide his supervisory sign-off in his role as Series 30 supervisor. The sign-off requirement is a request that he execute forms which confirm that he has reviewed and approved the North American Desk's trading activity, how the Desk executes its business on the exchange, and its revenues and commissions. While Mr.           reviewed what BGC is intending to report, he told the firm that he didn't agree with their procedures and

---

[1] In a later conversation with BGC's Chief Compliance Officer, Michael Sulfaro, Mr. Sulfaro expressed the remarkable (to Mr. ,           ) sentiment that it was "normal" to send people home if they come forward with a complaint.

**EXHIBIT D TO COMPLAINT**

thus could not approve the figures BGC intends to report because he knows them to be false. Mr.      also remains concerned about the undisclosed (and unresolved) weakness in BGC's internal controls that permitted an employee to gain access to the firm's trading platform from home and cause an $800,000 trading loss. He believes it to be his duty to sign off to accurate figures and that appropriately full disclosures should be reported to regulators.

On March 14, 2016, BGC's Chief Compliance Officer, Michael Sulfaro, who previously had expressed to Mr.      that he himself had "serious concerns" about the internal controls weakness that permitted the unauthorized trading referenced above, expressed that he needs to have Mr.      sign off. To Mr.      opposition, Mr. Sulfaro has responded by pressing him to sign, saying that Mr.      need only sign off to the Desk's trading activity and not the accounting. Mr. Sulfaro has copied Mr. Aubin and others on his emails to Mr.      on this subject. Mr.      has expressed his disagreement for the reasons stated above and expressed to Mr. Sulfaro and Mr. Aubin that he would like a meeting with Mr. Sulfaro's boss, William Shields.

In response, late that same day, BGC's Shawn McLoughlin wrote to Mr.      to recommend that he "recuse" himself of sign-off authority and allow another to perform the function while the firm investigates his concerns. Of course, HR has already confirmed that it is investigating those concerns, having expressed that it is taking them "very seriously." To Mr. McLoughlin, Mr.      declined to recuse himself. He explained that he is the licensed and proper supervisor with the relevant experience to question the firm's procedures and figures. He also emphasized that, in his view, the whole point of supervision was for it to be fulsome and correct, not a rubber stamp. Indeed, the notion that a person should be removed from their supervisory duties because they disagree or feel compelled to report irregularities which they believe would harm BGC is contrary to BGC's own internal policies as well as the whole point of objective and accurate supervision.

In sum, Mr.      has reported complaints of accounting and tax violations which, pursuant to clear Company policies, is both an express duty incumbent upon employees and strictly protected from retaliation. He did so, moreover, through the channels set up by the Company. In response, he has been put on administrative leave by the Company, issued a formal warning, and told that he should no longer make such reports through those channels. In view of the reactions of the Company's executives to his reports, Mr.      is gravely concerned that he is likely to be deprived of deserved opportunities at BGC and will continue to be the subject of other forms of career-damaging retaliation. The more appropriate response, which we urge, would be to subject to disciplinary action those persons identified in this letter as responsible for the actions taken in response to Mr.      reports. As well, the Company should

**EXHIBIT D TO COMPLAINT**

Michael S. Popok, Esq.
May 9, 2016
Page 9

affirmatively ensure that Mr. ____ will be free from prejudice against his career opportunities and against any other further retaliation inimical to his interests.

Very truly yours,

William B. Fleming

**EXHIBIT D TO COMPLAINT**