**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JOHN DOE,

               Plaintiff,

     vs.

BGC PARTNERS, INC., TOWER BRIDGE
INTERNATIONAL SERVICES, L.P., BGC
HOLDINGS, L.P., BGC SERVICES
(HOLDINGS), LLP, and SHAUN D. LYNN,

            Defendants.

Civil Action No. 1:19-cv-06076-KPF

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

---

## INTRODUCTION

Plaintiff John Doe (a fictitious name), by his undersigned attorneys, alleges upon personal knowledge as to his own acts and experiences, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's counsel, which included, among other things, a review of public documents issued by the U.S. Securities Exchange Commission ("SEC") and other regulators, and materials published by the International Consortium of Investigative Journalists ("ICIJ") and other related public documents, as well as non-public information provided to the SEC and other regulators in connection with said investigation, as follows:

## NATURE OF THE ACTION

1.    This action arises out of Defendants' harassment, suspension and wrongful termination of John Doe ("DOE" or "Plaintiff"), a listed products trading manager, because of his opposition to supervisory failings and securities regulatory violations, including a scheme hatched by executives of BGC Partners, Inc. ("BGC Partners") to misstate the performance of subsidiary

1

BGC Financial, L.P.'s ("BGC Financial") New York listed products trading desk ("New York Desk") in the fourth quarter ("Q4") of 2015. Specifically, the false statements of BGC Partners' executives—including misrepresenting the New York Desk's revenue for Q4 2015—had potential implications for BGC Financial's accounting and reporting requirements. In addition, these executives denied DOE and the traders working for him compensation owed to them. BGC Partners further retaliated against DOE by offsetting the falsified Q4 2015 loss against BGC Partners' London trading desk ("London Desk"), which DOE also managed.

2.      The executives' scheme was hatched to cover up losses of more than $800,000 caused by a rogue trader who was illegally trading from his apartment on a laptop computer in New York City. The scheme was also hatched to compensate the Firm for the rogue trader's losses by externalizing the costs onto DOE and his trading teams.

3.      DOE subsequently discovered additional accounting fraud, including the illegal siphoning of some $2.5 million in revenue away from the New York and London Desks over about a three-year period by BGC Partners executives in order to make another office of the Firm appear profitable.

4.      BGC Partners is a publicly traded company. As a result of the misstatements and omissions described, the accuracy of financial statements regarding BGC Partners was compromised. Further, the activities of BGC Partners and related companies were concealed from securities regulators, including but not limited to the SEC, the U.S. Commodity Futures Trading Commission ("CFTC"), the National Futures Association ("NFA"), and others in the United States and the United Kingdom. The misstatements and omissions were also ultimately concealed from tax authorities, including but not limited to the Internal Revenue Service ("IRS") in the U.S. and Her Majesty's Revenue and Customs ("HMRC") in the United Kingdom ("U.K."). Accordingly,

upon information and belief, monies otherwise subject to taxation were laundered by BGC Partners and/or its affiliates, including but not limited to Defendant and BGC Partners subsidiary Tower Bridge International Services, L.P. ("Tower Bridge").

5.      When DOE became aware of this illegal activity and other violations of securities and tax laws and regulations, he reported his concerns to his direct supervisor, Jean-Pierre Aubin, Executive Managing Director of BGC Partners, and other corporate officials including but not limited to Defendant BGC Partners President Shaun D. Lynn, who directly controlled Aubin, and Paul M. Pion, the Chief Executive Officer ("CEO") of Defendant Tower Bridge, resulting in DOE's harassment, suspension, demotion, and eventual termination.

6.      DOE also began reporting this illegal conduct to the SEC's Office of the Whistleblower before his termination in January 2017.

7.      DOE suffered harassment and retaliation in 2016 and well after his termination in January 2017, continuing to the present, for exercising his legally protected rights to inform his supervisors about, and to refuse to participate in, conduct that he reasonably believed violated laws and rules designed to protect investors from violations of the federal securities laws. Such harassment was also carried out on Defendants' behalf by Ronin Capital, LLC ("Ronin"), that company's CEO John Springs Stafford III, and a Ronin market maker based in the Bahamas named Tim O'Leary, who have defamed DOE to his present employer.

8.      In December 2017, another BGC Partners subsidiary, Defendant BGC Holdings, L.P. ("BGC Holdings"), wrongfully denied Plaintiff deferred compensation owing to him in further retaliation for his ongoing reporting to regulators nearly a year after his termination.

9.      Because DOE was harassed, suspended and terminated for his whistle-blowing activities, which are otherwise protected under Section 806 of the Sarbanes Oxley Act of 2002

("Sarbanes Oxley Act") (18 U.S.C. § 1514A), Defendants have violated the Dodd-Frank Act of 2010 ("Dodd-Frank Act") (15 U.S.C. § 78u-6(h)).

## JURISDICTION AND VENUE

10.     Jurisdiction in this Court over Plaintiff's claim is invoked pursuant to the Dodd-Frank Act, 15. U.S.C. § 78u-6 ("Dodd-Frank Act").

11.     This Court has federal subject matter jurisdiction pursuant to 25 U.S.C. § 1331.

12.     Venue is proper within this District, pursuant to 28 U.S.C. 1391 (b)(2), in that "a substantial part of the events or omissions giving rise to the claim occurred" in this District.

13.     This Court has supplemental jurisdiction over DOE's state law claims pursuant to 28 U.S.C. § 1367.

## PARTIES

14.     DOE is currently a resident of and domiciled in London, England. At all times relevant to this action, DOE was a resident of New York, New York, and was employed by Defendant BGC Partners and non-party BGC Financial. During his employment with BGC Financial and BGC Partners, other subsidiaries and affiliates of BGC Partners, including BGC Services (Holdings), LLP ("BGC Services"), non-party BGC Brokers, L.P. ("BGC Brokers"), and Defendant Tower Bridge, exercised control over the manner and means by which he carried out his duties as an employee.

15.     Defendant BGC Partners is a Delaware corporation with its principal place of business in New York, New York. BGC Partners is a publicly-held company listed on the NASDAQ. "[H]eadquartered in London and New York[,]" BGC Partners has "offices in dozens of major markets across the globe." https://www.bgcpartners.com/bgc/ (last visited on Oct. 2,

2019). BGC Partners was formed in 2004 as a spin-off of non-party Cantor Fitzgerald & Co. ("Cantor").

16.     Cantor holds approximately eighty percent (80%) of the voting power in BGC Partners, and BGC Financial is a wholly-owned subsidiary of BGC Partners. Upon information and belief, BGC Partners controls BGC Financial, Tower Bridge, BGC Services, and BGC Holdings, L.P. ("BGC Holdings"), as well as other BGC/Cantor entities.

17.     BGC Partners also controls and administers a share scheme known informally as the "Newton Plan," through which BGC Partners and other BGC entities hold deferred compensation, in the form of shares of certain BGC entities, for employees of the Cantor/BGC family of companies. The purpose of awarding deferred compensation through the Newton Plan is "to advance the interests of [BGC Partners] and its stockholders by providing a means to attract, retain, motivate, and reward directors, officers, employees and consultants of and service providers to [BGC Partners.]"

18.     In addition, BGC Partners controls and oversees a "Global Charity Day" that raises money for the Cantor Fitzgerald Relief Fund by inviting celebrities to trade with established clients. Traders are required to allow celebrities to conduct all business on Global Charity Day, effectively requiring that traders forfeit to the company an entire day's worth of revenue.

19.     Defendant BGC Holdings is a Delaware limited partnership. BGC Holdings holds participation units, which it issues to certain employees of the Cantor/BGC family of companies and administers exchanges of such participation units. BGC Holdings also conducts certain activities arising from agreements ancillary to the agreement pursuant to which Cantor contributed its inter-dealer brokerage, market data, and fulfillment services business to BGC Partners.

20.     Defendant BGC Services is a U.K. limited partnership. BGC Services holds participation units, which it issues to certain employees of the Cantor/BGC family of companies and administers exchanges of such participation units. BGC Services is a wholly owned subsidiary of BGC Partners, L.P. BGC Partners, L.P. is a wholly owned subsidiary of Defendant BGC Partners.

21.     Defendant Tower Bridge is a U.K.-based partnership that provides a wide variety of administrative and other services for BGC Partners and its subsidiaries and affiliates, including BGC Financial. Tower Bridge holds a fifty-two percent (52%) interest in BGC Services. The remaining forty-eight percent (48%) interest is held by "another entity in the Cantor Group." Paul Pion, an American citizen, has been Tower Bridge's CEO since 2012, when he took over from non-party Lee M. Amaitis,[1] BGC Partners' former Chairman and CEO. DOE's investigation of BGC Partners' and Cantor's corporate structures after his termination lead him to the ICIJ's Panama Papers database, which includes a listing for Pion[2] and what appear to be entities affiliated with Tower Bridge.

22.     Amaitis was Lutnick's second-in-command before Defendant Lynn assumed that role. Amaitis joined Cantor in 1995 and helped create Tower Bridge. Amaitis also helped Lutnick create and run eSpeed, an electronic platform for trading U.S. Treasuries, which merged with BGC Partners in 2008. When BGC Partners spun off from Cantor in 2004, Amaitis was its Chairman and CEO. Since then, he has shifted his focus to the Firm's gaming business.

23.     BGC Partners, Tower Bridge, BGC Holdings, and BGC Services (collectively, the "Corporate Defendants") each had and exercised supervisory authority and control over DOE, including the power to suspend and terminate his employment and to grant or deny him

---

[1] As described below, upon information and belief, Amaitis also played a role in Defendants' retaliation against DOE.
[2] *See* https://offshoreleaks.icij.org/nodes/80112898.

compensation. As such, BGC Partners, Tower Bridge, and BGC Holdings are "employers" under the applicable provisions of the Dodd-Frank Act.

24.    Defendant Lynn was at all relevant times an executive officer of BGC Partners, serving as its President. Lynn is Lutnick's second-in-command at the Cantor/BGC family of companies, which includes BGC Partners and is directly responsible for the actions of BGC Partners described herein, including initiating BGC Partners' misstatements and omissions regarding the New York trading desk's production recalculations in Q4 2015. Lynn individually retaliated against DOE when DOE reported his concerns.

25.    Defendant Lynn had and exercised supervisory powers over DOE, including the power to suspend and terminate his employment. As such Defendant Lynn is an "employer" under the applicable provisions of the Dodd-Frank Act.

## STATEMENT OF FACTS

### I.    The Cantor/BGC Family of Companies.

26.    Cantor was founded in 1945 by Bernard G. Cantor ("Bernie") as a brokerage service for inter-dealer fixed income markets. It is now a Financial Industry Regulatory Authority ("FINRA") member firm. More recently, Cantor has moved into new business lines such as wagering and gaming and commercial real estate. Not long after it came into existence, Cantor began compiling a record of questionable conduct in the financial and securities industries. *See, e.g.*, "With Partners Like These, Who Needs Rivals?", *New York Times*, Apr. 28, 1996, available at https://www.nytimes.com/1996/04/28/business/with-partners-like-these-who-needs-rivals.html (last visited Oct. 11, 2019).

27.    Lutnick joined Cantor in or around 1983, advancing quickly. In 1991, he became its President. By 1993, it was common knowledge that Lutnick was Bernie's designated successor to run Cantor.

28.     In 1996, assisted by Amaitis, Lutnick wrested control of Cantor through a "palace coup" in which he forced a takeover via a vaguely worded succession plan, maintaining that Bernie was "incapacitated." Lutnick emerged from this acrimonious dispute as the self-described "apex executive" of the Cantor and BGC family of companies.

29.     In 2008, Cantor agreed to separate its inter-dealer brokerage, market data, and fulfillment businesses from the remainder of its operations, contributing them to BGC Partners and its subsidiaries.

30.     Today, Cantor is owned by CF Group Management, Inc. ("CF Group"), the majority partner, and Cantor Limited Partners. Lutnick is the sole shareholder of CF Group. As a result, Lutnick owns approximately sixty percent (60%) of Cantor and has sole voting control of Cantor.

31.     Cantor, CF Group, and Lutnick have beneficial ownership of one hundred precent (100%) of BGC Partners' Class B super-voting common stock.

32.     In addition to controlling Cantor and BGC Partners, Lutnick is the Chairman and CEO of both companies.

33.     BGC Partners is the general partner of BGC Holdings and, with BGC Holdings, controls BGC U.S. and BGC Global. Upon information and belief, BGC Financial is a wholly-owned subsidiary of BGC U.S. and, as such, is controlled indirectly by Lutnick. Upon information and belief, Tower Bridge, BGC Services, and non-party BGC Brokers are wholly-owned subsidiaries of BGC Global and, as such, are also controlled indirectly by Lutnick.

34.     Cantor's and BGC Partners' executives comprise a close-knit and tightly controlled group. Many of the same executives manage Cantor's and/or BGC Partners' affiliates and subsidiaries and report directly to Lutnick.

35.     Cantor and BGC Partners have a common principal place of business in New York, at 499 Park Avenue. They share the same general counsel's office and largely share the same human resources ("HR"), compliance, and other related departments. Their common registration and payroll systems are run through Tower Bridge.

36.     All relevant BGC entities share the same website: https://www.bgcpartners.com/.

37.     Cantor, BGC Partners, and their various affiliated and subsidiary entities are hereinafter collectively referred to as the "Firm."

## II.     **The Newton Plan**.

38.     The Firm compensates its employees in part by issuing shares in various Firm entities, including BGC Holdings and BGC Services.

39.     The Firm also requires employees to contribute ten percent of their gross earnings to purchase such shares.

40.     This deferred compensation plan is known informally as the "Newton Plan."

41.     When Aubin informed DOE of the mandatory ten percent share purchase requirement, he told DOE only that his ability to sell shares in the Newton Plan during his employment was subject to management approval but that such approval was not difficult to obtain. Aubin did not inform DOE that, to obtain approval to cash in his shares, DOE could or would be required to agree to remain employed at the Firm for several more years or pressured to accept a loan from the Firm in exchange for permission to cash in shares.

42.     Otherwise, the Firm provided little information about the Plan. Specifically, the Firm provided no information about the Plan's vesting schedule or procedures for cashing in shares that had vested.

43.     As it turned out, Firm employees were not permitted to cash in shares unless they committed to another several-year contract term, guaranteeing that additional compensation would

be withheld and used by the Firm as additional leverage in the future. DOE would later hear from other BGC Financial employees about their difficulties with the Firm in this regard, causing him to wonder if the Newton Plan was a Ponzi scheme.

44.     DOE's suspicions grew in mid-2015 after BGC Partners took over GFI Group ("GFI"). GFI CEO Mickey Gooch had stated in a December 2014 deposition, which was broadcast on Bloomberg Television in May 2015, that "[BGC Partners] have committed to committing crimes [including] money laundering." Gooch also said that "[BGC Partners'] relationship with their employees is outrageous. They're in constant litigation with their own employees. All of the highest producing brokers in [GFI] would never work for [BGC Partners] under any circumstances." Gooch added, "…I consider the structure of [BGC Partners] and their stock to be an extremely risky dividend Ponzi scheme that could collapse at any time."[3]

45.     GFI employees who shared Gooch's beliefs were concerned that they would lose much of the value of their Restricted Stock Units ("RSUs") in GFI in the takeover, and that the RSUs would be exchanged for what they called "Howie Dollars" (named for Lutnick) or partnership shares of [BGC Partners] that they considered of questionable value. In their words, "There is absolutely no vesting schedule. There are several different types, which give you some sort of participation, but at the sole discretion of the managing member. You're at their mercy. [BGC Partners'] game is that they'll let you cash in a million [dollars' worth of shares] but you have to put 15% of your future income into more of their [BGC Partners] partnership interests. So,

---

[3]   *See*   http://www.msn.com/en-us/money/watch/inside-mickey-goochs-bgc-buyout-trash-talk/vi-BBk4hIr.   Gooch abruptly ended his criticism of BGC Partners after receiving some $285 million when the merger was completed. *See also*   http://www.independent.co.uk/news/business/news/gfi-chief-loses-control-of-his-destiny-but-ends-up-285m-richer-10061102.html.

you get some out, but you have to put a lot more in. Other times they're granted in the form of loans. You do get a dividend but that's in lieu of your bonus compensation."[4]

### III.  <u>DOE Accepts Employment with the Firm.</u>

46.     DOE joined the Firm in 2012, as an employee of BGC Brokers in London, where he became Head of the Futures and Options Desk in London (the "London Desk").

47.     Before joining the Firm, DOE had been successfully managing a team of traders at Nomura, which produced $10 to $12 million a year in revenue. DOE brought most of this team with him to BGC Brokers.

48.     When he joined the Firm, DOE executed an employment agreement with BGC Brokers that memorialized the terms of his position as Head of the London Desk (the "London Agreement"). The London Agreement was countersigned by Defendant Lynn.

49.     The London Agreement provided for an initial five-year term of employment, until November 2017. The London Agreement also provided that BGC Brokers had the option of terminating DOE's employment before the expiration of the initial five-year period, but only upon certain conditions.

50.     The London Agreement was never terminated.

51.     The London Agreement is a valid and binding contract.

52.     As part of his compensation package, DOE was awarded 2,000,000 participation units in BGC Holdings ("Partnership Units"), a portion of which he shared with his incoming team. The correspondence setting forth the award refers to a Partnership Agreement purportedly governing the grant, but no such Partnership Agreement was provided to or executed by DOE.

53.     Upon information and belief, the Partnership Units are part of the Newton Plan.

---

[4] *See* the December 30, 2014 article in *The Observer*, at https://observer.com/2014/12/exclusive-gfi-top-performers-threaten-to-quit-en-masse-if-bgc-wins-tender-offer/.

54.     Simultaneously with the award of Partnership Units, DOE executed a Promissory Note for a loan in the principal amount of $853,600 from BGC Brokers. The Note bore interest of three percent (3%) per year.

55.     Under the Promissory Note, DOE was required to repay the balance of the Promissory Note from the net partnership distributions on the Participation Units.

56.     Like BGC Financial, BGC Brokers is an inter-dealer broker. BGC Brokers is authorized and regulated by the Financial Conduct Authority ("FCA").[5] It shares office space in London, at One Churchill Place, with Tower Bridge, BGC International, L.P., Cantor Index Ltd. and Cantor Fitzgerald Europe.

57.     As Head of the London Desk, DOE reported directly to Aubin, Executive Managing Director of BGC Partners. Aubin, in turn, reported directly to Lynn, President of BGC Partners, who reported directly to Lutnick. Aubin also worked closely with Amaitis, particularly in Europe and Asia, to expand Cantor Fitzgerald's business after 9/11, and continues to do so. Aubin has a history of litigation brought against him by former employees, including a sexual harassment court case in New York County and several FINRA arbitrations.[6]

58.     Amaitis also has a history of litigation brought against him by former employees. Recently, Amaitis faced a federal investigation of money laundering at CG Technology, the company Amaitis had founded to enable Cantor Fitzgerald to make its foray into the gambling business in Las Vegas. When the investigation closed, Amaitis surrendered his FINRA broker licenses.

---

[5] The FCA regulates financial services firms and financial markets in the U.K.

[6] BGC broker Kelly Dunloy named Aubin in a 2012 case filed in the United States District Court for the Southern District of New York; BGC managers Ray Walton and Michael Riffice filed FINRA arbitrations against BGC in 2013 and 2015, respectively, based in large part upon Aubin's misconduct.

59.     Aubin was also responsible for supervising the New York Desk and several other desks around the world. By his own account, in or around 2016, Aubin managed well over 500 people.

60.     Nonetheless—or perhaps as a result—Aubin had little understanding of or knowledge about the London and New York Desks' daily activities. During DOE's onboarding, Aubin provided a list of brokers he said DOE would be "inheriting" as supervisees in London. As DOE and his team settled in, however, they learned that several of the brokers on Aubin's list were no longer employed by BGC Brokers.

61.     Upon information and belief, Aubin has a pattern and practice of misrepresenting the status and productivity of the Firms' teams in order to induce acceptance of employment offers.

62.     Aubin also paid little attention to the activities of the traders under his supervision, and he routinely and improperly denied traders compensation to cause the Firm as a whole or an individually-named entity within the Firm to appear more profitable than it was.

63.     Within a year of DOE's and his team's arrival at BGC Brokers, Aubin denied them compensation they had earned to boost BGC Brokers' apparent profitability.

64.     Aubin's denial of compensation to the London Desks's brokerage team had its genesis in guidance published by the FSA in May 2012 regarding payment for order flow ("PFOF"). This guidance suggested that inter-dealer brokers like the Firm would no longer be able to charge market makers for trades because such payments could be seen as improper inducements. As a result, several market makers refused to pay BGC Brokers approximately $600,000 owed and in arrears.

65.     Rather than properly account for these outstanding payments, which would have required BGC Brokers to disclose them as "aging debt" on its financial statements, in 2013, Aubin

confiscated $600,000 from the London Desk's revenue pool to satisfy the outstanding debt. The confiscation was ordered by Defendant Lynn and non-party Sean Windeatt, BGC Partners' Chief Operating Officer ("COO") in the U.K.

66.     DOE internally reported this improper confiscation in 2015 and 2016.

67.     Under DOE's contract, the $600,000 should have been allocated as revenue brought in by the London Desk and thus included in the Firm's calculation of DOE's compensation and the compensation of his team of traders.

68.     The denial of bonuses came at the worst time—Christmas—sowing significant discontent among DOE's team.

69.     In or around 2011, the FSA had also put the brakes on BGC Brokers' expansion in the U.K. because its anti-money laundering ("AML") controls were inadequate.[7] The FSA explicitly required BGC Brokers to tighten these controls. BGC Brokers provided some on-line training to its employees but otherwise did not substantively change its policies and procedures.

70.     Believing the Firm was "at war with the FSA," and seeking to "work around" registration rules to escape the FSA's jurisdiction, Aubin attempted to transfer DOE and his team beyond the FSA's reach, to France, although none DOE's team members was licensed there. Because operating in France without proper licenses would violate applicable regulations, DOE and his team refused to be transferred.

71.     On or about June 28, 2013, BGC Partners completed the sale of eSpeed to NASDAQ OMX Group, Inc. ("NASDAQ OMX"), pursuant to a purchase agreement dated April 1, 2013.

---

[7]   *See*   https://www.telegraph.co.uk/finance/newsbysector/banksandfinance/8587646/FSA-hits-BGC-with-controls-after-finding-weaknesses-in-governance-procedures.html.

72.     To offset its gain from the sale of eSpeed, BGC Partners redeemed or exchanged 77.4 million Partnership Units of BGC Holdings for 45.2 million shares of BGC Partners' Class A common stock, most of which were restricted shares. The restricted shares were "generally expected to be saleable by partners in good standing after either five or ten years." BGC Partners' Form 10-Q for the quarterly period ended June 30, 2013, available at https://www.sec.gov/Archives/edgar/data/1094831/000119312513324796/d557162d10q.htm (last visited Oct. 7, 2019).

73.     The redemption/exchange reduced partners' equity and simultaneously generated cash to pay tax liability incurred in the sale of eSpeed. It also allowed BGC Partners to recognize $464.6 million in expenses related to the redemption/exchange, which it used to offset the gain from the sale of eSpeed. In other words, BGC Partners improperly externalized tax and related liabilities onto employees, increasing their individual tax liability in order to lower the Firm's. BGC Partners got a tax break that was unwittingly and unwillingly subsidized by the Firm's employees.

74.     As Mark Webster, then head of trading in BGC Partners' London office, put it: "BGC don't like paying tax."[8] This would not be the first, or the last, time DOE would wonder, "Where did the money go?"

75.     In November 2013, DOE executed a Limited Liability Partnership Deed ("Deed"), pursuant to which he became a member of BGC Services.

76.     The Deed is a valid and binding contract.

---

[8] DOE notes here that Amaitis had a significant role in eSpeed's administration since its creation and likely through its final sale to NASDAQ OMX Group, Inc. in 2013. As described in more detail in the Addendum attached hereto as **Exhibit A**, eSpeed may also be implicated in relation to the Panama Papers, and money laundering more generally.

77.     DOE was encouraged to become a member of BGC Services by Shawn McLoughlin, now CEO and President of BGC Financial.

78.     Pursuant to the Deed, DOE was required to contribute £5,000 to the BGC Services Partnership. *Id.* at 1, ¶2.2.

79.     The Deed also required DOE to "carry out the business of the Partnership (or as required for one of its Affiliates) in the office of One Churchill Place, Canary Wharf, London[.]" *Id.* at 3 (Schedule 1), ¶2.2. The Deed further provided that DOE would be entitled to monthly drawings, but also required that he generate a certain level of commission revenue. *Id.*, ¶¶3.1, 3.2.

80.     The Deed further articulated how DOE's profits would be allocated and under what conditions the Deed could be terminated. *Id.* at 4-6.

81.     Contemporaneously with execution of the Deed, BGC Services loaned DOE £5,000. DOE was required to apply his distributions from the BGC Services Partnership to repay the balance of the loan.

82.     After DOE became a member of BGC Services, all of his compensation was paid through BGC Services, notwithstanding his contract with BGC Brokers. McLoughlin informed DOE that receiving his compensation through BGC Services would generate a lower tax rate for DOE.

83.     McLoughlin also reiterated what Aubin had told DOE: that, although cashing in shares was subject to management approval, it would not be difficult for DOE to cash in his vested shares.

84.     As a result of becoming a member in BGC Services, DOE's Partnership Units in BGC Holdings were converted to shares in BGC Services.

85.     DOE never signed any documentation transferring or converting his Partnership Units to shares in BGC Services, nor is he aware of any such documentation.

86.     DOE was not informed, before he agreed to become a member of BGC Services, that his Partnership Units would be converted to BGC Services shares.

87.     Upon information and belief, DOE's shares in BGC Services are part of the Newton Plan.

88.     DOE has never received a statement or summary of account evidencing his investments in BGC Services or BGC Holdings.

## IV.     __The Firm Transfers DOE to Move to New York.__

89.     In or around October 2014, the Firm asked DOE to add management of the New York Desk and the Chicago Futures Execution Desk to his responsibilities. The Firm informed DOE that its North American business, run through BGC Financial in New York, was losing money and they needed someone to turn things around.

90.     Mike Riffice was DOE's predecessor at BGC Financial. The Firm fired Riffice after he internally reported his concerns about the Firm's regulatory compliance—just as the Firm would later terminate DOE in retaliation for his reports.[9]

91.     When he transferred to New York, DOE sought to cash in a portion of his Newton Plan shares. DOE learned then that, contrary to what Aubin and McLoughlin had told him, he was not at liberty to sell vested shares in the Newton Plan. Instead, he was subjected to significant pressure to take out a loan in exchange for the Firm allowing him to cash in his vested shares.

---

[9] In this period, BGC Financial was being pressured by its guarantor Barclays to update its supervisory controls in the U.S. as it strained against limits imposed on its use of margin. In the end, BGC Financial was forced to find a new guarantor. The Firm gave Riffice this task, a job well outside of his contract. After forcing Riffice to fix this problem instead of producing, Aubin used the resulting decline in earnings as a pretext to fire him. Though Riffice secured a new guarantor for BGC Financial, replacing Barclays with ABN AMRO, few of the supervisory problems necessitating that change were resolved. When Riffice spoke up about these persistent problems, he was fired for being "insubordinate."

92.     DOE later learned that BGC Partners had done the same thing to Riffice, forcing Riffice to pay back the loan—without having received any of his shares—when it terminated him from BGC Financial.

93.     Because he would be managing a team of brokers trading listed products in the United States, DOE needed to obtain a Series 30 license. This required him to pass the "Series 30 – NFA Branch Manager Exam" (formerly entitled, "Branch Managers Exam – Futures"). The purpose of the Series 30 is to provide assurances to FINRA that teams of futures traders are being properly supervised, including that firms employing such traders are ensuring compliance with applicable regulations. Series 30 managers are required to sign off on the trading activity of the traders under their supervision, which functions to inform the NFA and the CFTC that the trading activity complies with applicable regulations. Studying for and passing a Series 30 exam can take several weeks. During that time, DOE would not be legally permitted to supervise the New York Desk.

94.     The Firm had terminated Riffice before promoting DOE to manage the New York Desk, leaving the desk without a manager. To fill this gap while DOE prepared for and took the Series 30 exam in London, Senior Vice President of New Business at BGC Partners, Kristi Haas, was installed as the temporary Series 30 to supervise the New York Desk. Although she had a current Series 30 license, Haas had little experience managing listed products trading. Indeed, she had not actively traded or supervised traders since at least 2006, her last year as an Operations Manager at BGC Partners.

95.     Nonetheless, because supervising the New York Desk would add to Haas' duties, the Firm required that she be paid an additional $10,000 in compensation for supervising the New York Desk until DOE received his Series 30.

96.     Rather than pay Haas out of Aubin's "pool," or allocate other Firm funds to compensate her, Aubin demanded that DOE pay Haas an "offline" bonus out of his personal funds. Aubin told DOE that, if he failed or refused to pay Haas, Lou Scotto would be "livid." Scotto was then co-CEO of BGC Financial—one of the few at the Firm who had direct authority over DOE.

97.     Jon McLachlan, Aubin's Business Manager at BGC Partners, informed DOE that he would be reimbursed once he passed his Series 30.

98.     Despite passing his Series 30, however, DOE encountered significant resistance to his request for reimbursement for paying Haas. Finally, DOE went to Scotto directly. Scotto told DOE that he had never directed Aubin to require DOE to pay Haas. Instead, Scotto had directed Aubin himself to pay Haas.

99.     Moreover, DOE was never fully reimbursed for the payment to Haas because the reimbursement was made from bonus pool funds, requiring him to pay taxes and allocate ten percent of it to the Newton Plan.

100.    The Firm also failed and refused to pay DOE for the first four months after he took over the New York Desk. BGC Partners executives excused this failure and refusal by saying they were unable to pay DOE until he had a U.S. Social Security number. Because Aubin required DOE to return to London at least once a month, his stays in the U.S. were too short to qualify for a Social Security number; he was submitting new applications every few weeks.

101.    Eventually, rather than paying him as an employee, the Firm paid DOE's monthly rent in New York until he was able to obtain a Social Security number.

**V.     DOE's U.S. Employment Agreement with the Firm.**

102.    DOE signed an employment agreement (the "U.S. Agreement") with BGC Financial on or about January 21, 2015. A true and correct copy of the U.S. Agreement is attached as **Exhibit ("Ex.") B** and incorporated by reference.

19

103.    The U.S. Agreement is a valid and binding contract.

104.    Pursuant to the U.S. Agreement, DOE was required to

perform such duties and assignments relating to the business of a Managing Director of BGC and any entity whether now existing or hereafter arising that directly or indirectly, through one or more intermediaries, controls or is controlled by or under common control with BGC (each such entity, an "**Affiliate**"), as the management of BGC and/or their designees shall direct.

**Ex. B** at 1, §2.

105.    As compensation, DOE was to be paid a base salary of $36,000 per year. This salary was "not subject to reduction due to variations in the hours worked or the quality of quantity of" his performance. Section 3(a).

106.    DOE was also entitled to compensation pursuant to "an incentive pool compensation arrangement (the 'Pool')[.]" Section 3(b).

107.    DOE's Pool was calculated based on the performance of "BGC's North American Futures and Options Desk (excluding the Chicago Futures Execution Desk) and the London Financial Futures and Options Desk (the 'Desks')"—the desks DOE managed.

108.    The Pool was "an amount equal to" fifty percent (50%) of each desk's net revenues minus salaries, taxes, and certain administrative expenses.

109.    Accordingly, by definition, each desk's net revenues were to be calculated separately, as were each desk's "Desk Compensation."

110.    The amount of the Pool was calculated on a quarterly basis and bonuses paid from the Pool were "payable within 45 days after the last day of the" quarter.

111.    DOE was also to be paid a "variable draw at the annualized rate of three hundred sixty-four thousand dollars ($364,000)," plus bonuses. Bonuses were to be awarded following DOE's recommendation regarding how to allocate the Pool, after required deductions. The Firm

agreed that it would not make bonus decisions without receiving DOE's recommendations and consulting with him. However, final approval of allocation of the Pool was in the sole discretion of BGC Partners' President, Defendant Lynn. *Id.* at 2, § 3(b).

112.    The Firm retained the right to reduce DOE's draw and/or salary if the Net Revenues for his Pool fell below certain levels—setting the stage for Aubin to manipulate accounting to deny DOE and his team their well-earned compensation.

113.    The U.S. Agreement also provided that ten percent of DOE's compensation was to be paid as a non-cash grant that was to be put into the Newton Plan.

114.    Although the U.S. Agreement states that the non-cash grant was "subject to the terms of the grant documents under which such non-cash grant was awarded," few substantive documents for the Newton Plan were ever provided to DOE—despite multiple requests.

115.    Nor did DOE ever receive any statements setting forth how many shares he owned or what the value of those shares was.

116.    The U.S. Agreement states that it supersedes DOE's contract with BGC Brokers. **Ex. B** at 8, ¶10(a). However, DOE's employment at BGC Brokers, as Head of the London Desk, continued. DOE continued to perform the tasks he was required to perform under the agreement with BGC Brokers, and Aubin continued to oversee DOE's management of both the London and New York Desks.

117.    Because the majority of DOE's and his team's compensation depended upon their ability to generate revenue, the Firm also agreed to exclude the performance of certain traders from the calculation of DOE's Pool. The excluded traders were not members of DOE's original team, and they had been underperforming for some time. Thus, to protect DOE's team's revenues from

dilution, the Firm agreed to compensate these traders based solely on their individual performance and not from the total available Pool.

118.    As it turned out, in late 2015, BGC Partners and the Firm refused to honor this agreement, retroactively reducing the Pool by, among other things, including revenue from underperforming traders in order to avoid paying earned compensation, including bonuses, to DOE and his team.

119.    BGC Partners only went back on its word after DOE began identifying and objecting to the Firm's regulatory violations regarding trader supervision in New York.

120.    Finally, the U.S. Agreement prohibited DOE from providing services to "any business activity that is in competition with, or otherwise related to or arises from, the then current business of" the Firm. **Ex. B** at 6, §5(b). As consideration for DOE's forbearance, the Firm agreed to pay DOE "an amount equal to one-twelfth (1/12) of [his] Salary and Draw in effect" at the time of his termination. *Id.*

## VI.    **Defendants Retaliate Against DOE Because He Reported His Reasonable Belief That the Firm was Engaged in Regulatory Violations.**

### A.    **DOE Objects to Rogue Traders in New York.**

121.    In late April 2015, DOE learned that BGC not only tolerated, but supported, rogue traders, even when their trading activity hurt clients. Worse, when rogue traders' activities hurt the Firm, it directed its subsidiaries to pilfer from its other employees' pools—like DOE's—to avoid having to declare a loss.

122.    On or about April 28, 2015, BGC Financial compliance officer Steve Duchene informed DOE that Aubin had authorized a trader in New York named Richard Anthony to trade e-Mini S&P, also known as "Mini S&P." Mini S&P refers to futures contracts that are one-fifth the size of standard S&P futures and are electronically traded on the Chicago Mercantile Exchange.

Trades in Mini S&P should be supervised by a firm's Series 30. Further, Mini S&P involves a high use of margin. It is one of the fastest-moving futures products, traded in one of the largest and most volatile markets.

123.   Anthony's primary experience was in trading equities. He was not a member of DOE's team and did not sit on DOE's floor. Anthony did not have access to the futures trading platform used by DOE's team, so Aubin had also provided Anthony with his own trading platform, giving him essentially free rein to trade without supervision in a market new to him in which the risks were far higher than many other markets.

124.   Aubin did not ask for or receive input from anyone else, including DOE, before approving Anthony to trade a product with which he had no experience in a market with which he had very little experience. Aubin's unilateral sign-off was also unusual because Aubin operated primarily in Paris, France and Nyon, Switzerland. He only rarely visited New York and, thus, had no real ability to supervise Anthony.

125.   Typically, futures trading in an inter-dealer broker setting is segregated from other types of trading and is heavily supervised, in part due to the high level of regulatory oversight of exchange-based products. As the Series 30 for the New York Desk, supervision of futures traders in New York was DOE's responsibility.

126.   DOE objected to the arrangement for Anthony. Anthony had held a Series 3 license—which allowed him to sell commodities futures contracts and options on commodities futures contracts—for fewer than six years. He had limited experience trading futures.[10]

127.   DOE viewed the arrangement—allowing a relatively inexperienced broker to trade unsupervised—as "a disaster waiting to happen." He was not willing to expose the Firm to such

---

[10] Earlier in Anthony's career, possessing only a Series 7 license, his flawed options trading strategies caused losses over $15 million to three separate clients at Alex Brown & Sons, Inc.

risk and refused to sign off on Anthony's trading activities. Instead, DOE suggested that Anthony "place orders through the desk"—*i.e.*, DOE's desk—"and we will rebate him," an arrangement that was already in place with Scotto. The suggestion was ignored.

128.    DOE was also concerned that Anthony would front-run against other BGC Financial clients. Aubin had left the Firm's trade booking system open to the whole Firm—to other trading teams in New York as well as in other offices—so all trading teams had access to all other trading teams' accounts and trades. Anthony's own book of clients had been dwindling, as had the books of the team of traders Anthony was managing on the Firm's equities desk in New York, giving Anthony incentive to "poach" from other trading teams' books.

129.    DOE's concerns were not misplaced. On or about September 30, 2015, Anthony put up a trade of 120,000 VIX futures contracts for BlackRock, Inc. ("BlackRock") with only two market makers instead of the customary four to six. Anthony also failed to check the market for interest by other participants, including other BGC Financial clients, busting through resting and potential bids that other BGC Financial traders had set for their institutional clients.

130.    The procedure Anthony should have followed was to 1) call around to the other desks and banks (including the Firm's clients) with proposed bids for transparency so that they could put in bids of their own, 2) call the market makers (4 to 6, at least), 3) call the floor and check price, and then 4) find best price and put up the trade. Anthony did only one of these—he had the floor broker put up the trade—skipping the other steps altogether.

131.    Because Anthony did not allow the floor brokers to first gauge their own interest and possibly contribute bids, Anthony caused the transaction to go through at a unit price of about a dollar lower than what other participants would have paid. This constitutes a market conduct rules violation.

132.    It also set off an uproar among the other BGC Financial traders. As the Series 30,
DOE was the first manager to hear about the incident. The Firm's other clients—who had not been
given the opportunity to participate in the trade—voiced their shock at Anthony denying them bids
on a trade that size.

133.    Moreover, because Anthony did not trade with the pit or "on the screen," as he was
required to do under applicable regulations and the Firm's own policies and procedures, he
received commissions and rebates not only from BlackRock but from the two market makers and
the floor broker. Had Anthony traded in compliance with regulations and internal policy and
procedure, he would have received a commission only from BlackRock.

134.    Aubin reacted not by admonishing Anthony but by bullying compliance. In an
email to Duchene and BGC Financial Chief Compliance Officer Michael Sulfaro on or about
October 2, 2015, Aubin demanded to know, "Did you talk to my guys before talking to me?"—
suggesting that Sulfaro had done something wrong by speaking to anyone else before conferring
with Aubin, even though Aubin had no direct knowledge of the violative conduct. Duchene quickly
placated Aubin to avoid further browbeating.

135.    In an email sent on or about October 5, 2015, DOE further explained his concerns
to Aubin about an inexperienced broker working in futures, crossing unsupervised, and the risks
that posed to BGC. DOE reminded Aubin that crossing at the wrong market level could open the
Firm to complaints from other market participants as well as regulatory investigation.

136.    "Crossing" at the wrong market level refers to cross trades that were not executed
at a price that corresponds to the prevailing market price when the trades were executed.[11]

---

[11] A "cross" trade occurs when a broker executes matched buy and sell orders for the same security across different
client accounts and reports them on an exchange. For example, if Client A wants to sell and Client B wants to buy, a
broker is permitted to match the two orders without sending them to an exchange to be filled. This type of trade is
only permitted if the broker reports the reports the transactions in a timely manner after they occur. The transactions

137.    Aubin replied that compliance "was fine with the trade" and "had no issue with it."

138.    DOE told Aubin that it was his duty to point out "potential risks to the business" but did not continue the argument. Plainly, Aubin—who had supervisory authority over DOE—had made up his mind.

139.    When BGC Financial traders and managers told Aubin how displeased their clients were with what had happened, he responded, "Tell them it will happen again." Scotto and McLoughlin sided with Aubin.

140.    Upon information and belief, Anthony and Aubin received additional improper inducements from the two market makers Anthony contacted and other market participants in the form of entertainment and/or other non-cash compensation that was not recorded on the Firm's travel and entertainment ("T&E") books.[12]

141.    Aubin administered T&E for BGC employees in New York, including Anthony. In his role as manager of the BGC Financial equities desk in New York, Anthony had signed off on T&E for all brokers on that desk, relaying his reports to Aubin for approval.

142.    DOE later learned that Anthony was not the only rogue trader in New York.

143.    In or around late April 2015, a trader named Mourad Jridi lost more than $800,000 trading on his laptop from his living room in an unauthorized institutional-sized cash trade in a risk arbitrage transaction. Because the trade was unauthorized, the loss was borne by BGC Financial and ultimately BGC Partners, not the client.

---

also must be time-stamped with the time and price of the cross, and the trades must be executed at a price that corresponds to the prevailing market price at the time.

[12] Anthony was a subject of the SEC's Order in Administrative Proceeding File No. 3-18598, released in July 2018. The Order outlined the issues relating to T&E record-keeping at BGC Financial—and the Firm's improper destruction of relevant recorded communications—but did not address the other supervisory issues DOE describes above.

144.     Jridi was employed in the New York office of BGC Financial. He was assigned to be monitored by Eugene Croddick, a Series 24 licensee managed by Bob Velez, an equities trading manager. Croddick and Velez had significant concerns about Jridi's trading activities, including his penchant for working from home and the abnormally high frequency of his trades, which often generated $500,000 to $800,000 per month in commissions. Croddick and Velez informed Duchene and Scotto of their concerns. Duchene and Scotto were also concerned.

145.     After engaging in detailed email and oral discussions with the Firm's compliance department about Jridi's trading, Velez told McLachlan at BGC Partners that he was no longer willing to supervise Jridi, given the risks Jridi posed to the Firm. McLachlan advised Velez to speak to Aubin about it.

146.     Aubin was unconcerned. He was equally unresponsive to the statements of the Firm's management in New York, including the compliance and HR departments, warning him that Jridi's trading posed an unacceptable risk.

147.     Nonetheless, Velez convinced Scotto to take on supervision of Jridi. Aubin agreed to share this duty with Scotto, although Aubin was rarely present in the New York office and therefore had little ability to effectively supervise Jridi.

148.     Just days after Velez was able to remove Jridi from his supervision, Jridi wrongly anticipated a client's position and traded ahead of the client's instructions. When Jridi received the client's instructions and saw that the trade had gone against the client, he doubled down, increasing the loss.[13]

---

[13] After Velez communicated his concerns regarding this and similar issues to Defendant Lynn and other executives at BGC Partners and BGC Financial, including Aubin and Scotto, BGC Financial terminated him at BGC Partners' direction in August 2016.

149.     The loss would not appear on a profit and loss statement until the next month, but Lutnick directed Aubin to find an immediate solution. Rather than reporting it to the Firm's insurer—probably because a loss due to unauthorized trading would not be covered—Lutnick told Aubin in a face-to-face meeting to find an internal source of funds to cover the loss.[14]

150.     Aubin chose DOE's New York and London pools as the source of those funds.

151.     Aubin's approval of Jridi's conduct was particularly troubling because the Firm was aware that brokers were not generally permitted to trade at home on their laptops, without supervision. On or about January 12, 2016, Dyanne Rosado, Deputy Director of Human Resources for Cantor Fitzgerald, sent an email that reminded employees about the Firm's work-from-home policy. The email emphasized that such arrangements were "rare," citing "security and compliance issues."

152.     DOE and others at the Firm found it odd that a Cantor HR employee authored a memorandum that should have been drafted and distributed by an internal BGC Financial compliance department—a department that did not exist apart from the rest of the Firm.

**B.      DOE Learns That the Firm is Not Properly Licensed in Singapore.**

153.     In Summer 2015, Lynn and Aubin directed DOE to assist with recruiting Elise Choukroun, a futures trader from Israel, to BGC Partners (Singapore) Limited. This task was well outside DOE's contractual duties but he wanted to be a team player, so he agreed.

154.     During the recruiting period, Choukroun visited the Singapore. When she returned, Choukroun told DOE that "something was off" there—the office was sparsely furnished and appeared to have few staff. Choukroun said, "It was like something out of that scene in *The Boiler Room*."

---

[14] After learning of the Jridi incident, Lutnick summoned Aubin to get on the next plane to New York from London to explain what had happened. Before this meeting, Aubin had told Velez he was afraid he would lose his job.

155.     When Mark Webster, BGC Partners' Executive Managing Director for East Asia based in Hong Kong, learned of Choukroun's visit to Singapore, he personally attacked DOE, sending him obscenity-laced emails and calling him "retarded." DOE then learned that the Singapore office did not have a license for futures trading, and Webster had no intention of getting one—and Choukroun's visit brought this circumstance to light. Though Choukroun could have worked in Singapore conducting other types of trades, Webster refused. He told DOE he "didn't want [the Monetary Authority of Singapore ("MAS")] involved."

156.     Instead of protecting DOE, Aubin took Webster's side, accusing DOE of "putting the BGC Franchise at risk."

157.     DOE turned to Eva Chan, HR Manager, VP – Asia Pacific for BGC Partners/Cantor Fitzgerald in Hong Kong, reaching out to her multiple times about Webster's abuse. Chan never responded. Defendant Lynn was also unresponsive to DOE's inquiries. The stress and confusion of this experience, which overlapped the work required to run the New York and London Desks, caused DOE to have a heart attack.

158.     DOE's heart attack kept him in the hospital for a week and out of the office for two more weeks. After DOE returned to work, he made efforts to clear up the Singapore issue with Defendant Lynn and to repair the damage to his relationship with the Firm done by Aubin and Webster.

159.     Attempting to move forward, in September 2015, DOE emailed Defendant Lynn, describing his recent work seeking more business for the Firm, specifically referencing certain institutions he had spoken to. Among these was LetterOne, a hedge fund that Russian oligarch Mikhail Fridman had set up in 2013. DOE told Defendant Lynn that the fund's Chief Information Officer ("CIO") Yves Leysen was at a meeting DOE had arranged and that Leysen mentioned that

he knew Defendant Lynn. Leysen had also mentioned having been on the board of BGC European GP Limited.[15] DOE also described the problems he faced in dealing with Webster and Aubin over Singapore and other issues, telling Lynn that the situation was bad enough to cause him to consider resigning despite his desire to continue his employment with the Firm.

160.    Less than nine hours later, Defendant Lynn responded by email, offering to "work out an exit" from the Firm for DOE. He later learned that Defendant Lynn had passed his complaint on to Aubin almost immediately.

161.    The Firm responded to DOE's efforts by escalating its campaign of retaliation. Immediately, Aubin summoned DOE to Amaitis' office in London (which Aubin routinely used) to reprimand him. Threatening to fire DOE, Aubin barked, "You'll go the way of Mike Riffice if you don't shut up!"

**C.     Aubin Claims a False Loss of $500,000.**

162.    In Q4 2015, after DOE and his team had been compensated as agreed for nearly a year, Aubin directed a Business Officer in Paris, Aldric Marinos, to recalculate the New York Desk's 2015 production.

163.    Marinos had no experience in listed products, exchanges, rebates, and the other specifics of DOE's teams' trading activities and, therefore, was not adequately equipped to understand how DOE's teams' trades should be accounted for. Nonetheless, Aubin directed Marinos to revise the accounting for DOE's Desks.

164.    Marinos' recalculation generated an on-paper loss of $500,000 for the New York Desk—meaning no bonuses for DOE and his team.

---

[15] That company is yet another BGC Partners subsidiary. Leysen also appears to have briefly parked his British securities licenses at BGC International and BGC Brokers L.P., where he was also a director, from 2009 to 2011 and from 2009 to 2014, respectively. *See* https://register.fca.org.uk/ShPo_IndividualDetailsPage?id=003b000000LUnzRAAT.

165.    DOE knew that the New York Desk had not lost money in 2015, but rather had profited, and that his team should receive bonuses. When he challenged the alleged loss, Aubin told him to "keep his mouth shut" and "stay focused on doing the job." Aubin implied that, if DOE cooperated, his and his teams' situation would improve in 2016.

166.    Not satisfied, DOE asked Marinos to explain his accounting. Marinos refused and further blocked DOE's access to the electronic and other files related to his teams' production in New York and London.

167.    DOE then enlisted the help of Tommy Attrill, a business analyst in the Firm's accounting department in London, who was familiar with the Desks' historical performance. Attrill had significant experience reconciling disputed figures throughout the Firm and had specifically calculated the profitability of the New York and London Desks in previous quarters.

168.    DOE asked Attrill to review Marinos' accounting. When Attrill began looking into the issue, Aubin and Marinos also worked to block *his* access to information. In response, Attrill submitted his resignation from BGC Partners. DOE convinced Attrill to delay his departure by a month in order to try to sort out the accounting that generated the false $500,000 loss.

169.    Despite BGC Partners' efforts to block his access, Attrill identified the accounting gymnastics that had produced the false loss. Attrill also discovered that, for several years, Aubin had been siphoning revenue from the New York and London Desks and assigning the revenue to other desks and offices, including the BGC Financial Chicago office, a non-client facing office (meaning its revenue was not generated by direct client trades and, accordingly, BGC Financial did not have to pay bonuses and other compensation out of the revenue booked in Chicago). Aubin refused to provide any information about monies "reassigned" to other offices from New York and London.

170.     Attrill explained that, to create the false $500,000 loss, Marinos first had improperly applied losses incurred by traders who, according to the agreement DOE made when he took over the New York Desk, were not supposed to be counted for purposes of the New York and London Desks' revenue pools. In April 2014, Aubin had confirmed that the Firm "had a deal" with Aubin about this.

171.     Second, Marinos retroactively characterized a $26,000 "override" DOE had already received from New York's Q4 2015 performance figures as an error and debited it to the New York Desk's revenue pool. However, this "override" had originally been paid to DOE by the Firm's management out of its general funds, not the New York Desk's pool. Accordingly, even if the "override" had been made in error, it should not have been debited from the New York Desk's pool but from the Firm's general fund, from which the override payment had been made.

172.     Third, Marinos excluded from the accounting revenues directly resulting from DOE's New York and London teams' trades, including but not limited to rebates paid by pit brokers to BGC Financial for trading activity executed directly with them on the CME. Specifically, Marinos excluded revenue from pit brokers rebating BGC Financial 7.5 cents per contract executed on the CME.[16] Marinos also excluded revenue generated from matched trades made with market makers. And, he excluded rebates from the CME that were customarily paid to BGC Financial when the Firm exceeded a certain threshold trading volume. DOE's trading teams

---

[16] BGC Financial was a non-clearing member of the Exchange and therefore ABN AMRO assumed those duties on behalf of the Firm. Aubin falsely claimed that ABN AMRO was charging BGC 7.5 cents per contract to pay for that service. He said that he had discounted that rate down to 1.5 cents for DOE's teams. The actual cost for ABN AMRO's services was, in truth, capped at about $125,000 per month for *all* trading teams at BGC Financial collectively, equaling a fee of roughly 1 cent per contract. Upon information and belief, this discrepancy enabled Aubin and/or BGC Financial, and ultimately BGC Partners, to skim revenue from DOE's teams in New York and London as a result. Aubin justified the theft of the rebate revenue that DOE's teams would otherwise have received, and which would have factored into their true production figures, by saying that the rebates were going towards paying for the discount of the clearing fees ABN AMRO allegedly charged.

enabled BGC Financial as a firm to meet this threshold, but by Marinos' new accounting they were not credited for having done so.

173.     Excluding revenue from pit broker and CME rebates, and matched trading involving market makers, had a severe impact on the New York trading desk's performance calculation for Q4 2015. For such trading, market makers in the U.S. paid BGC Financial commissions. In his recalculation, Marinos discounted these commissions altogether. Leaving out revenue generated from both matched trading and rebates enabled Aubin to deny DOE and his team in New York compensation due to them. It also enabled Aubin to offset "losses" against the London office, denying bonuses and other earned compensation to those traders as well.

174.     In Attrill's experience, Marinos' offset of false losses at the New York Desk against the London Desk was unprecedented.

175.     DOE also reviewed the offset with Annette Fong, BGC Partners' Head of Compliance for Europe. Fong holds CF11 licenses in the U.K. for Money Laundering Reporting and was likely the person at BGC Partners who would have had the most relevant experience and knowledge to understand the problems with Aubin's false accounting. Fong told DOE that Aubin's offsetting the "losses" in New York against the revenue of the London Desk was illegal.

176.     Fourth, Marinos excluded another $1 million in commission revenue earned by the New York Desk in Q4 2015, though BGC Financial had already claimed fifty percent (50%) of those funds as its share.

177.     Finally, Attrill also discovered that Marinos assisted Aubin in concealing the illegal siphoning of approximately $2.5 million in market maker matched revenue away from the New York and London Desks over a period of about three years.

178.    Because Attrill continued to examine Marinos' recalculation, BGC Partners sent him home, refusing to allow him access to any Firm information for the remainder of his notice period.

179.    DOE also spoke with John Skitt, an attorney serving as Group Head of Human Resources for the Firm, about the foregoing accounting issues and the retaliation he and Attrill were facing from Aubin. Skitt refused to discuss DOE's concerns. Instead, he dismissed them out of hand.

180.    Because he could not get answers from Aubin, in early 2016, DOE went further up the BGC Partners chain of command to address the accounting issue created by Marinos. DOE believed he had a duty to report his concerns, pursuant to BGC Partners' Policy on Reporting Possible Ethics Violations and Disciplinary Action (the "Policy") in effect at the time, which required employees to report violations to compliance. Compliance, in turn, was required "to maintain the confidentiality of the individual reporting the possible violation." Finally, the Policy "strictly prohibit[s]" retaliation for reporting violations. A copy of the Policy is attached hereto as **Exhibit C** and incorporated by reference as though fully set forth herein.

181.    On or about January 28, 2016, DOE emailed Scotto and McLoughlin, referencing "serious issues with regard to the accounting procedures that are in place at BGC." He asked Scotto and McLoughlin to engage in a discussion with him to "ensure that the correct revenue is being allocated" to the correct office. Neither Scotto nor McLoughlin responded.

182.    Within a week of the email to Scotto and McLoughlin, DOE learned that his communications had been forwarded to Aubin—in direct violation of the Policy.

183.    In early February 2016, DOE complained again to McLoughlin that accounting for the New York and London Desks was being improperly manipulated and, as a result, earned

34

bonuses were not being paid. DOE also provided this information to Rosado in HR; Sulfaro; and Haas. The stress associated with this process and Aubin's backlash caused DOE chest pains and other health problems.

184.    On or about February 4, 2016, DOE sent a follow-up email to Rosado, informing her that he had reported the accounting irregularities, including the losses arising from rogue trading, to Sulfaro because the NFA was scheduled to conduct an audit at BGC Financial on February 19, 2016. DOE reiterated his concerns about improper and illegal accounting practices at the Firm and said he would not lie about what was happening, despite pressures from Aubin.

**D.      The Firm Issues DOE an Unwarranted and Unsupported "Conduct Warning."**

185.    On February 8, 2016, Cantor Fitzgerald Director of Human Resources for the Americas Patricia Dreste gave DOE a conduct warning and placed him on administrative leave for two weeks—through February 19, 2016. The purported reason for the conduct warning was that DOE's conduct had been "inappropriate, unprofessional and insubordinate" and had "caused the Company to have serious concerns about your present ability to appropriately execute your duties and responsibilities." The letter also stated that DOE should have no communication with Cantor's commercial real estate arm, Newmark Grubb Knight Frank ("NGKF") while he was on leave. This directive made no sense to DOE, as he had never had any contact with that entity.[17]

186.    Before the February 8 conduct warning, the Firm had not given DOE any indication that it believed his conduct fell outside ordinary business standards. Nor did the Firm cite any internal document, such as the Employee Handbook, to support the conduct warning. Plainly, the

---

[17] As described in the Addendum attached as **Exhibit A**, DOE would later learn that entities tied to Cantor Fitzgerald's real estate businesses can be found on the ICIJ's Panama Papers database.

warning was pretextual: to exclude DOE from the NFA audit, scheduled for February 19, despite his status as the New York Desk's Series 30.

187.    The Firm also stated that it would "continue" an investigation into the allegations DOE had raised the week before. There is no record of any such investigation. Upon information and belief, to the extent there was any such investigation, it was a sham.

188.    Although the Firm was loath to investigate the misconduct DOE report, members of the Firm's legal department, including Deputy General Counsel Michael Popok, discussed having an internal team conduct an audit to protect the Firm.

189.    While on administrative leave, and believing that the Firm intended to fire him, DOE began looking for another job. During interviews with other firms, DOE spoke with Matt Kent, a Director at Sigma Broking Ltd. ("Sigma") in London. During that interview, DOE expressed concerns about non-solicit/non-compete issues. Kent told him that another former BGC employee named Rob Palmer "got around" such problems because he knew of the firm's "shady" accounting, including "illegal offshore payments" to executives through one subsidiary called "Tower Bridge," and another called "Seminole," "Seminole Financial," "Seminole Group," or "Seminole Holdings."

190.    Kent said Palmer also knew of BGC Partners and Cantor brokers registered and paid in one country while operating from another, a "tax dodge." He said that a trader named Alex Mouradian, a friend of Aubin, had such an arrangement while he was employed by BGC Brokers in London from 2009 to 2012. Specifically, Mouradian worked in BGC Brokers' office in Nyon, Switzerland but was registered in and paid from the company's Hong Kong office, allowing BGC Brokers to evade Swiss taxes and tighter regulation.[18]

---

[18] DOE subsequently learned that a BGC Brokers executive named Laurent Imbert, also Senior Managing Director of Seminole Financial Limited, had threatened to go to a BGC Partners shareholders meeting and expose the company

191.    Attrill confirmed the foregoing, particularly about Tower Bridge's role. Attrill had previously worked for Amaitis at Tower Bridge in its accounts department in London. He told DOE that he had routinely reviewed documents published internally by Tower Bridge called "BR Reports," and that such reports revealed the "tax dodge" of registering and paying brokers out of one office while they worked out of another that would receive less favorable tax treatment. When Attrill questioned this practice, BGC Partners executives told him that this was "nothing to worry about and not your concern."

192.    Attrill believed that entities like Tower Bridge and Seminole were part of a wider tax evasion scheme at BGC Partners. After reviewing BR Reports and other documents, Attrill determined that the Firm plays a "shell game" with its traders in Hong Kong, Switzerland, France, and Dubai, and possibly also with its traders in Florida. That is, the firm registers traders and books their revenue in one jurisdiction but directs or permits such traders to physically work in a different jurisdiction.

193.    Considering that Aubin had tried to move DOE's London trading team to France in 2012, and that Aubin and Mouradian had also worked at Paris-based commodities firm Compagnie Financière Tradition ("Tradition"), together, it was not far-fetched for DOE to conclude that Aubin played a central role in BGC Partners' "shell game" and "tax dodge."[19]

---

regarding financial misconduct. Upon information and belief, BGC Partners paid Imbert a large settlement for his silence.

[19] Aubin had also recently been named director of a new U.K.-based company called Lake Securities Limited, housed at BGC Partners' offices in London. This company was incorporated in the U.K. in July 2015 but kept its brokers in Geneva, Switzerland. Two of DOE's team members in London, Nigel Roberts and Lester Saunders, put market crosses through the exchanges for these brokers when they were apparently unable to do so themselves. Roberts and Saunders noted that many of these crosses were facilitated in the single stock equity space with a high turnover of trades. They also questioned where the Geneva brokers were registered, finding it odd that they were placed in Geneva, Switzerland rather than BGC Brokers' facilities in Nyon, only a half hour away, and while their firm was based in the U.K.

194.     Kent later told a market maker at Ronin Capital, Tim O'Leary, that DOE had interviewed at Sigma. O'Leary, also a friend of Mouradian, passed this information to Aubin, causing further retaliation against DOE.

### E.     The Firm Issues DOE a Second Unwarranted and Unsupported "Conduct Warning."

195.     On or about February 22, 2016, DOE's first day back in the office after his forced leave, Rosado and Dreste called him into a meeting with Aubin to interrogate him about his internal reporting. After DOE defended his statements, Dreste issued DOE another "conduct warning," based on alleged "off-contract" payments to, among others, a trader named Andrew Chiles in London.

196.     In fact, the payments DOE had made were standard bonus payments to his team, as authorized by the Agreement with BGC Financial.

197.     Furthermore, "off-contract" payments clearly were not prohibited by BGC Partners' "management policies"—as evidenced by Scotto's demand that Aubin, and Aubin's displacement of that demand onto DOE, pay Haas $10,000 to act as the New York Desk's Series 30 until DOE received his Series 30 license.

198.     After the February 22 meeting, DOE told Rosado and Dreste that, if they refused to continue their attempts to falsely pin things on him, he would have no choice but to report their conduct to the SEC.

199.     On or about February 23, 2016, DOE again contacted Rosado and Dreste, demanding that they withdraw the conduct warnings. DOE also informed them that he was aware of the rogue trading that had resulting in Jridi's $800,000 loss. He questioned the Firm's decision to have him sign off on listed products trading activities without any knowledge of such activities

right before a scheduled NFA audit. The Firm's conduct was not only improper, but exposed DOE individually to possible regulatory backlash.

200.   Aubin then offered to retract the conduct warning if DOE would sign a non-disclosure agreement. Treating DOE like a child, Aubin "took away" his supervision of the London Desk. Aubin promised to give it back, but only if DOE was a "good employee"—meaning, DOE would no longer bring his concerns to compliance or any other internal authority without first speaking to Aubin about them. Aubin also required DOE to retract his complaints of retaliation.

201.   Aubin told DOE that, in any event, he could not report internally without Aubin's knowledge: "You talk to anybody at BGC, you're talking to me. There's no use talking to anyone else. We all talk to each other and we all know everything."

202.   Sulfaro repeated this, admonishing that DOE could not get around speaking with Aubin before reporting to compliance: any more internal reporting would "just get you thrown back to the business," meaning all such reporting would be conveyed to Aubin.

**F.    The Firm Demands that DOE Rubber-Stamp Trading Activity, Despite His Reasonable Concerns About Compliance.**

203.   On or about March 14, 2016, DOE received an email from compliance with the subject "Weekly Transaction Review." The email asked him to "vote approve on the review forms."

204.   DOE refused to do so, on the ground that he did not have complete information about the trading activities he was being asked to approve. DOE had only recently learned that the Firm was allowing traders to trade unsupervised from laptops at home, in addition to allowing Anthony to trade unsupervised from another area in the building.

205.   Sulfaro told DOE that the Firm would not permit him to reject the Weekly Transaction Review because signing off on the New York Desk's activities provided necessary

evidence that DOE was reviewing trading activity in accordance with the Firm's policies and procedures and CFTC and NFA regulations.

206.    DOE responded that he would sign off when the Firm would report accurately to regulators, rather than what the Firm was telling him to do. DOE further informed Sulfaro that he would not sign off until the Firm followed procedure correctly. What Sulfaro was suggesting appeared to DOE as "doublethink," a directive to sign off on activities he knew were noncompliant as a means of demonstrating the Firm's compliance with applicable regulations.

207.    Given that the Firm was demanding that DOE approve trading activities as compliant with CFTC and NFA procedures and regulations whether he had supervised them or not—in violation of his core duties as the Series 30 for the New York Desk—DOE's objections were reasonable.

208.    McLoughlin then got involved, recommending that DOE recuse himself because the Firm needed a "proper supervisor" for the New York Desk.

209.    Shortly thereafter, McLoughlin forwarded this email correspondence to Aubin, who demanded that DOE contact him.

210.    The email correspondence establishes that the Firm treated the Series 30 for the New York Desk as a "rubber stamp," expecting the supervisor to sign off regardless of his concerns about whether trading activities complied with CFTC and NFA regulations. It also reveals that the Firm failed to take DOE's concerns about its lack of compliance seriously, reinforcing the conclusion that the conduct warnings the Firm issued to DOE, and its later termination of DOE's employment, ordered by BGC Partners executives, were retaliatory.[20]

---

[20] The Firm ultimately withdrew all the conduct warnings it had issued to DOE, despite ongoing resistance by HR Head John Skitt, who said, "This guy's never going to give up."

211.     On or about March 15, 2016, Aubin admitted in an email to DOE that, in fact, there had been no $500,000 loss on the New York Desk. However, Aubin refused to have the false accounting corrected or restore any of the $2.5 million he had siphoned away from the New York and London Desks.

212.     In May 2016, aware that DOE was still interviewing at other firms, O'Leary emailed him, copying others at BGC Financial, saying that he had "let Deutsche Bank know what a terrible broker you are" and said, "hopefully they won't be hiring you now."[21]   O'Leary said he "hoped BGC's Compliance Department was reading this email."

213.     DOE emailed Aubin to complain about O'Leary's conduct. Aubin answered that he had "known O'Leary for years" and would "take care of it."

### G.     DOE Reports His Concerns About Accounting Issues to Cantor Fitzgerald's Deputy General Counsel.

214.     On or about May 5, 2016, in his capacity as a whistleblower, DOE emailed Popok, providing details about the New York Desk's accounts, explaining his and Attrill's concerns with Marinos' accounting, and identifying the rogue trades as problematic. DOE specifically noted that the Chicago desk showed a large profit for Q4 2015, evidence at least of "improper accounting practice." At most, and of significant concern, the Chicago desk's profit showed accounting fraud.

---

[21] DOE had not interviewed with Deutsche Bank during this period. He could not make sense of O'Leary's statement until he learned of Deutsche Bank's connections to the Firm and Ronin Capital on the Panama Papers, as described in the Addendum attached as **Exhibit A**. Considering Defendants' connections to Deutsche Bank, and the recent hiring of former Deutsche Bank co-CEO Anshu Jain as President of Cantor Fitzgerald, O'Leary's statements take on new significance. Jain left Deutsche Bank in 2015 amid scandals in which the firm was forced to pay massive fines to authorities on both sides of the Atlantic over manipulation of interest rates and money laundering, as well as pleading guilty to criminal charges in the U.S. On June 7, 2019, Jain was added to the list of suspects in an ongoing German criminal probe of the Cum-Ex tax deals. The deals being reviewed by Cologne prosecutors took place roughly between 2007 and 2012, overlapping the period when Jain was responsible for the London-based investment-banking arm of Deutsche Bank.

215.    Popok failed to substantively respond. Accordingly, on May 9, 2016, DOE, through counsel, made a formal Whistleblower Complaint (the "Complaint") to the Firm, detailing the regulatory violations he had discovered and the Firm's campaign of retaliation against him as a result of his reports of such violations. The Complaint is attached hereto as **Exhibit D** and incorporated by reference as though fully set forth herein.[22]

216.    When he received the Complaint, Popok quipped, "You can't shit a shitter."

217.    In or around June 2016—six months after DOE reported the regulatory violations, accounting manipulation, and fraud—Annette Fong, BGC Partners' Head of Compliance for Europe, left the Firm. Dyanne Rosado, the Firm's Deputy Director of Human Resources, also left.

218.    On or about July 11, 2016, Popok told DOE that the Firm had conducted a formal investigation and found no accounting fraud. Popok offered no details to support this conclusion. Nor did he address Aubin's March 2016 admission that there was no $500,000 loss in New York. Popok claimed that there had been "no retaliatory acts" and that the Firm's internal policies had been followed.

219.    Regarding other issues, such as rebates, market maker matches, and other payments due to the New York and London Desks, as well as expenses those desks carried as an ongoing burden, Popok deferred to Lynn and Windeatt, who also refused to address the issues DOE had raised.

**H.    Under Mounting Pressure, BGC Partners Escalates Its Retaliation Against DOE, Pulling Out All Stops.**

220.    Throughout the summer and fall 2016, O'Leary's attacks on DOE and his teams became more frequent and intense. O'Leary seemed to believe he had been given *carte blanche* to

---

[22] The Complaint also references the fact that DOE had reported his concerns regarding accounting, internal controls, auditing, and other matters, including the conduct of BGC Partners to its outside whistleblower counsel, Morgan, Lewis, & Bockius, LLP.

continue his attacks. In one email, he wrote, "As long as I do business with BGC no one can do anything." O'Leary's conduct prompted other traders at the Firm to join DOE in complaining to the Firm's compliance and legal departments.

221.    Popok, Sulfaro, and William Shields, Chief Compliance Officer and Assistant General Counsel at Cantor Fitzgerald, took steps to address O'Leary's harassment, including contacting Ronin's compliance department. But Aubin directed them to stand down, saying he alone would deal with O'Leary: "Everyone has to respect what I say about Ronin." Popok, Sulfaro, and Shields complied.

222.    DOE again contacted the Firm's internal and outside counsel about the compliance and compensation issues he and his trading teams continued to face. At a meeting with the Firm's internal counsel, DOE reiterated the numerous violations of his contracts and the ongoing retaliation he was experiencing.[23] He further reported on the Firm's failure to properly account for rebates from the CME and pit brokers that his teams' production generated.[24] Finally, DOE reported that the Firm's improper accounting meant that his teams subsidized the costs associated with the Firm's clearing of trades for *all* trading centers at BGC.

223.    DOE also reiterated his request that the Firm stop Aubin's continuing retaliation, reminding Mulligan that he had a heart attack and had been hospitalized several times as a result. Milligan claimed that the Firm was "investigating" the issues DOE reported. DOE never received any follow-up or report about the purported investigation. Nor did Popok offer any solutions.[25]

---

[23] Only Emily Milligan, the Firm's Assistant General Counsel, was physically present. Popok failed to show up and Shields attended part of the meeting via speakerphone.

[24] In the Riffice and Walton FINRA arbitrations referenced above, upon information and belief, Aubin has given conflicting testimony regarding rebates, market maker matches, and other related issues. The issue of rebates has been a lingering problem at the Firm, affecting the compensation of other managers besides DOE.

[25] Popok separated from Cantor Fitzgerald in March 2019 after losing FINRA Arbitration Case No. 15-00142 in New York City, a case the Firm dragged out for several years. Plaintiffs, former BGC Financial employees, sought damages

224.    In fall of 2016, after encountering intense resistance from the Firm's designated reporting channels, DOE opened an investigation with the SEC.

225.    Meanwhile, the retaliation against DOE escalated and, upon information and belief, Amaitis, Lutnick, Fraser, and possibly other top Firm executives joined the effort to silence DOE. These executives were motivated to become involved because DOE continued to report possible money laundering at the Firm—an issue about which Amaitis and Lutnick were particularly sensitive, for two reasons.

226.    First, CG Technology had recently endured a federal money laundering probe, pursuant which it agreed to pay $22.5 million in fines.[26] U.S. Attorney Robert L. Capers of the Eastern District of New York, who headed the investigation into CG Technology, described the problem: "Cantor Gaming quickly grew into one of the largest race and sports book operators in the United States [and] became a place where at least two large-scale illegal bookmakers could launder their ill-gotten proceeds."[27]

227.    IRS Criminal Investigation Chief Richard Weber told Bloomberg News, "Cantor Gaming bet on never getting caught but this wager didn't pay off. Financial transactions always leave a money trail and IRS-CI Special Agents relentlessly follow that trail."[28] The operation involved an offshore sportsbook in Costa Rica, as well as books Amaitis ran for CG Technology in Las Vegas.

---

for breach of contract, violation of New York's labor laws, defamation, slander, hostile work environment, discrimination, and retaliation. The award included a significant sum for retaliation by the Firm in particular.

[26] In 2013 CG Technology had been fined $3.5 million for violating Nevada Gaming Board regulations. Vice President Michael Colbert was charged with enterprise corruption, first, third, and fourth-degree money laundering, and fifth degree conspiracy.

[27] *See*  https://www.bloomberg.com/news/articles/2016-10-03/cantor-funded-business-said-to-pay-22-5-million-to-end-probe.

[28] *Id.*

228.    During the probe, Amaitis told another Firm executive, Michael Colbert,[29] that he would "be crucified in New York"—meaning, by Lutnick, who was the only person Amaitis answered to at the time. Amaitis' fear of discipline over a relatively small sum of money reveals the control Lutnick maintained over CG Technology, and over Amaitis.[30]

229.    In light of Lutnick's reaction to the $800,000 loss caused by rogue trader Jridi, and how he handled it with Aubin, it was reasonable for DOE to believe that Lutnick and Amaitis had become involved in the Firm's retaliation against him.

230.    The second issue motivating these executives to become involved, and contributing to the Firm's severe reaction to DOE's internal reports, was a November 2016 federal lawsuit filed by investors against GAW Mining, LLC ("GAW"), et al. The suit named Cantor Vice Chairman Stuart Fraser as a "controlling person," due to his involvement in cryptocurrency mining. The suit also implicated Lutnick and other Cantor executives, as well as the Firm's legal, compliance, and accounting departments. Indeed, the complaint states: "On information and belief, Fraser approached [Lutnick] about investing in GAW Miners. But, according to an October 31, 2014 message written by Fraser, 'Howard is supportive. Only wants us to make a shitload. But not be involved.'"

231.    The SEC had filed a similar case against GAW the year before, in which it said that GAW bore "the hallmarks of a Ponzi scheme." Both suits alleged that, from August through December 2014, the defendants sold—to over 10,000 investors—investment contracts representing shares in the profits they claimed would be generated from using their purported computing power to "mine" for virtual currency.[31]

---

[29] In 2013, Colbert was charged with multiple counts of money laundering.

[30] Lutnick was also CG Technology's founder and was majority owner throughout the relevant period.

[31] According to the SEC complaint, "'Mining' for virtual currency means applying computer power to try to solve complex equations that verify a group of transactions in that virtual currency. The first computer (or collection of

232.    Fraser was a mentor to GAW's founder Homero Garza and had an eighty percent (80%) stake in the enterprise. The investor plaintiffs called him a "culpable participant" in the fraud, involving investment units called "hashlets."[32] Investors' returns on them were, according to the SEC, "mostly paid by using the money invested by others"—by definition, a Ponzi scheme.

233.    According to the investors' complaint, Fraser used his position at Cantor to introduce investors to Garza and GAW. He involved not only the Firm's legal, compliance, and accounting resources, but also what he referred to as a "9/11 fund." The "hashlets" involved a graphic depicting the outline of the Pentagon housing an image of the World Trade Center's twin towers. *See* **Exhibit E**, attached. Upon information and belief, none of the proceeds from the sale of these hashlets ever went to any charity.[33]

234.    Lutnick plainly was aware of and supported GAW's operations, including the "9/11 fund."

235.    The Firm's campaign of harassment and retaliation, both direct and through O'Leary, continued to compromise DOE's physical and mental health. DOE consulted several doctors in order to take care of himself and maintain his high level of performance for the Firm. Rather than allow him to do so, the Firm impeded DOE's ability to do his job and began to create a pretext for firing him.

---

computers) to solve such an equation is awarded new units of that virtual currency. This process is known as 'mining,' and the computer equipment used in this process, and the humans who own it, are known as 'miners.'"

[32] For a description of how these "hashlets" work, *see* http://cryptominingasic.com/gaw-miners-hashlet-explained/.

[33] DOE has also examined the accounting of the Cantor Relief Fund's 9/11 Global Charity Day event, in which traders employed by BGC Partners subsidiary and affiliated firms worldwide are required to give up all gross revenue for that trading day as celebrities do trades with institutional clients in their stead. In 2015, DOE arranged to have actor Samuel L. Jackson attend the Charity Day with him. The way BGC Partners handled Mr. Jackson's contributions led DOE to take a closer look at the company's IRS Forms 990 for the past several years. The accounting is incomplete and misleading. BGC Partners and Cantor Fitzgerald do not generate or maintain complete records of the actual revenue generated by the celebrities and do not fully report other related sources of revenue or costs involved in generating such revenue to the IRS and tax authorities in other countries. This is an international tax issue, much like Aubin's improper transfer of $2.5MM away from the New York and London Desks.

236.    During Election Week 2016 in the U.S., a time of very heavy trading—especially in futures—Aubin worked to prevent DOE from accessing the London office. Aubin claimed that DOE had not provided a note from his doctor stating that he was cleared to return to work—which was not required.

237.    Despite these efforts, DOE and his teams in New York and London posted one of their best quarters yet, producing a two hundred fifty percent (250%) gain in revenue over 2015. Nonetheless, the harassment and retaliation continued, causing DOE to experience chest pains and dizziness in mid-November 2016.

238.    Fortunately, DOE did not have a second heart attack, although he was hospitalized for five days. During that time, Aubin constantly texted, emailed, and called him, demanding immediate responses. DOE was physically unable to respond to Aubin's barrage of communication as fast as Aubin demanded.

239.    Given his health and the stress of dealing with Aubin, DOE asked the Firm to limit his work schedule. On or about November 21, 2016, the Firm agreed to do so. But the Firm refused to allow DOE to report to someone other than Aubin, and Aubin's retaliation continued.

240.    Anthony Warner, a general manager with BGC Partners in London who had previously worked for the Firm in Singapore, offered DOE a job with Mint Partners ("Mint"), a division of BGC Financial, L.P. DOE refused. Had he accepted such offer, DOE would have lost the New York and London Desks, as well as considerable compensation. And his trading teams would have competed against rather than supported him.

241.    Warner's offer is further evidence of the Firm's retaliation against DOE, as Warner essentially tried to push DOE into a demotion.

242.    In attempting to get the Firm to rectify the regulatory issues he observed, and to address the retaliation he was being subjected to, DOE had repeatedly asked HR for the name of the person responsible for BGC Partners' Code of Conduct and internal whistleblower procedures, to no avail. Finally, in November 2016, HR directed DOE to Pion.

243.    On or about November 30, 2016 DOE met with Pion and Shields and reported the regulatory compliance violations and accounting irregularities he had observed. He also reported the retaliation he had suffered. To ensure that his report was complete, DOE sent a lengthy follow-up email to Pion.

244.    At that time, DOE did not know that Pion was the CEO of Tower Bridge, the company DOE had previously learned might be involved in tax evasion and money laundering for the Firm. Nor did DOE know that Shields was on the verge of becoming the CCO of Sunrise Brokers, LLC, a FINRA member firm owned by BGC Partners subsidiary BGC Partners, L.P., with connections to Cyprus, as described in **Ex. A**.

245.    On December 1, 2016, the Firm ordered DOE to attend a Tandberg videoconference with Aubin. None of the HR personnel resident in New York, with whom DOE had been dealing, was present. Instead, Eva Chan, who had recently transferred to New York from Hong Kong, sat behind him.[34] Chan refused to tell DOE why she was now involved or why she had not returned any of his calls when Webster had been attacking him by email the year before.

246.    Aubin questioned DOE about his recent statements to HR and others at the Firm, but made an effort not to mention Pion. Aubin appeared shaken. He revealed that he had been planning to replace DOE as manager of the New York and London Desks for nearly a year.[35]

---

[34] In September 2016, Eva Chan had transferred to New York and became Senior HR Generalist, VP for Cantor Fitzgerald.

[35] DOE had questioned Aubin about this issue before, and Aubin had said it was "just market rumors"—meaning Aubin had spent nearly a year lying to DOE about his ongoing efforts to replace him.

247.    DOE told Aubin that he was seeing physicians for stress and anxiety as well as for the heart condition he developed due to Aubin's conduct. Chan seemed surprised to learn that DOE had suffered a heart attack in summer 2015.

248.    When DOE asked for clarification about the Q4 2015 "loss" and other accounting irregularities, Aubin's admission that there was no loss, and possible money laundering in general at the Firm, Aubin abruptly left the videoconference. It appeared that he was receiving guidance from someone off camera.

249.    Aubin returned a few minutes later, but when DOE again raised the issue of money laundering, Aubin, again appearing prompted to do so, brought the Tandberg to an immediate close.[36] Visibly disturbed, Chan abruptly got up and left the conference room.

250.    The day after the Tandberg conference, the Firm reneged upon the bargain it had made with DOE on November 21, 2016 (*see* ¶ 239, above). Chan refused to give DOE a copy of her minutes from the meeting.

251.    Despite the December 1 Tandberg, BGC Financial alleged in written correspondence that DOE had "failed to comply" with Aubin's requests to communicate and again put DOE on administrative leave.

252.    The Firm also stated that it was "exercising its right to submit you to separate examinations by a qualified mental health professional and a licensed physician, to be scheduled by the Company, with doctors selected by the Company[.]" The Firm provided no support for this claimed "right," and DOE is not aware of any such support.

253.    DOE was also instructed not to enter any premises of BGC Partners or its affiliates or perform any work for the Firm.

---

[36] Upon information and belief, Lutnick and/or Amaitis accompanied Aubin on the Tandberg.

254.     The allegedly qualified mental health professional was a doctor located in Port Jefferson, New York, approximately two hours outside Manhattan. He had been sued previously for his role in helping the New York School System fire a teacher by falsely diagnosing him with mental illness. Upon information and belief, Amaitis has family in Port Jefferson, including a relative who works for the New York School System.

255.     The allegedly qualified physical health professional, a doctor who was an infectious diseases specialist, had been sued previously for misdiagnosing a patient with HIV.

256.     After scheduling appointments for DOE with these doctors, the Firm sent written correspondence to each doctor, in which the Firm explained in detail DOE's recent health issues as well as certain of DOE's concerns about being supervised by Aubin. The Firm then listed the essential functions of DOE's job and asked each doctor to evaluate whether DOE was fit to perform them.

257.     Aside from reporting Aubin, the essential functions of DOE's job at the Firm were tasks arising from the requirements of his Series 30 license, including understanding and providing information about trades to clients, executing trades, and understanding and complying with rules and regulations. Individuals outside the specialized financial industry in which DOE is employed, no matter how educated or intelligent, are simply not trained to perform or fully understand these tasks.

258.     The Firm's correspondence to the doctors was an unadorned attempt to obtain a vote of "no confidence" in DOE's ability to perform his job, given the Firm a pretext to terminate him.

259.     The Firm wrote several more letters to DOE in the following weeks, attempting to reschedule the appointments, and threatening termination, either for "insubordination" or lack of

fitness for the job, if DOE failed to comply. Such terms are found in DOE's Agreement with BGC Financial; the Firm deliberately posed the dilemma to DOE of complying, and being fired on the pretext of incapacity, or refusing to help the Firm discredit him and being "insubordinate."

260.    DOE again refused to attend the medical appointments, although Popok now joined in the Firm's efforts in pressuring him to do so. Shields and Pion were included in email communications about these efforts. Popok refused to speak with DOE's counsel and tried to blame DOE and his counsel for the breakdown in communications.

261.    On January 31, 2017, the Firm terminated DOE's employment in a letter sent by Dreste, even though DOE had already given notice for February 1, 2017. The termination was directed by Defendant Lynn.

262.    Had the Firm not preempted DOE's notice, DOE would have been entitled to a $250,000 bonus and other monies he earned during Election Week.

263.    The Firm's preemptive termination of DOE was further retaliation for his internal whistleblowing.[37]

264.    A few days after DOE's termination, he received cryptic communications via LinkedIn from Kamal Haider, a friend of Aubin's and CEO of BGC Partners-affiliated company Kyte Broking Limited. Haider feigned curiosity about DOE's situation and where he would be seeking future employment. Haider was obviously fishing for negative comments.

265.    In spring 2017 as DOE submitted whistleblower reports to other regulators, BGC Partners continued to encourage O'Leary to defame him, including by telling potential employers that DOE was "a drug addict and alcoholic." O'Leary's false and defamatory statements obstructed DOE's efforts to find an equivalent position at commodities trading firms ICAP and R.J. O'Brien.

---

[37] Failing to follow BGC Partners' own internal procedures, Dreste in HR did not call DOE in for an exit interview.

266.    Around this time, as DOE began researching BGC Partners', Cantor Fitzgerald's and Ronin's corporate structures, he learned that these entities, as well as companies owned by O'Leary himself, have a connection to the Panama Papers, suggesting that O'Leary's attempts to destroy DOE's career were motivated by more than a personal grudge.[38]

267.    Undersigned counsel Christopher H. Tovar contacted Ronin's general counsel James Griffin and demanded that O'Leary cease and desist from all harassment of DOE. Griffin refused, and said that, should a suit be brought for defamation, Ronin CEO Stafford would "fight to the death" allegations about O'Leary and that Stafford "had all the time and money in the world." For about a year after this exchange, however, O'Leary fell silent.

268.    In mid-2017, the Firm demanded repayment of just over £257,000 for payments it claimed to have made on DOE's behalf to British tax authorities for tax year 2014-15 on capital gains associated with his Newton Plan shares. The Firm declined to produce an accounting of the shares giving rise to the tax, and refused to provide other information DOE needed to resolve the tax issue and to value his shares.

269.    DOE's counsel requested information about Tower Bridge and other entities likely involved in handling transactions related to DOE's partnership shares. Mark Snelling, Director of Legal for the Firm, operating in the capacity of Data Protection Officer for Tower Bridge International Services, L.P., and acting by its General Partner, Tower Bridge GP Limited, refused to provide any of the requested information.[39]

---

[38] As described in the Addendum attached hereto as **Exhibit A**, Aubin also appears to have at least one company listed on the ICIJ database.

[39] As DOE describes in the **Exhibit A**, Snelling is a corporate officer of many companies comprising a latticework of entities BGC Partners and Cantor Fitzgerald and their subsidiaries and affiliates may use to launder money around the world. Additional information regarding Tower Bridge GP Limited is also included in **Exhibit A**.

270.    When DOE's counsel continued to seek information about Tower Bridge, BGC Partners abandoned its demand that DOE reimburse it for the purported tax payments.

271.    The Firm made no attempt to recoup these purported payments until well after they were allegedly made, or for months after the Firm had fired DOE. Upon information and belief, the Firm used the purported tax to harass DOE in retaliation for submitting whistleblower reports to SEC and other regulators, including regulators in the U.K.

272.    On December 11, 2017, the Firm alleged in written correspondence that, by taking a job with Square Global, a London-based brokerage, DOE had violated the terms of the Partnership Agreement he had signed in 2012, when he joined BGC Brokers in London.[40] As already alleged, DOE has no recollection of signing any such agreement and does not believe he did so. In any event, as of November 7, 2013, when DOE became a member in BGC Services, DOE was no longer a partner in BGC Holdings and, thus, no longer subject to the Partnership Agreement.

273.    The Firm further stated that, as a result of the alleged violation, DOE had forfeited Partnership Units that had been awarded to him in 2013, as well as other payments due to him.

274.    However, on May 24, 2017, after DOE's counsel had confronted Ronin about O'Leary's ongoing defamation, the Firm released DOE from his "gardening leave" and, thus, his non-compete obligations as of June 1, 2017—two months early. Aubin was copied on that letter conveying this release.

275.    The Firm's error—telling DOE he had forfeited his shares—was obviously willful and retaliatory. DOE's counsel attempted to resolve this issue with the Firm in written correspondence but received no response. DOE still has not received shares that are rightfully his.

---

[40] DOE had joined Square Global in November 2017 and left that firm in August 2018. Eva Brunot, VP and Assistant General Counsel at the Firm, authored the December 11, 2017 letter.

276.    In September 2018, when DOE was hired by BGC Partners' rival Tradition—where Aubin had previously worked—the Firm, Ronin, and O'Leary renewed their campaign to put DOE out of work. An associate of O'Leary, a trader named David Blewett, began spreading rumors at Tradition that DOE "has a drinking problem," and Ronin stated that it will not work with Tradition if DOE remains with the firm. An email between Tradition employees Stuart Giles and Dan Marcus on or about September 4, 2018, states: "Did you hire a futures guy named [DOE]? Reason I ask is I am trying to onboard Ronin to NY futures and they said if he works at Tradition NYC they will NOT deal with us."[41]

277.    The Firm also refused to provide full and accurate information regarding the circumstances of DOE's termination in January 2017, impede DOE's onboarding at Tradition for several weeks. The issue was resolved only after the FCA became involved.[42]

278.    More recently, DOE learned Aubin has threatened to terminate and sue anyone at BGC Partners or any affiliated company who speaks to him.

279.    The retaliation Defendants have inflicted upon DOE has resulted in permanent physical and psychological injury, as well as financial losses in the millions of dollars.

280.    The wrongful actions of Defendants have cost DOE more than two years of compensation that would have otherwise amounted to more than two million dollars, as well as partnership share value and other compensation that would have amounted to several million dollars more.

---

[41] The word "they" shows that O'Leary was not acting alone in this campaign. Rather, Ronin CEO John Stafford and others he directed were likely involved in sending the message to Tradition.

[42] Previously, when DOE was onboarding at Square Global, he learned that the Firm had not updated his records with the FCA regarding his termination date, causing delay there as well. The Firm has apparently done this with several other brokers; FCA rules require that a firm report a broker's separation within seven (7) days.

281.    Defendants' wrongful actions have also permanently damaged DOE's health. After his heart attack and related health issues that Defendants have worsened through their more recent actions against him, DOE has been diagnosed with Chronic Fatigue Syndrome ("CFS"), which significantly limits his longevity in this business and impairs his day-to-day living.[43] The possibility that he will not be able to continue as a trader and manager in listed products at all spells the loss of several millions more in lost future earnings.

282.    DOE has also spent several hundred thousand dollars on moving and other logistical expenses of relocating his family to London, medical bills in the U.S. and the U.K. for health problems Defendants caused and/or exacerbated, legal bills associated with bringing these claims and in dealing with U.K. tax authorities and regulators in multiple countries, and other costs that he would not have incurred had Defendants not engaged in their campaign of abject retaliation.

283.    DOE has worked diligently to mitigate his losses, but Defendants persist in their efforts to end his career in the securities industry.

284.    Like other BGC Partners-employed managers who have come before him, DOE has had his career and life permanently damaged by a Firm that acted in a manner calculated to either silence him as he uncovered supervisory and accounting irregularities, or worse, to destroy him as a member of the securities industry and as a human being. The information contained in the Addendum attached as **Exhibit A** sheds significant light on their motivations for doing so.

285.    As demonstrated by the above, DOE's warnings to his employers regarding the activities of Aubin and other BGC Partners-employed and controlled personnel were clearly true

---

[43] CFS is the common name for Myalgic Encephalomyelitis (ME). ME/CFS is a long-term, chronic, and devastating multi-system disease that causes dysfunction of the neurological, immune, endocrine and energy metabolism systems. It is a fluctuating neurological condition that affects many body systems, most commonly the nervous and immune systems. ME/CFS affects an estimated 250,000 people in the U.K., and around 17 million people worldwide. People with ME/CFS experience debilitating pain, fatigue, and a range of other symptoms associated with post-exertional malaise, or the body and brain's inability to recover after expending even small amounts of energy.

and made in good faith, and his harassment, suspension, and termination were unlawful retaliation for his attempt to stop illegal activity at BGC Partners and its subsidiaries and affiliated companies.

## FIRST CAUSE OF ACTION
### Violations of the Dodd-Frank Whistleblower Statute
### (Against all Defendants)

286.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 285 as if fully set forth herein.

287.    BGC Partners is a publicly traded company having SEC reporting obligations. Defendant Lynn was President of BGC Partners throughout the relevant period.

288.    Tower Bridge, BGC Holdings, and BGC Services are wholly owned subsidiaries of BGC Partners.

289.    At all relevant times, Plaintiff was employed by and provided services to BGC Partners and its various subsidiaries, including BGC Brokers and BGC Financial.

290.    On multiple occasions between 2014 and 2017, Plaintiff reported to individuals in the Firm's compliance and legal departments his reasonable belief that the Firm was not properly supervising its traders, was engaging in improper and illegal accounting, including possible money laundering, and that the Firm was committing other violations of federal securities and tax laws.

291.    Plaintiff reasonably expected that his concerns would be addressed and that any misconduct would be reported to the SEC.

292.    Instead, Plaintiff was unlawfully suspended, demoted, and discharged in retaliation for his reporting of these securities and tax law violations.

293.    Defendants' retaliation took place after Plaintiff had initiated an investigation with the SEC Office of the Whistleblower regarding his concerns.

294.     After Plaintiff's discharge, the Corporate Defendants continued to retaliate by defaming Plaintiff to prevent him from obtaining equivalent employment in the securities industry. In addition, the Corporate Defendants denied Plaintiff deferred compensation that was due to him and confiscated shares he was entitled to receive in retaliation for his ongoing reports to regulators, including but not limited to the SEC.

295.     Section 922 of the Dodd-Frank Act, 15 U.S.C. § 78u-6, prohibits an employer from discharging a whistleblower because of any lawful act done by the whistleblower in providing information to the SEC regarding potential violations of the federal securities laws *or* in making disclosures that are required or protected under the Sarbanes-Oxley Act, the Securities Exchange Act of 1934 (15 U.S.C. 78a *et seq*.), or any other law, rule or regulation subject to the jurisdiction of the Commission.

296.     Plaintiff's internal reports regarding accounting fraud and money laundering, as well as violations of applicable regulations and federal securities laws at BGC Partners, BGC Financial, Tower Bridge, and other BGC Partners subsidiaries was protected by Section 806 of the Sarbanes-Oxley Act, 18 USC § 1514A. The Firm's termination of Plaintiff based upon these internal reports violates the Dodd-Frank Whistleblower Statute, 15 U.S.C. § 78u-6.

297.     As a result of Defendants' violations of the Dodd-Frank whistleblower statute, Plaintiff has been injured in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
#### Breach of Contract
#### (Against Corporate Defendants)

298.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 297 as if fully set forth herein.

299.    Plaintiff entered into valid and binding contracts with each of the Corporate Defendants, together and separately.

300.    The contracts promised that Plaintiff would receive deferred compensation. The contracts further promised that Plaintiff would not suffer retaliation for the reporting of wrongdoing at the Firm.

301.    The Corporate Defendants have breached their contracts with Plaintiff by harassing, suspending, demoting, and terminating him for refusing to engage in and/or conceal illegal behavior by his supervisor and others at the Firm.

302.    The Corporate Defendants have also breached their contracts with Plaintiff by refusing to pay monies due under the contracts related to deferred compensation in the form of performance bonuses, and by retaliating against him for reporting wrongdoing, including Defendants' illegal activities during the relevant period.

303.    As a direct result of Defendants' actions, Plaintiff has suffered damages, including consequential damages, in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**Breach of Covenant of Good Faith and Fair Dealing**
**(Against Corporate Defendants)**

304.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 303 as if fully set forth herein.

305.    Under New York law, all contracts contain an implied covenant of good faith and fair dealing.

306.    The covenant of good faith and fair dealing includes a pledge that neither party to the contract will do anything to destroy or injure the rights of the other party to receive the fruits of the contract.

307.    By denying Plaintiff deferred compensation owed to him, the Corporate Defendants breached their duties of good faith and fair dealing.

308.    By confiscating Plaintiff's shares in BGC Holdings and/or BGC Services, the Corporate Defendants breached their duties of good faith and fair dealing.

309.    By terminating Plaintiff's employment after Plaintiff had already given notice but before the notice period had run, thus denying Plaintiff earned compensation, the Corporate Defendants breached their duties of good faith and fair dealing.

310.    The Corporate Defendants' bad faith conduct warrants awarding Plaintiff punitive damages, so as to deter such harmful employment practices in the future.

311.    As a direct result of the Corporate Defendants' actions, Plaintiff has suffered damages, including consequential damages, in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
### Tortious Interference with Contract
### (Against Defendant Lynn)

312.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 311 as if fully set forth herein.

313.    Defendant Lynn knew that Plaintiff had a valid and binding employment contract with the Corporate Defendants.

314.    Defendant Lynn intentionally, maliciously, and without justification induced a breach of Plaintiff's contract with his employers by, among other things, causing Aubin and others at the Firm to harass, suspend, demote, and terminate Plaintiff.

315.    Defendant Lynn interfered with Plaintiff's contract because Plaintiff refused to engage in and/or conceal illegal conduct by Defendants and others at the Firm.

316.    As a direct result of Defendant Lynn's actions, Plaintiff has suffered damages, including punitive damages, in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**Prima Facie Tort**
**(Against All Defendants)**

317.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 316 as if fully set forth herein.

318.    Defendants have intentionally inflicted harm upon Plaintiff without excuse or justification by harassing, suspending, demoting, and terminating Plaintiff without lawful basis and by denying Plaintiff bonus and other compensation to which he was entitled by virtue of work already performed.

319.    Defendants have also inflicted harm upon Plaintiff without excuse or justification by making defamatory and derogatory statements to others in the securities industry with the intent to prevent Plaintiff from obtaining suitable equivalent employment.

320.    Defendants' actions were motivated solely by disinterested malevolence.

321.    As a direct result of the Defendants' actions, Plaintiff has suffered consequential and punitive damages, in an amount to be determined at trial.

322.    Plaintiff has also suffered specialized and particularized damages, including injury to his health and reputation, causing him to incur medical bills and suffer lost wages. Plaintiff is entitled to recover specialized and particularized damages in an amount to be determined through discovery.

## SIXTH CAUSE OF ACTION
### 10b-5 Securities Fraud
### (Against Corporate Defendants)

323.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 322 as if fully set forth herein.

324.    The Corporate Defendants repeatedly made false and misleading statements to Plaintiff regarding the shares they required him to purchase in the Newton Plan.

325.    These statements began in late 2012, when Aubin informed Plaintiff that he would be required to contribute ten percent of his compensation to the Newton Plan. Aubin specifically told Plaintiff that he would be entitled to withdraw his investment at any time, subject to management approval. Aubin also specifically told Plaintiff that management approval was not difficult to obtain.

326.    These statements continued in early 2014, when McLoughlin persuaded Plaintiff to invest in and join the BGC Services partnership. McLoughlin told that Plaintiff the tax rate applied to his compensation would be lower if he joined the BGC Services partnership.

327.    McLoughlin also told Plaintiff that he would be able to withdraw his investment in BGC Services at any time, subject to management approval, which would not be difficult to obtain.

328.    McLoughlin did not inform Plaintiff that the Partnership Units he had been granted in BGC Holdings in 2012 would be converted to shares in BGC Services.

329.    No accounting was provided when Plaintiff's Partnership Units were converted to shares in BGC Services, preventing Plaintiff from learning the value of his Partnership Units.

330.    Plaintiff was never informed that he might never receive the full value of his Partnership Units or other Newton Plan shares.

331.    Aubin, McLoughlin, and others at the Firm also provided false and inaccurate information about the valuation of Plaintiff's investments and the benefit of the "deferred compensation" component of these investments.

332.    These representations were made with the intent to induce Plaintiff to invest, or to remain invested, in BGC Partners. These representations were also made with the intent of driving up BGC Partners' share prices and to camouflage the Firm's misleading accounting practices.

333.    Plaintiff did not know that Aubin's and McLoughlin's statements were false and misleading. Had he known, Plaintiff would not have purchased or otherwise acquired shares in the Newton Plan or, if such acquisition was a necessary component of employment, would not have accepted or continued employment with the Firm.

334.    Plaintiff relied on Aubin's and McLoughlin's statements and omissions in deciding to invest in and join the BGC Services partnership.

335.    In 2015 and 2016, Plaintiff repeatedly asked individuals in the Firm's accounting, compliance, and legal departments for information sufficient to determine the value of the shares he was required to purchase and/or that were awarded to him. The Firm failed and refused to provide verifiable calculations and historical financial statements supporting the represented redemption valuations of such shares.

336.    Instead, the Firm presented a black box investment scheme and a demonstrated pattern of untimely, inaccurate, incomplete, and contradictory reporting that left Plaintiff uninformed regarding such valuation.

337.    The Corporate Defendants have prevented Plaintiff from redeeming his Newton Plan shares, while the Corporate Defendants continue to profit from Plaintiff's invested funds.

338.    The Corporate Defendants have offered no reasonable options for Plaintiff to liquidate, as Aubin and McLoughlin, as well as others in the Firm, promised he would be able to do.

339.    The Corporate Defendants' primary liability, and controlling person liability, arise from the following facts: (i) the Corporate Defendants' personnel, including but not limited to Defendant Lynn and Aubin, were senior officers, executives and/or directors during the relevant time period, and they were members of the Corporate Defendants' management teams or had control thereof; (ii) each of these Corporate Defendants' personnel, by virtue of his responsibilities and activities as a high-level officer, executive and/or director of the Corporate Defendants, was privy to and participated in the creation and development of the Newton Plan and the false and misleading financial statements generated by the Corporate Defendants; (iv) each of these above-named the Corporate Defendants was aware that their statements to Plaintiff regarding the Newton Plan were materially false and misleading.

340.    The Corporate Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

341.    The Corporate Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of inducing investment and thereby allowing their officers, executives, and directors to profit by collecting certain management/administrative fees from the investment and associated arrangement without providing Plaintiff, the investor, any real benefit.

342.    The Corporate Defendants exhibited conduct that was highly unreasonable, grossly negligent, and intentionally deceiving, because Corporate Defendants failed to provide Plaintiff

with truthful, timely and accurate prospectuses or other detailed information regarding the financial instruments Plaintiff purchased and/or was awarded.

343.    The conduct of these Corporate Defendants was an extreme departure from the standards of ordinary care provided to investors.

344.    By virtue of the foregoing, Corporate Defendants violated §10(b) of the '34 Act, and Rule 10b-5(a), (b) and (c) promulgated thereunder.

345.    As a direct and proximate result of Corporate Defendants' wrongful conduct, Plaintiff suffered damages in connection with his purchases of the Newton Plan shares during the relevant period in an amount to be proven at trial.

346.    Plaintiff's damages include, but are not limited to, BGC Partners share valuations based on Plaintiff's gross earnings invested during the relevant period, plus increased tax liability, loss profits, and interest.

### SEVENTH CAUSE OF ACTION
**Common Law Fraud**
**(Against All Defendants)**

347.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 347 as if fully set forth herein.

348.    Throughout the relevant period, Defendants made false statements to Plaintiff regarding his employment status and their contractual obligations to him.

349.    Specifically, Aubin told Plaintiff that the revenue of certain brokers would not be included in his Pool.

350.    Plaintiff relied on Aubin's representation in accepting employment with the Firm, to his detriment. Had Plaintiff known Aubin's statement was false, he would not have accepted employment with the Firm.

351.    Aubin also told Plaintiff that it was permissible, even required, for him to make a personal payment to Kristi Haas while he studied for the Series 30 exam.

352.    Plaintiff relied on Aubin's statement and made the payment to Haas, to his detriment. Had Plaintiff known that Aubin's statement was false, he would not have made the payment to Haas.

353.    Plaintiff also relied on Aubin's and McLoughlin's statements regarding investment in Newton Plan shares, including statements about redemption liquidity, to his detriment. Had Plaintiff known Aubin's and McLoughlin's statements were false, he would not have invested and continued to invest in the Newton Plan.

354.    Plaintiff reasonably relied on relied on Aubin's, McLoughlin's, and others' false statements. As a result, Plaintiff suffered significant financial injury as a result of such reliance.

355.    As a direct and proximate result of Defendants' fraud, Plaintiff has suffered money damages in an amount to be proven at trial.

### EIGHTH CAUSE OF ACTION
**Fraud in the Inducement**
**(Against All Defendants)**

356.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 355 as if fully set forth herein.

357.    In forming the employment agreements and other related employment contracts with Plaintiff, the Defendants made misrepresentations or omissions of material fact which they knew to be false. Defendants made such statements with the intention of inducing Plaintiff's reliance. Plaintiff reasonably relied on Defendants' statements, which caused him injury.

358.    Specifically, at the time Defendants induced Plaintiff to sign the employment agreement with BGC Financial, they made misstatements of present facts related to the soundness

of the compliance culture at the Firm, Plaintiff's actual role or roles in the Firm to be performed in New York, and how he would ultimately be compensated and/or expensed.

359.    Defendants also had a preconceived intention of not performing their obligations to Plaintiff under the employment agreement.

360.    As a direct and proximate result of Defendants' fraud, Plaintiff has suffered money damages in amounts to be proven at trial collectively, plus interest and attorneys' fees.

**NINTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(Against All Defendants)**

361.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 360 as if fully set forth herein.

362.    Defendants owed fiduciary duties to Plaintiff during the relevant period when they solicited Plaintiff to invest in the Newton Plan and to carry out the Firm's business objectives. Defendants owed Plaintiff duties of care, loyalty and full disclosure. Defendants also owed a duty to act in Plaintiff's best interest.

363.    Defendants intentionally breached their duties in one or more of the following ways:

A.    Failing to accurately represent and report BGC Partners' valuations of Newton Plan shares;

B.    Failing to provide fair, accurate and timely accounting and financial records of Plaintiff's investments in BGC Holdings and BGC Services;

C.    Failing to accurately represent how investment funds were collected, invested, allocated, and distributed in any given year to Plaintiff;

D.    Failing to provide a solid investment that offered growth;

E.    Failing to effectively facilitate deferment of taxes and other related benefits;

F.  Providing unreasonable, inconsistent, ever-changing and disparate redemption valuations without clear or reliable explanations or documentations;

G.  Co-mingling assets by and between the Defendants and putting their own interests in maximizing their own personal profits above the interests of Plaintiff;

H.  Providing no vesting schedule for Plaintiff's shares of BGC Partners;

I.  Refusing to allow Plaintiff to redeem his shares; and

J.  Misappropriating and converting revenues generated by Plaintiff that constituted his earnings.

K.  Plaintiff has been damaged in amounts to be proven at trial as a result of breaches of their respective fiduciary duties by the Defendants.

364.  As a direct and proximate result of Defendants' breach, Plaintiff has suffered money damages in amounts to be proven at trial collectively, plus interest and attorneys' fees.

## TENTH CAUSE OF ACTION
### Conversion
### (Against All Defendants)

365.  Plaintiff repeats and realleges the allegations in paragraphs 1 through 365 as if fully set forth herein.

366.  Defendants interfered with Plaintiff's possession of compensation he had earned by providing services to the Firm, to the exclusion of his owner's rights in them.

367.  Defendants intended to deprive Plaintiff of such compensation.

368.  Defendants did so through schemes including but not limited to compulsory contributions to the Newton Plan, the sale of eSpeed, and the Charity Day events Plaintiff was required to participate in during the relevant period.

369.  As a direct and proximate result of the Defendants' conversion, Plaintiff has suffered money damages in an amount to be proven at trial, plus interest and attorneys' fees.

**ELEVENTH CAUSE OF ACTION**
**Unjust Enrichment**
**(Against All Defendants)**

370.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 369 as if fully set forth herein.

371.    By providing services to Defendants, Plaintiff conferred a benefit on Defendants.

372.    Specifically, Defendants capitalized and profited from the compensation earned by but not paid to Plaintiff, through the unlawful retention of Plaintiff's investment in the Newton Plan and by clawing back shares awarded pursuant to the sale of eSpeed.

373.    Defendants also relied on Plaintiff's association with BGC Partners to solicit other financial service firms and clients to conduct business with BGC Partners, generating revenue for the Firm.

374.    Defendants were further unjustly enriched by Plaintiff's forced participation in BGC Partners' annual Charity Day event, in which BGC Partners and its executives misappropriated funds raised by Plaintiff.

375.    Defendants have been unjustly enriched in an amount to be proven at trial.

376.    Despite demand, Defendants have not paid Plaintiff for the benefits they received by reason of Plaintiff's provision of services.

**TWELFTH CAUSE OF ACTION**
**Accounting**
**(Against Corporate Defendants)**

377.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 376 as if fully set forth herein.

378.    By their conduct alleged above, the Corporate Defendants and entities and/or persons they control committed fraud and conversion against Plaintiff and breached fiduciary duties owed to him.

379.    Defendants' fraud, conversion, and breaches of fiduciary duty led to dispersion of assets misappropriated from Plaintiff.

380.    In order to discover and trace the whereabouts of assets misappropriated from Plaintiff, an accounting is required from the Corporate Defendants and entities and/or persons they control, as described herein, and in the Addendum attached hereto as **Exhibit A**.

**THIRTEENTH CAUSE OF ACTION**
**RICO 18 U.S.C. S 1962(c) & (d)**
**(Against All Defendants)**

381.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 380 as if fully set forth herein.

382.    Defendants' conduct alleged above, and in the Addendum attached hereto as **Exhibit A**, constitutes the conduct of an enterprise through a pattern of racketeering activity under 18 U.S.C. § 1962.

383.    Defendants' conduct constitutes indictable acts under 18 U.S.C. § 1961(1)(B) and "fraud in the sale of securities" (*see* Second Cause of Action, *supra*) under 18 U.S.C. § 1961(1)(D).

384.    Defendants' racketeering activity compromises a pattern because the acts, omissions, and conduct at issue: (1) occurred well over 2 times in the past 10 years; (2) had the same purpose, participants, victims, and methods of commission; and (3) occurred over a substantial period of time.

385.     As a direct and proximate result, Plaintiff has suffered damages in an amount to be proven at trial and Plaintiff is entitled to treble damages, attorneys' fees, and costs pursuant to 18 U.S.C. § 1964(c).

## FOURTEENTH CAUSE OF ACTION
### Defamation
### (Against All Defendants)

386.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 385 as if fully set forth herein.

387.     Throughout the relevant period, Defendants and their agents have made false and disparaging statements about Plaintiff and/or caused others to do so on their behalf. These statements include that Plaintiff was unfit to perform his duties at the Firm, which disparaging Plaintiff to his co-workers and others in the securities industry.

388.     As described above, Tim O'Leary of Ronin admitted to disparaging Plaintiff to Deutsche Bank. In fall of 2018 individuals directed by and acting on behalf of Ronin falsely told Plaintiff's current employer, Tradition, that Plaintiff "has a drinking problem."

389.     Agents of Ronin also told Tradition that Ronin would not do business with it if Plaintiff remained employed there.

390.     Such publication to third parties orally and in written email communications, without privilege or authorization, and fault amounting to at least negligence have irreparably harmed Plaintiff's personal and business reputation, constituting defamation per se.

391.     Defendants are jointly and severally liable by virtue of their involvement in defaming Plaintiff and are therefore liable to Plaintiff for money damages in amounts to be proven at trial.

## FIFTEENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (Against All Defendants)

392.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 391 as if fully set forth herein.

393.    Defendants have acted toward Plaintiff in a manner meant to cause intimidation, fear, and severe emotional distress.

394.    By defaming Plaintiff as "having a drinking problem" to his present employer, Tradition, and stating that they would not work with Tradition so long as Plaintiff was employed there, Ronin and its agents, acting at the direction of Defendants, have intentionally (or recklessly) caused severe emotional distress, mental trauma and bodily harm to Plaintiff.

395.    This, and such other extreme and outrageous behavior by Defendants against Plaintiff, as described herein, has led Plaintiff to seek medical attention. He presently fears another heart attack and/or other health problems as a result of the trauma of knowing that Defendants seek to put him out of another job and blacklist him from the securities industry altogether.

396.    Defendants are jointly and severally liable by virtue of their involvement in intentionally inflicting emotional distress upon Plaintiff and are therefore liable to Plaintiff for money damages in amounts to be proven at trial.

## SIXTEENTH CAUSE OF ACTION
### Civil Conspiracy
### (Against All Defendants)

397.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 396 as if fully set forth herein.

398.    Defendants conspired to retaliate against Plaintiff for internally reporting accounting fraud, theft, and supervisory failings at the Firm, and for reporting same to regulatory

agencies including but not limited to the SEC, both while he was employed by the Firm and after his termination.

399.     As a direct and proximate result of the actions taken in furtherance of this conspiracy, Plaintiff was damaged in an amount to be determined at trial.

400.     Defendants are jointly and severally liable to Plaintiff.

### SEVENTEENTH CAUSE OF ACTION
### Violations of New York Labor Law ("NYLL")
### (Against All Defendants)

401.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 400 as if fully set forth herein.

402.     At all relevant times, the Corporate Defendants jointly employed Plaintiff, or employed Plaintiff through a single entity.

403.     Defendants, through their retaliatory actions described herein, denied Plaintiff unpaid deferred compensation in an amount to be proved at trial.

404.     Plaintiff seeks attorneys' fees and costs as required by NYLL § 198(1-a).

405.     Plaintiff seeks liquidated damages in an amount equal to the unpaid deferred compensation as required by NYLL § 198(1-a).

406.     Plaintiff seeks prejudgment interest in an amount of 9 percent per annum as required by NYLL § 198(1-a).

407.     Plaintiff seeks interest to run as required by NYLL § 198(1-a).

### ATTORNEYS' FEES AND COSTS

408.     Plaintiff's attorneys' fees and costs, including expert witness costs, are compensable in this matter pursuant to the Dodd-Frank Act. In addition, an award of attorneys' fees and costs are particularly warranted in this matter as Plaintiff has repeatedly and in good faith

attempted to negotiate a reasonable resolution of this dispute without having to refer the matter to this forum for adjudication.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff seeks judgment in his favor and against Defendants, as follows:

A.    Reinstating Plaintiff to his position at BGC Financial with the same seniority status that he would have had but for the discrimination and retaliation or providing him with front pay in lieu thereof;

B.    Awarding Plaintiff two times the amount of back pay he is owed, with interest;

C.    Awarding Plaintiff the deferred compensation he was due pursuant to his employment contract with reasonable interest;

D.    Compensating Plaintiff for litigation costs; including expert witness fees and reasonable attorneys' fees;

E.    Finding that Defendants committed intentional torts against Plaintiff and granting Plaintiff a punitive damages award; and

F.    Granting such other and further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: October 11, 2019                    Respectfully submitted,

                                           PUGH HAGAN PRAHM PLC

                                           By: */s/Siobhan Briley*
                                               Siobhan Briley
                                               sbriley@pughhagan.com
                                               425 E. Oakdale Blvd., Suite 201
                                               Coralville, IA 52241
                                               Tel: (319) 351-2028
                                               Fax: (319) 351-1102
                                               *Attorney for Plaintiff John Doe*


                                           LAW OFFICES OF CHRISTOPHER H.
                                           TOVAR, PLLC

                                           By: */s/Christopher H. Tovar*
                                               Christopher H. Tovar
                                               christopher.h.tovar@gmail.com
                                               3990 Chilson Road
                                               Howell, MI 48843
                                               Tel: (832) 370-3908
                                               *Attorney for Plaintiff John Doe*